**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 1:16-cv-6221 |
| v. | ) ) | |
| NCR CORPORATION | ) ) | Judge Manish S. Shah |
| Defendant. | ) ) ) | |

**DEFENDANT NCR CORPORATION'S OPPOSITION TO PLAINTIFF'S RENEWED**
**MOTION FOR CONDITIONAL CERTIFICATION AS COLLECTIVE ACTION AND**
**ISSUANCE OF NOTICE PURSUANT TO 29 U.S.C. § 216(B)**

Date:   June 19, 2017

Respectfully submitted,

NCR Corporation

By:____*/s/ Thomas E. Hill*_____
Thomas E. Hill (admitted *pro hac vice*)
Christina T. Tellado (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:  (213) 457-8000
Facsimile:  (213) 457-8080
Email:  thill@reedsmith.com
Email:  ctellado@reedsmith.com

James A. Burns, Jr. (Bar No. 3126908)
REED SMITH LLP
10 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 207-1000
Facsimile:  (312) 207-3890
Email:  jburns@reedsmith.com

Counsel for Defendant

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND .............................................................................. 4

        A.      NCR's Structure And CE Workforce ...................................................... 4

        B.      NCR's Timekeeping System And Policies Regarding "Off-The-Clock" Work .......... 5

        C.      NCR's Open Door Policy And The Differences Between CEs, Territories And
                States ....................................................................................................... 8

III.    ARGUMENT ..................................................................................................... 14

        A.      Legal Standard ...................................................................................... 14

        B.      Plaintiff Cannot Establish A Nationwide Corporate Policy Or Plan That
                Requires CEs To Work "Off-The-Clock" .............................................. 18

                1.      Plaintiff Has Failed To Show That The Individuals He Seeks To
                        Represent Are Similarly Situated ............................................... 22

                        a.      The Variations In CEs' Work Locations Weighs Heavily Against
                                Certification ..................................................................... 22

                        b.      The Individualized, Fact-Intensive Inquiries Necessitated By
                                Plaintiff's Claims Also Weigh Heavily Against Certification ......... 24

                2.      To The Extent Conditional Certification Is Granted, Plaintiff's
                        Proposed Form And Method Of Notice Is Inappropriate ............. 26

IV.     CONCLUSION .................................................................................................. 26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adair v. Wisconsin Bell, Inc.*,
    2008 WL 4224360 (E.D. Wis. Sept. 11, 2008)......................................................14, 16, 20, 26

*Allen v. City of Chicago*,
    2015 WL 8493996 (N.D. Ill. Dec. 10, 2015) ..........................................................................21

*Allen v. Payday Loan Store of Ind., Inc.*,
    2013 WL 6237852 (N.D. Ind. Dec. 3, 2013) ..............................................................15, 18, 25

*Anderson v. McCarthy, Burges & Wolff, Inc.*,
    2015 WL 224936 (N.D. Ohio Jan. 15, 2015)........................................................................17

*Basco v. Wal-Mart Stores, Inc.*,
    2004 WL 1497709 (E.D. La. July 2, 2004) ...........................................................................25

*Bernard v. Household Int'l, Inc.*,
    231 F. Supp. 2d 433 (E.D. Va. 2002) ...................................................................................25

*Blakes, et al., v. Illinois Bell Tel. Co.*,
    2011 WL 2446598 (N.D. Ill. June 15, 2011) ...........................................................4, 15, 20, 26

*Boelk v. AT &T Teleholdings, Inc.*,
    2013 WL 3777251 (W.D. Wis. July 19, 2013).......................................................................21

*Boyd v. Alutiiq Glob. Sols., LLC*,
    2011 WL 3511085 (N.D. Ill. Aug. 8, 2011) ..........................................................................14

*Bradley v. Arc of Nw. Ind., Inc.*,
    2015 WL 2189284 (N.D. Ind. May 11, 2015) ................................................................15, 25

*Brand v. Comcast Corp.*,
    135 F. Supp. 3d 713 (N.D. Ill. 2015) .....................................................................................3

*Brown v. Club Assist Rd. Serv. U.S., Inc.*,
    2013 WL 5304100 (N.D. Ill. Sept. 19, 2013) .......................................................................14

*Bunyan v. Spectrum Brands, Inc.*,
    2008 WL 2959932 (S.D. Ill. July 31, 2008) ....................................................................15, 17

*Collazo v. Forefront Educ., Inc.*,
    2010 WL 335327 (N.D. Ill. Jan. 28, 2010) ...........................................................................22

*Dager v. City of Phoenix*,
  Case No. 2:06-cv-01412 JWS, Doc. 36 (D. Ariz. Dec. 15, 2006) ..........................................15

*Drake v. Aerotek, Inc.*
  2015 WL 6554592 (W.D. Wis. Oct. 29, 2015).........................................................................16

*Dudley v. Texas Waste Sys., Inc.*,
  2005 WL 1140605 (W.D. Tex. May 16, 2005) ........................................................................25

*England v. New Century Fin. Corp.*,
  370 F. Supp. 2d 504 (M.D. La. 2005).............................................................................16, 25

*Espenscheid v. DirectSat*,
  2011 WL 10069108 (W.D. Wis. 2011)....................................................................................3

*Forney v. TTX Co.*,
  2006 WL 1030194 (N.D. Ill. Apr. 17, 2006) ..........................................................................24

*Gromek v. Big Lots, Inc.*,
  2010 WL 5313792 (N.D. Ill. Dec. 17, 2010) .........................................................................14

*Hadley v. Journal Broad. Group, Inc.*,
  2012 WL 523752 (E.D. Wis. Feb. 16, 2012) .....................................................................15, 18

*Harrison v. McDonald's Corp.*,
  411 F. Supp. 2d 862 (S.D. Ohio 2005) ..................................................................................25

*Hawkins v. Alorica, Inc.*,
  287 F.R.D. 431 (S.D. Ind. 2012)...........................................................................................15

*Haynes v. Singer Co.*,
  696 F.2d 884 (11th Cir. 1993) ..............................................................................................15

*Hoffmann-La Roche v. Sperling*,
  493 U.S. 165 (1989)............................................................................................................15

*Holt v. Rite Aid Corp.*,
  333 F. Supp. 2d 1265 (M.D. Ala. 2004) ................................................................................14

*Horne v. United Servs. Auto. Ass'n*,
  279 F. Supp. 2d 1231 (M.D. Ala. 2003) ................................................................................22

*Howard v. Securitas Sec. Servs., USA Inc.*,
  2009 WL 140126 (N.D. Ill. Jan. 20, 2009)......................................................................15, 20

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005)..............................................................................................................25

*In re Amer. Family Mut. Ins. Co. Overtime Pay Litig.*,
  2009 WL 248677 (D. Colo. Feb. 3, 2009) ...........................................................26

*Kellar v. Summit Seating Inc.*,
  664 F.3d 169 (7th Cir. 2011) ...........................................................................21

*Lawrence v. City of Philadelphia*,
  2004 WL 945139 (E.D. Pa. Apr. 29, 2004) ........................................................25

*MacGregor v. Farmers Ins. Exch.*,
  2011 WL 2981466 (D.S.C. July 22, 2011) ..........................................................16

*Mares v. Caesars Entm't, Inc.*,
  2007 WL 118877 (S.D. Ind. Jan. 10, 2007) .........................................................20

*Marsh v. Butler County Sch. Sys.*,
  242 F. Supp. 2d 1086 (M.D. Ala. 2003) ........................................................15, 25

*Martin v. Citizens Fin. Grp., Inc.*,
  2013 WL 1234081 (E.D. Pa. Mar. 27, 2013) .......................................................16

*Martinez v. Regency Janitorial Servs., Inc.*,
  2012 WL 252230 (E.D. Wis. Jan. 26, 2012) ........................................................15

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) .............................................................................14

*Pacheco v. Boar's Head Provisions Co., Inc.*,
  671 F. Supp. 2d 957 (W.D. Mich. 2009) ............................................................16

*Payne v. Pauley*,
  337 F.3d 767 (7th Cir. 2003) ...........................................................................20

*Postiglione v. Crossmark, Inc.*,
  2012 WL 5829793 (E.D. Pa. Nov. 15, 2012) .......................................................23

*Powers v. Centennial Communs. Corp.*,
  679 F. Supp. 2d 918 (N.D. Ind. 2009) ...............................................................16

*Sandifer v. US Steel Corp.*,
  678 F.3d 590 (7th Cir. 2012) ...........................................................................25

*Scott v. NOW Courier, Inc.*,
  2012 WL 1072751 (S.D. Ind. Mar. 29, 2012) .................................................15, 17

*Sheffield v. Orius Corp.*,
  211 F.R.D. 412 (D. Or. 2002) ..........................................................................25

*Steger v. Life Time Fitness, Inc.*,
  2016 WL 245899 (N.D. Ill. Jan. 21, 2016) ................................................................15, 16, 25

*Strait v. Belcan Eng'g Group, Inc.*,
  911 F. Supp. 2d 709 (N.D. Ill. 2012) ..........................................................................15, 16

*Taillon v. Kohler Rental Power, Inc. ex rel. Kohler Co.*,
  2003 WL 2006593 (N.D. Ill. Apr. 29, 2003) .......................................................................14

*Valcho v. Dallas County Hosp. Dist.*,
  574 F. Supp. 2d 618 (N.D. Tex. 2008) ...............................................................................17

*Velasquez v. HSBC Finance Corp.*,
  266 F.R.D. 424 (N.D. Cal. 2010) ......................................................................................23

*Williams v. Accredited Home Lenders, Inc.*,
  2006 WL 2085312 (N.D. Ga. July 25, 2006) ................................................................24, 25

**Statutes**

29 U.S.C. § 207(a)(1)-(2) ..........................................................................................................25

29 U.S.C. § 216(b) .............................................................................................................14, 26

**Rules**

F.R.C.P. 30(b)(6) ......................................................................................................................17

**Regulations**

29 C.F.R. § 254(a)(1)(2) ........................................................................................................3, 25

29 C.F.R. § 785.11.14 ..............................................................................................................26

## I.  __INTRODUCTION__

In his renewed motion for conditional certification ("Renewed Motion"), Plaintiff Meadows only offers more of the same; *i.e.*, more of the same bare assertions and unsubstantiated conclusions that this Court previously found insufficient to support the conditional certification of a _nationwide_ collective of _more than 4,300 individuals_.  (*See* Order dated January 10, 2017, Dkt. No. 118, hereinafter referred to as the "January 10 Order.")  But more of the same is not enough to compel a different conclusion; to the contrary, Plaintiff's reliance on more of the same simply confirms the merits of and justification for this Court's original decision.

As, explained herein, the record evidence makes clear that Plaintiff and his Opt-in declarants were not, in the words of this Court, "victims of a common policy or plan that violates the law." (January 10 Order, at *1-2)  Rather, the evidence shows that the proposed collective consists of thousands of individuals who performed different work, for different customers, pursuant to different schedules, under different supervisors, across 70 different NCR territories, located in 50 different states. Thus, while members of the putative collective may share the same job title (*i.e.*, customer engineer or "CE"), resolving the "off-the-clock" wage claims of this diverse population of CEs will require a highly individualized examination of their work habits, timekeeping practices, and, most tellingly, the instructions (if any) that they received from their Territory Managers ("TMs") regarding what *not* to record as hours worked.

The declarations submitted by Plaintiff in support of his Renewed Motion demonstrate that there is no evidence of a _common corporate policy_ requiring "off-the-clock" work – a policy by which the claims of all members of the proposed collective can be resolved.  Instead, these declarations present a smorgasbord of different and often inconsistent allegations regarding the pre- and post-shift activities required by NCR, some of which are candidly described as absurd by the Opt-ins who have been deposed in this case.  (*See generally*, Dkt. No. 136, Ex. E)  Although some of the declarants

contend that "[p]er NCR policies" they were "instructed to enter" their start-of-shift time when they arrived at the first customer site of the day, and their end-of-shift time when they completed their last job of the day – *all in direct contradiction of NCR's written policies* – not one of the declarants identifies a written NCR policy that required this timekeeping practice. (*See, e.g.*, Dkt. No. 136, Ex. E, at *3, ¶ 10; Brian Taylor Declaration.) In that regard, there is no evidence – none! – that NCR's individual TMs or other management personnel have acted in accordance with some common corporate plan or policy to require "off-the-clock" work, or that NCR supervisors have uniformly instructed CEs not to record all of their work time. Indeed, the certified time records and compensation histories of Plaintiff and his declarants confirm that CEs *routinely record* more than 40 hours of work in a workweek, and are paid fully for that time, including all overtime.

The deposition testimony taken from Plaintiff and three of his declarants exposes the utter lack of evidentiary support for the Renewed Motion.[1] This testimony confirms that CEs self-report their time and are paid for all the time they do report. No one instructed these deponents to under-report their time or prevented them from recording their time accurately, and they are aware of NCR's express written policies prohibiting "off-the-clock" work. In fact, these deponents confirm that some CEs are paid for *all* of their commute time, and that some CEs perform "off-the-clock" tasks for their *own personal convenience*, knowing that such work is prohibited and not expecting to be compensated for it. Overall, this testimony completely refutes the existence of a uniform, corporate-wide policy to require or encourage "off-the-clock" work.

The simple truth is that Plaintiff has now failed twice to make the required showing that his

---

[1] Following the January 10 Order, NCR sought to take the depositions of just six of the Opt-in declarants; Daniel Conrad, Christopher Flood, Thomas McCartney, Jared Nyaberi, Bryan Seaton and Patrick Williams. Despite NCR's multiple requests for the availability of these individuals, or the withdrawal of their declarations if they refused to appear for deposition, Plaintiff's counsel was unable to produce Conrad, McCartney or Nyaberi for deposition.

proposed nationwide collective consists of "similarly situated" employees who are victims of a common illegal pay policy or practice.[2]  Indeed, Plaintiff relies almost entirely on one section of NCR's Handbook which states that "[a]s a general rule," CEs should check in and update their status "at least thirty (30) minutes before the start of … [their] shift."  (Dkt. No. 136, at *9)[3]  But Plaintiff conspicuously ignores the fact that the cited "policy" also states that "[i]n total, these activities should take no more than one or two minutes to complete."  (*Id.*, Ex. A, NCR MEADOWS0000316, and Ex. B, NCR MEADOWS0000373)  Thus, the "policy" upon which Plaintiff predicates his Renewed Motion does not evince wage violations by NCR at all, much less evidence of a uniform corporate policy that requires "off-the-clock" work.

It is, of course, beyond dispute that NCR's written policies expressly prohibit "off-the-clock" work, and do so in the clearest possible language.  Indeed, many of the specific work activities that Plaintiff and his declarants assert they perform "off-the-clock" are specifically required by NCR's written policies *to be recorded* as hours worked.  Plaintiff and the three deposed Opt-in declarants

---

[2] To extent, that Plaintiff's claims are predicated on allegations that CEs were not paid for time spent commuting between their homes and first and last field assignments of the day, and reviewing, mapping and prioritizing their jobs for the day, those allegations fail to demonstrate a violation of the FLSA because such activities are all deemed non-compensable under the FLSA.  *See* 29 C.F.R. § 254(a)(1)(2); *Brand v. Comcast Corp.*, 135 F. Supp. 3d 713, 730-31 (N.D. Ill. 2015) (holding that "time an employee spends commuting and engaged in activities that are incidental to commuting" are non-compensable and that "routine tasks related to obtaining assignments electronically and performing vehicle safety inspections are inherently incidental" to their commute); *see also Espenscheid v. DirectSat*, 2011 WL 10069108, at *23 (W.D. Wis. 2011) (neither traveling to and from work nor activities incidental to commuting are compensable under the FLSA); *see also* Dkt. Nos. 142 -144, Defendant's Motion for Summary Judgment.  Plaintiff has thus failed to provide sufficient evidence to demonstrate a common illegal pay policy or practice based on such allegations.

[3] In his Renewed Motion, Plaintiff disingenuously contends that NCR failed to disclose its Handbooks until "after Defendant submitted its opposition."  (Dkt. No. 136, at *7) First, upon filing the initial motion for conditional certification, Plaintiff's counsel represented to the Court that he did not need to conduct any discovery prior to having the motion considered by the Court. (Ex. A, Tellado ¶ 2  Second, the cited Handbooks were used during Plaintiff's deposition, which was conducted on October 26, 2016.  (*Id.*, ¶ 3)  NCR's Opposition was filed on October 31, 2016.  Third, in support of Plaintiff's initial motion for conditional certification, Plaintiff submitted the Handbook containing the exact "policy" which he cites to in his Renewed Motion.  (*See* Dkt. No. 97, Ex. A) Fourth, each of the cited Handbooks contains numerous provisions prohibiting "off-the-clock work."  (*Id.*)  In short, there is no evidence of a written NCR policy requiring "off-the-clock" work, much less evidence of such a policy that was unavailable to Plaintiff when he filed his first motion for conditional certification.

admit that they were subject to these policies and were aware that "off-the-clock" work is prohibited. Notwithstanding these admissions, Plaintiff and the deponents have identified _completely different and personal reasons_ that caused them to work "off-the-clock."  Such evidence does not support a finding that there is an "across-the-board" policy that requires "off-the-clock" work.  _Blakes, et al., v. Illinois Bell Tel. Co._, 2011 WL 2446598, at *3 (N.D. Ill. June 15, 2011).  Indeed, the _only_ evidence of a common corporate policy with respect to "off-the-clock" work is of one that _expressly prohibits_ such work – a policy that has admittedly been communicated to CEs in writing throughout the claim period covered by this action.

In sum, the evidentiary hole that was fatal to Plaintiff's initial motion for conditional certification continues to exist with respect to his Renewed Motion.  Again, in the words of this Court, Plaintiff lacks evidence of "a de facto [NCR] policy of not compensating" for pre- and post-shift activities, and requiring such work to be performed "off-the-clock."  It follows that the Court should again deny Plaintiff's request for conditional certification.

## II.     FACTUAL BACKGROUND

### A.     NCR's Structure And CE Workforce

NCR employs CEs who install, maintain and repair retail point-of-sale machines and automated teller machines ("ATMs") across the United States.[4]  (Ex. B, Martinaitis ¶ 5)[5]  Currently, there are over 3,000 CEs employed by NCR, and approximately 4,300 CEs were employed during the

---

[4] Although Plaintiff and the Opt-in declarants generically characterize themselves as "customer engineers," there are multiple job categories (_e.g._, CE I, CE II) within the customer engineer employee population, including Team Lead CEs.  Team Lead CEs have additional responsibilities to those of a CE I or CE II, such as monitoring CEs, providing training to CE Is and IIs, trouble- shooting for CEs, checking on other CE work orders, and engaging in other quasi-supervisor duties, for which they are paid a higher rate of compensation.  There are also disparities between the particular job duties and work activities of CE Is and CE IIs.  For example, a CE I performs basic service calls requiring no tools.  For that reason, NCR does not provide CE Is with company tools or a company vehicle.  (Ex. B, Martinaitis ¶ 6; _see generally_ Ex. C, TM Declarations)

[5] Citations to "[Name] ¶ __" contained in this memorandum refer to the declarations submitted by NCR that are attached hereto as Exhibits.

alleged claim period – *i.e.*, from June 15, 2013, to the present.  (Ex. B, Martinaitis ¶ 5)

NCR organizes its operations in the United States into six main geographic areas:  Northeast, Northeast (Union), Southeast, Midwest, South Central and West.  These six areas are divided into sub-areas and territories.  There are 70 NCR territories located across the 50 states.  CEs are each assigned to one geographic territory, and they perform work orders solely within their assigned territory.  (Ex. B, Martinaitis ¶ 4)

Each of NCR's 70 territories has a designated TM who oversees the CEs within that territory.  TMs report to Service General Managers.  (*Id.*, ¶ 4)  In general, a TM will oversee the work of 30 to 50 CEs, depending on the territory.  (Ex. D, Yeager ¶ 4; *see generally* Ex. C, TM Declarations)  Within the CE population, there are also CEs whose employment terms and conditions are governed by a collective bargaining agreement ("CBA").  (Ex. D, Yeager ¶ 5; Ex. C, Abbruscato ¶¶ 4, 6, Mousaad ¶¶ 5-6, 10, 12, Wolven ¶¶ 3-5, 7-8)

CEs do not report to a NCR home office, but rather work in the field and commute between their homes and their first and last assignments of the day in NCR service vehicles.  (Ex. B, Martinaitis ¶ 7)  CEs receive work assignments through NCR's ES Mobility application on a company-issued Android device.  (*Id.*)  CEs use the ES Mobility application to communicate service-related information to NCR's Group Service Planners and NCR management.  (*Id.*)

> **B.** **NCR's Timekeeping System And Policies Regarding "Off-The-Clock" Work**

CEs are paid based on time entries that they *personally record and identify as accurate* in NCR's timekeeping system, Workday.[6]  (Ex. G, Haws ¶ 4)  CEs are required to report the start and stop

---

[6] Prior to the implementation of Workday in December 2015, CEs personally recorded and certified their time entries in a system called Cybershift.  In Cybershift, CEs were required to report exception time – *i.e.*, overtime hours, vacation, sick pay, holiday and other exceptions to their standard workweek.  When CEs reported overtime hours, CEs had to input their actual start time, stop time, and start and stop times for their meal breaks.  CEs also

*(Continued on following page)*

times of their work day, as well as record the start and stop times of their off-duty meal breaks. (*Id.*, ¶ 4, *see also* Exs. E and F, at pp. 14) ("It is your responsibility to input all hours that you work into NCR's electronic time tracking system, Workday. You must record your work start time, your work end time, and the duration of any meal or other unpaid break(s) that you take during your shift in Workday.") CEs are instructed to report this time daily and in real time. On a weekly basis, CEs *certify* and submit their time entries in Workday to their TM for approval, with each CE affirming, "[b]y clicking 'Submit', *I am verifying the time reported is true and complete*." (Ex. H, emphasis added; Ex. G, Haws ¶ 5)

Plaintiff and the deposed Opt-in declarants admit that they have always been personally responsible for recording their own work time, and that NCR has always paid them fully for that recorded time. (Ex. J, Meadows Depo., at 13:11-16; 19:24-20:25; 87:17-20; Ex. K, Flood Depo., at 123:23-124:8; 150:7-16; 150:22-151:2; Ex. L, Seaton Depo., at 69:21-70:11; 70:24-71:21; 77:12-78:4; 108:20-22; Ex. M, Williams Depo., at 107:17-108:6; 116:7-16) Throughout their employment with NCR, Plaintiff and the deposed declarants submitted their recorded time to their TMs for approval. (Ex. J, Meadows Depo., at 90:11-20; Ex. M, Williams Depo., at 107:17-108:6; Ex. G, Haws ¶ 5) They admit that they were paid for all the hours they reported to NCR. (Ex. J, Meadows Depo., at 90:11-20; Ex. K, Flood Depo., at 143:7-144:6; 150:7-16; 160:7-161:11; Ex. L, Seaton Depo., at 75:21-76:13; 77:12-78:4; 95:5-24; Ex. M, Williams Depo., at 107:17-108:6).

NCR's written policies make clear that all time worked and reported through NCR's timekeeping system will be compensated. NCR requires that each newly hired CE review a copy of the "NCR Customer Engineer Handbook" ("Handbook"), and provides ongoing access to the

---

*(Continued from previous page)*
submitted their time for approval by their TMs in Cybershift. Prior to submitting their time for approval, CEs were required to *certify the accuracy* of their time entries. (Ex. G, Haws ¶ 7)

Handbook to all CEs through NCR's intranet website.[7] (Ex. D, Yeager ¶¶ 6, 8) The Handbook sets out NCR's overtime, timekeeping, administrative time, meal and rest breaks, and commute time policies. (*Id.*, ¶ 6) It also contains an extensive section regarding NCR's strict prohibition of "off-the-clock" work. The "off-the-clock" work section provides specific examples of prohibited "off-the-clock" activities, and contains an express instruction that CEs are to record all pf their work time.

> NCR expects CEs to work within the work schedules set by their managers. However, **all time spent performing work (regardless of whether it falls during your scheduled shift) must be reported in Workday**. Supervisors are prohibited from requiring, encouraging or even suggesting that CEs (and any other nonexempt employees) work "off the clock." Employees that underreport or fail to report hours, or any other violation of the foregoing, may be subject to the full range of disciplinary action. This includes managers who fail to observe this policy. If you have any questions or concerns about the prohibition against "off the clock" work, please contact HR Central.

(Exs. E and F, Handbook at pp. 14-15) (emphasis added)

To eliminate any possibility of confusion with respect to this policy, the Handbook describes specific activities that should not be performed "off-the-clock," including many of the activities upon which Plaintiff and his declarants base their "off-the-clock" claims. For example, the Handbook specifically states that CEs are prohibited from checking email during non-working hours. (Exs. E and F, Handbook at pp. 13) ("Territory Managers will give general direction regarding the frequency with which you should check email based upon the frequency with which email is used in your territory, **but in no event should email be used during your unpaid, non-working hours,**" emphasis added.) Likewise, the Handbook provides that "[t]ime spent performing administrative activities (e.g., e-mail, time reporting, parts management, mandatory training and other administrative duties) are compensable

---

[7] At the time of hire, NCR provides each CE a copy of the Handbook, and each CE is required to acknowledge his or her receipt of it. The acknowledgement provides that the CE has read, understands and agrees to follow NCR's policies, as well as to review any updates to the Handbook by accessing NCR's intranet. (Ex. D, Yeager ¶ 8, *see also* Exhibits E and F, Handbook at p. 2)

as work time." (*Id.*)

NCR's written policies requiring CEs to report all hours work and prohibiting "off-the-clock" work are clearly stated and communicated to CEs. Moreover, NCR compensates CEs for all recorded hours worked, including overtime pay for any and all overtime hours worked. For example, for the calendar year 2016, NCR paid CEs $23,162,296 for 729,995 hours of recorded overtime work. (Ex. S, Haws II ¶ 3; *see also* Ex. A Tellado ¶ 13, providing detail of overtime hours recorded and compensated for each of the 30 CEs who submitted declarations in support of Plaintiff's Renewed Motion) The record evidence thus confirms that *NCR's only corporate-wide policy with respect to "off-the-clock" work is to prohibit it*, and that NCR pays CEs for all of their self-recorded time, including overtime.

Based on the foregoing, any CE who performs "off-the-clock" work does so in direct contravention of NCR's express written policies forbidding such work. Moreover, any TM or other manager who allegedly instructs CEs to perform work "off-the-clock" does so in direct contravention of NCR's policies.

## C. NCR's Open Door Policy And The Differences Between CEs, Territories And States

NCR provides CEs multiple ways through which to raise concerns about anything related to their employment, including complaints regarding alleged unlawful pay practices. (Ex. D, Yeager Decl. ¶ 11) The Handbook sets out NCR's Open Door Policy, and explains that CEs may contact their manager or human resources to discuss any issue arising in the workplace. (Exs. E and F, Handbook at pp. 50, 51) The Handbook section prohibiting "off-the-clock" work also contains an instruction that if CEs "have any questions or concerns about the prohibition against 'off the clock' work, please contact HR Central." (*Id.*, at p. 15) NCR maintains a dedicated HR telephone line and email account through which CEs may submit questions, concerns or complaints about any issue arising out of their employment. (Ex. D, Yeager Decl. ¶ 11) NCR's Human Resource employees and management

personnel hold periodic in-field town hall and roundtable meetings to provide CEs with face-to-face opportunities to raise any questions, concerns or complaints about local practices or issues occurring in the field. (*Id.,* ¶ 12; Ex. B, Martinaitis Decl. ¶ 7) Notwithstanding all of the foregoing, Plaintiff and the deposed Opt-in declarants never complained about not being paid for "off-the-clock" work. (Ex. J, Meadows Depo., at 105:2-6; Ex. K, Flood Depo., at 204:12-205:6; 206:12-18; Ex. L, Seaton Depo., at 163:6-19; Ex. M, Williams Depo., at 97:10-18; 98:11-15; 112:13-16; Ex. C, Kent ¶ 12)

Significantly, the work activities and work flows of individual CEs vary based on the CE's territory and TM. TMs develop and implement individualized practices to meet the particular needs of the customer bases within their territories, including individualized practices with respect to scheduling, availability (*i.e.*, "on-call") time and overtime. (Ex. N, Ivic Depo., at 15:20-16:8; 38:13-39:1; 39:12-23; 49:22-51:7; *see generally* Ex. C, TM Declarations)

Plaintiff Meadows has spent his entire career with NCR as a CE in the Chicago area. (Ex. J, Meadows Depo., at 41:22-42:11) Plaintiff admits that he was aware of NCR's "off-the-clock" work prohibitions. (*Id.*, at 92:20-94:3; 103:11-104:15) He also admits that he was never prevented from reporting all of his work time, and that he has been paid for all of his self-recorded hours worked, including overtime. (*Id.*, at 84:9-85:8; 87:21-88:1; 90:11-92:3) NCR's payroll records reflect that Plaintiff reported and received compensation for overtime hours on his NCR paychecks. (Ex. A, Tellado ¶ 13) Plaintiff admits that his wage claims arise solely from directives that he allegedly received from his own TMs. (Ex. J, Meadows Depo., at 79:19-81:13)

Similarly, deposed Opt-in declarant Flood admits that he spent the entirety of his employment with NCR working in Florida. (Ex. K, Flood Depo., at 8:14-21) He admits that he worked in the field without any supervision, and that he has no knowledge of other CEs' compensation or work activities. (*Id.*, at 125:21-127:20) Flood acknowledges that NCR's policies prohibit "off-the-clock" work, and

that he was never told not to record all of his work time by anyone at NCR. (*Id.*, at 92:11-18, 94:4-95:22, 99:12-19, 114:15-116:15) He admits that he could request time to perform administrative duties, and that he in fact recorded and was paid for time that he spent performing pre-shift administrative work. (*Id.*, at 114:15-116:15, 171:13-16) Flood further admits that he self-reported his time and was paid for all of that time by NCR, including overtime of up to 50 hours per pay period. (*Id.*, at 159:7-14; Ex. A, Tellado ¶ 13) Notably, Flood admits that he recorded time for pre- and post-shift work, including commute time, and that he was paid for such time. (*Id.*, at 193:24-200:10, 218:10-219:15, 223:1-10; *see also* Ex. P, Flood's Sept. 22, 2016 self-reported timekeeping records and Ex. Q, Flood's Sept. 22, 2016 customer call activities) Flood also admits that it was rare for him to have a workweek where he did not work and receive compensation for overtime. (*Id.*, at 211:14-212:23) Nonetheless, Flood contends that he did not record all of his time due to the "culture of NCR," and because he *assumed* that he would "get a call" from his TM if he did so. (*Id.*, at 166:1-167:12, 202:17-203:3)

Likewise, deposed Opt-in declarant Williams admits that he was told that NCR's policy is that all work time is compensable. (Ex. M, Williams Depo., at 146:3-147:4) He also admits that he has always self-reported his time during his 39 years with NCR. (*Id.*, at 39:12-40:2, 116:7-16) Williams states that he has been paid for all of his recorded hours worked, and that no one has ever instructed him or pressured him to under-report his work time. (*Id.*, at 107:17-108:6, 113:5-116:2) He admits that he averaged between 700 to 1,050 hours of overtime in each of the past five years, including approximately 725 overtime hours in 2016, and that he has been paid for all of this overtime. (*Id.*, at 109:6-13; Ex. A. Tellado ¶ 13) Williams states that he did not record his alleged pre-shift activities "because we are told that's de minimis time." (*Id.*, at 105:20-24) He admits, however, that no one ever told him that he was not to clock in before the scheduled start of his shift. (*Id.*, at 119:7-18; 156:21-

- 10 -

157:16)

Deposed Opt-in declarant Seaton admits that he never worked "off-the-clock" when he was employed as a CE for NCR in California from October 2014 to September 2015, stating that "we pretty much did everything on the clock" in California. (Ex. L, Seaton Depo., at 119:19-120:14) Seaton admits that NCR has a policy prohibiting "off-the-clock" work, and that he was told "anything that you did work-wise for NCR should be reported." (*Id*., at 147:4-10) While working as a CE for NCR in Tennessee from January 2009 to October 2014, Seaton states that he failed to adhere to NCR's prohibition against "off-the-clock" work due to unspecified "pressures." (*Id*., at 147:11-148:1)

In the 30 declarations submitted by Plaintiff in support of his Renewed Motion, 23 declarants parrot that "[p]er NCR policies, I was instructed to enter my start time when I arrived at the first customer site of the day and my end time when I completed my last customer job in the field." (Dkt. No. 136-5: ¶ 10 of Taylor, Seaton, Varner, Conrad, Kiefer, Caley, Nyaberi, Hershberger, Rivera, Hammett, Hoffman, Morel, Vargas, Meadows, Zack, Mullens, Williams, Bratt, Barnett, Hunsberger, Campos, McCartney and Belcher) None of these declarants, however, identifies the "NCR policies" through which this instruction was purportedly communicated to them. This description of "policy" is thus not admissible evidence of anything – *it is a bare assertion without foundation*.

The remaining seven declarants state that their TMs directed them to be "on site at my first job" no later than their "scheduled start time," and to work at least until their "scheduled end time." But none of these declarants states that he has ever been directed by his TM or anyone else at NCR to work "off-the-clock" without pay, or that his TM or anyone else in NCR management was even aware that he had worked "off-the-clock." (Dkt. No. 136-5: Rosales ¶¶ 12, 13; Flood ¶¶ 12, 13; Conneran ¶¶ 11,

12; Hilla ¶¶ 10, 11; Cline ¶¶ 11, 12; Rodriguez ¶¶ 11, 12; Corona ¶¶ 10, 11)[8] These declarants simply contend in the most conclusory and generalized manner that they were not paid for all time worked, including pre- and post-shift work, and, in some cases, for time worked during meal breaks. (*Id.*: Rosales ¶ 17, Flood ¶ 18, Conneran ¶ 18, Hilla ¶ 17, Cline ¶ 18, Rodriguez ¶ 18; Corona ¶ 17)[9]

Conversely, NCR has submitted declarations from 12 TMs demonstrating that these TMs have instructed their CEs (including many of the declarants) to report all of their work time, and that "off-the-clock" work is strictly prohibited.[10] Among these TMs are individuals who previously worked as CEs (including individuals who held that position during the claim period applicable to this case), and who confirm that they did not perform work "off-the-clock" and were paid for all their recorded hours worked. (Ex. C, Bass ¶¶ 2,8, Dosie ¶¶ 2,8, Fisher ¶¶ 2, 10, Kent ¶¶ 2, 14, Tederous ¶¶ 2,10, Webb ¶¶ 2, 12)

TMs working in New Jersey and New York confirm that, pursuant to NCR's CBA with Local 202 of the International Brotherhood of Teamsters ("Local 202"), CEs who work in those states are subject to special commuting time pay practices that are not applicable anywhere else within NCR.

---

[8] The exact same declarations for Rosales, Flood, Conneran, Hilla, Cline and Rodriguez were submitted with Plaintiff's initial motion for conditional certification, and found by this Court to be insufficient to support certification. The declaration from Corona contains the same content as these other declarations, and, for the same reasons expressed in the January 10 Order, all of these declarations should be disregarded.

[9] To the extent that some declarants contend that they were not paid for commuting time, there is a dissimilarity among members of the putative collective. NCR pays CEs in the state of Washington and California for all of their commuting time. (Exs. E and F, Handbook at p. 8) Thus, any tasks performed during commuting time by CEs working in these states has been compensated. Likewise, those CEs working in New York and New Jersey who are subject to a CBA receive pay for commuting time. (Ex. C, Abbruscato ¶¶ 7-11, Mousaad ¶¶ 5-7, Wolven ¶¶ 6, 10) NCR compensates all other CEs for drive time in excess of their normal commute times. (Exs. E and F, Handbook at p. 8)

[10] *See generally* Ex. C, TM Declarations - *e.g.* Beavers ¶ 10 ("I have absolutely never told [Opt-in declarant Sheri] Campos or any other CE to [perform any work 30 minutes before the start of the shift], or to work off the clock in any other way. In fact, I have had to coach Ms. Campos regarding the necessity of reporting time she spent responding to emails and phone calls outside her scheduled shift; I did not instruct her to respond to the emails or phone calls, but once I found out that she did I required that she report the time so that she could be paid for it.")

(Ex. C, Abbruscato ¶¶ 7-11, Mousaad ¶¶ 5-7, Wolven ¶¶ 6, 10)  Similarly, in California and Washington, CEs clock in for the start of their work day while at home, and clock out for the end of their work day upon their return to their homes.  (Ex. C, Dosie ¶¶ 7-11)  Clearly, the different commuting, timekeeping and payroll practices applicable to CEs working in California, Washington, New Jersey and New York highlight that not all members of the proposed collective are similarly situated.[11]

Although the TMs who supervise or supervised CEs **outside** of California, Washington, New Jersey and New York generally agree that their expectation is or was that CEs arrive at their first customer location of the day by the scheduled start of their shift, there is no uniform requirement that CEs go "traveling" or "dispatch" 30 minutes before their shift.  (Ex. C, TM Declarations)  These TMs also agree that the only thing a CE should do before arriving at his first work site of the day is to turn on his phone and indicate that he is traveling to the customer location.  (*Id.*)  This action is often referred to as going "traveling," "dispatch" or "DS," and takes just seconds to perform.  (*Id.*)

In sum, Plaintiff has failed to present any evidence of a nationwide "uniform corporate policy" requiring CEs to perform "off-the-clock" work.  Indeed, the record evidence indicates that no such policy exists across the putative collective.  Resolution of the alleged "off-the-clock" claims will therefore require an individualized inquiry to determine whether each CE worked off-the-clock, the nature and extent of any such work, whether particular TMs instructed particular CEs to perform that work, and whether NCR was actually aware of the "off-the-clock" work.  This individualized inquiry will have to be undertaken to resolve the "off-the-clock" claims of 4,300 CEs working for well over 100 different TMs across the nation.  The inevitable need for such individual inquiries completely

---

[11] Of the 309 individuals who submitted consents to join, there are 86 CEs (27.8%) who work or worked in California, Washington, New Jersey and New York.  (Ex. A, Tellado ¶ 12; Ex. I, Hall ¶ 2)

negates the utility of a collective action, and dictates the denial of Plaintiff's Renewed Motion.

## III.   ARGUMENT

### A.   Legal Standard

To obtain conditional certification, Plaintiff must establish that he and the putative collective action members are "similarly situated" with respect to the "off-the-clock" claims in this action. *See* 29 U.S.C. § 216(b). In determining whether employees are "similarly situated," courts typically apply a two-stage process. January 10 Order, at *1-2; *see also Gromek v. Big Lots, Inc.*, 2010 WL 5313792, at *2 (N.D. Ill. Dec. 17, 2010). At the first step, a plaintiff must provide "some evidence, beyond pure speculation" that he and "similarly situated" employees "together were victims of a common policy or plan that violated the law." January 10 Order, at *1-2 (citing *Taillon v. Kohler Rental Power, Inc. ex rel. Kohler Co.*, 2003 WL 2006593, at *1 (N.D. Ill. Apr. 29, 2003) (citation omitted); *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010); *Brown v. Club Assist Rd. Serv. U.S., Inc.*, 2013 WL 5304100, at *12 (N.D. Ill. Sept. 19, 2013)). Importantly, Plaintiff cannot simply rely on "[b]are assertions" because the burden of proof at the first step is "not a mere formality." January 10 Order, at *2-5 (citing *Brown*, 2013 WL 5304100, at *12; *Boyd v. Alutiiq Glob. Sols., LLC*, 2011 WL 3511085, at *7 (N.D. Ill. Aug. 8, 2011)).

While collective notice can promote judicial economy, opening the door to expensive and expansive collective discovery by rubber-stamping requests for conditional certification "undoubtedly present[s] a ready opportunity for abuse." *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004). Thus, "[w]here the plaintiff has not made at least a modest factual showing that certification is appropriate, it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *4 (E.D. Wis. Sept. 11, 2008) (also explaining the Seventh Circuit's recognition that

discovery following conditional certification may impose a "tremendous financial burden to the employer") (citations omitted); *see also Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170-71 (1989).

Because substantial discovery has now been completed in this case, the Court should "weigh the evidence in the record without any artificial bifurcation[.]" *See Howard v. Securitas Sec. Servs., USA Inc.*, 2009 WL 140126, at *2 (N.D. Ill. Jan. 20, 2009).[12] That is, rather than accept Plaintiff's and the Opt-ins' allegations (*i.e.*, bare assertions) as true, the Court should closely and fairly evaluate the record evidence presented by both parties. *See Martinez v. Regency Janitorial Servs., Inc.*, 2012 WL 252230, at *1 (E.D. Wis. Jan. 26, 2012); *Hadley v. Journal Broad. Group, Inc.*, 2012 WL 523752, at *1 (E.D. Wis. Feb. 16, 2012) ("[A] court will not certify a class based on the plaintiffs' say-so alone."); *Blakes*, 2011 WL 2446598, at *6 (considering evidence submitted by defendant). The mere fact that certain individuals assert the same violations of law against the same employer using the same words does not make them similarly situated.[13] To the contrary, where the evidence supports a conclusion that the claims arise out of allegations regarding the individual practices of local managers across disparate geographies, a denial of conditional certification is appropriate. *Strait v. Belcan Eng'g Group, Inc.*, 911 F. Supp. 2d 709, 729 (N.D. Ill. 2012); *Steger v. Life Time Fitness, Inc.*, 2016 WL

---

[12] Some courts within the Seventh Circuit have employed an intermediate scrutiny standard where some discovery has already taken place. *Scott v. NOW Courier, Inc.*, 2012 WL 1072751, *7-8 (S.D. Ind. Mar. 29, 2012); *Bunyan v. Spectrum Brands, Inc.*, 2008 WL 2959932, at *2-4 (S.D. Ill. July 31, 2008). When some discovery has been conducted, the court cannot "close its eyes" to the evidence before it. *Id.* at *4*; *see also Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 439 (S.D. Ind. 2012).

[13] *Bradley v. Arc of Nw. Ind., Inc*., 2015 WL 2189284, at *4, 7 and 8 (N.D. Ind. May 11, 2015); *Allen v. Payday Loan Store of Ind., Inc.*, 2013 WL 6237852, at *7-9 (N.D. Ind. Dec. 3, 2013); *Boelk v. AT&T Teleholdings, Inc*., 12-CV-40-bbc, Doc. 124, Op. & Order, at 9-10 (W.D. Wis. Mar. 11, 2013); *Marsh v. Butler County Sch. Sys*., 242 F. Supp. 2d 1086, 1094 (M.D. Ala. 2003); *see also Haynes v. Singer Co*., 696 F.2d 884, 887 (11th Cir. 1993) (unsupported assertions of widespread violations insufficient to meet plaintiff's burden). Plaintiff must provide specific evidence regarding the alleged unlawful policy or plan. *Dager v. City of Phoenix*, 2:06-cv-01412 JWS, Doc. 36, Op. & Order at 10 (D. Ariz. Dec. 15, 2006) (denying conditional certification, finding "[w]hile plaintiffs baldly allege that '[d]efendants' common procedures and policies are centrally formulated and dictated by [d]efendants, they do not allege with any specificity what division or official(s) … make these uniform decisions regarding overtime pay ….")

245899, at *3 (N.D. Ill. Jan. 21, 2016); *Adair v. Wis. Bell, Inc*., 2008 WL 4224360, at *7 and 12 (E.D. Wis. Sept. 11, 2008); *England v. New Century Fin. Corp*., 370 F. Supp. 2d 504, 511 (M.D. La. 2005).

The foregoing conclusion is particularly true where (as here) the crux of the plaintiff's claim is that a *de facto* policy exists to require "off-the-clock" work, especially when that alleged policy contravenes written policies *that unequivocally prohibit such work*. *Steger,* 2016 WL 245899, at *3 (certification denied with respect to alleged "de facto policy of intimidating and pressuring employees to work off the clock," in the face of the employer's written corporate policy "that all employees must accurately report their hours"); *Drake v. Aerotek, Inc.* 2015 WL 6554592, at *1 (W.D. Wis. Oct. 29, 2015) (certification denied where the employer had a written policy requiring that all hours worked be recorded, notwithstanding evidence that some individual supervisors instructed employees to ignore that policy); *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 961-963 (W.D. Mich. 2009) (certification denied where employer's written policies expressly prohibited off-the-clock work, and plaintiffs failed to present evidence of a "common or uniform practice ... to not follow [the employer's] formal, written policy"); *MacGregor v. Farmers Ins. Exch.*, 2011 WL 2981466, at *4 (D.S.C. July 22, 2011) (certification denied where no evidence presented of an "unwritten policy contradictory to [the employer's] stated policy" to pay for all hours worked); *Martin v. Citizens Fin. Grp., Inc.*, 2013 WL 1234081, at *4-6 (E.D. Pa. Mar. 27, 2013) (certification denied where the evidence showed that "decisions to deny overtime were made independently, by either separate branch or regional managers, and were in direct conflict with [the employer's] written polic[ies]"). *See also Strait*, 911 F. Supp. 2d 709, 728-29 (N.D. Ill. 2012) (holding that when alleged violations do not stem from a company-wide policy or plan, collective treatment is not appropriate); *Powers v. Centennial Communs. Corp.*, 679 F. Supp. 2d 918, 922 (N.D. Ind. 2009) ("I can find no FLSA case where notice was ordered sent based on ... individualized evidence of an FLSA violation and no indications of a

- 16 -

company policy or plan to blame.").

This case has been pending for slightly more than one year. During that time, NCR has produced nearly 250,000 documents, including emails, schedules, customer service call work activities, personnel files, time records, paystubs, employee handbooks, job descriptions, training documents, training records, policies, and other documents.[14] (Ex. A, Tellado ¶ 9) Additionally, Plaintiff's counsel has conducted four depositions of NCR management personnel (including two witnesses designated as corporate deponents under F.R.C.P. 30(b)(6)), and NCR has conducted four depositions of CEs (including Plaintiff and three Opt-in declarants). (*Id.*) These depositions have explored topics relevant to NCR's time recording and overtime policies, pay practices, the training and job duties of CEs, and other issues. (*Id.*)

Given the completion of such substantial discovery, Plaintiff must do more than just make a minimal showing for conditional certification. *Scott*, 2012 WL 1072751, at *7-8 ("At this in-between stage … when substantial discovery has been conducted but is not yet complete, an intermediate level of scrutiny is appropriately applied by the Court."); *Bunyan*, 2008 WL 2959932, at *2-4 (intermediate scrutiny applied when conditional certification motion filed after 11 months of discovery); *Anderson v. McCarthy, Burges & Wolff, Inc.*, 2015 WL 224936, at *4 (N.D. Ohio Jan. 15, 2015) (applying intermediate scrutiny where parties had 8 months to conduct discovery); *Valcho v. Dallas County Hosp. Dist.*, 574 F. Supp. 2d 618, 622 (N.D. Tex. 2008) (three months of discovery is sufficient to trigger intermediate scrutiny). But, despite the production of nearly 250,000 documents and the

---

[14] Prior to agreeing to produce Opt-in declarants Conrad, Flood, McCartney, Nyaberi, Seaton and Williams for deposition, Plaintiff's counsel requested (and NCR provided) the personnel files, time records, paystubs, schedules, customer service call work activities and emails for these CEs. Nonetheless, Plaintiff has still not provided deposition dates for Conrad, McCartney or Nyaberi. As a consequence, NCR has requested that Plaintiff obtain withdrawals of the consents to join this action from these three individuals, as well as withdrawals of the declarations that they filed with this Court. (Ex. A, Tellado ¶ 11) To date, Plaintiff's counsel has only filed an opt-out form for McCartney. (Dkt. No. 156)

completion of eight depositions, Plaintiff is wholly unable to produce any admissible or otherwise persuasive evidence that all members of the proposed collective are subject to a common corporate policy requiring "off-the-clock" work. As previously noted, a court cannot and should not "certify [a collective action] based on plaintiffs' say-so alone." *Allen*, 2013 WL 6237852, *1 (citing *Hadley*, 2012 WL 523752, at *1).

### B. Plaintiff Cannot Establish A Nationwide Corporate Policy Or Plan That Requires CEs To Work "Off-The-Clock"

In its January 10 Order, the Court found that Plaintiff "ha[d] not made a sufficient showing" that he was the victim of "a common NCR policy or plan that violates the law." (*Id.*, at *5) Plaintiff continues to avoid this core issue (*i.e.*, whether a "common NCR policy or plan" exists that "violates the law"), contending instead that "[t]his case involves one overreaching **common question** – did Plaintiff and other CEs work before and after their shifts without pay and in violation of the [FLSA]?" (Dkt. No. 136, at *5, emphasis added.) But the relevant question for purposes of certification is not whether Plaintiff and other individual CEs perform work "off-the-clock," but whether they do so because of a common NCR policy or plan requiring such work. As this Court has explained, "the fact that work went uncompensated does not support an inference … that NCR had a de facto policy to not pay CEs for work performed before and after their shifts…." (January 10 Order, at *3.)

Plaintiff argues that "[p]er NCR's stated policies, Plaintiffs all began work in the same common way: by checking in with Defendant and/or its Operations Center via phone or mobile device and [sic] 'at least thirty minutes ***before the start*** of [their] shift[.]'" (Dkt. No. 136, at *6) Plaintiff then asserts that "consistent with this policy," CEs all followed the "same general sequence at the start of their work day" by "fielding calls, emails, or text messages with NCR's Operations Center, mapping their routes, entering estimated times of arrival ("ETAs") on NCR's routing application, pre-calling customers, loading their company-owned vehicles ("COVs"), updating their status to "dispatch," "DS,"

- 18 -

or "traveling" on NCR's routing application, and driving to their first jobs of the day." (*Id.*) Plaintiff contends that the 30 declarations he has submitted in support of his Renewed Motion evince "actual compliance" by CEs with "NCR's policies and directives to begin work at least 30 minutes before the start of their shifts and perform other common tasks to post-shift off the clock and without pay." (*Id.*) Plaintiff is wrong.

A review of the "policy" cited by Plaintiff exposes the "house of cards" nature of his argument. That "policy" actually provides as follows:

> As a general rule, at least thirty (30) minutes before the start of your shift: (1) you should check in with the Operations Center either via phone or handheld mobile device for call assignments; and (2) you should activate an incident or update your "whereabouts." [sic] **In total, these activities should take no more than one or two minutes to complete**.

(Dkt. No. 136, at Ex. A at NCR MEADOWS0000316 and Ex. B at NCR MEADOWS0000373, emphasis added.) In short, as a general rule, CEs are to take "one or two minutes" to complete two simple tasks before the start of their shifts. Nothing about this "policy" remotely purports to require the lengthy list of time-consuming pre-shift tasks referred to in Plaintiff's supporting declarations. Moreover, there is nothing in this "policy" that addresses much less dictates whether the "one or two minutes" in question should be recorded as work time. (Dkt. No. 136, at *6, 9 and 16) Finally, this "policy" fails on its face to require CEs to perform any "post-shift" work at all.

Now, contrast the "policy" upon which Plaintiff relies with NCR's robust written policies expressly prohibiting "off-the-clock" work. Plaintiff dismisses those latter policies as nothing more than "catch-all language ... purporting to prohibit off-the-clock work," and as not enough to prevent conditional certification. (Dkt. No. 136, at *18 n. 7) But NCR does not just "purport" to prohibit off-the-clock work, it has gone to great lengths to ensure that CEs understand that all time worked should be recorded and will be compensated. As previously noted, the Handbook not only sets out NCR's

overtime, timekeeping, administrative time, meal and rest breaks, and commute time policies, but also provides specific illustrations of work that may not be performed "off-the-clock," including many of the activities upon which Plaintiff and the Opt-ins base their "off-the-clock" claims. (Ex. E, Handbook at p. 13)  Moreover, CEs are routinely instructed by their TMs that "off-the-clock" work is prohibited, and that they should report all of their work time on NCR's timekeeping system. (*See generally* Ex. C, TM Declarations)

Plaintiff has also failed to establish that NCR has a *de facto* policy requiring CEs to work "off-the-clock."  It is Plaintiff's burden to present "adequate evidence" that any such "unwritten *de facto* policy" exists and applies equally to all members of the proposed collective, *Blakes*, 2011 WL 2446598, at *5, and he can only do so with specific facts.  *See Howard*, 2009 WL 140126, at *3 ("[T]he statements in the plaintiff's declaration must, at a minimum, be based on personal knowledge."); *Adair*, 2008 WL 4224360, at *4-12 (holding that declarations submitted in support of conditional certification must be premised on personal knowledge, not on conjecture or general awareness, given the financial and litigation burdens imposed on an employer by a certification order); *Mares v. Caesars Entm't, Inc*., 2007 WL 118877, at *3 (S.D. Ind. Jan. 10, 2007) ("[A]lleged conversations with unidentified persons is insufficient to establish personal knowledge as to the policies and practices in effect.").  Those facts  "must be grounded in observations or other first-hand personal experience," as compared to mere "flights of fancy, speculations, hunches, intuitions or rumors about matters remote from that experience."  *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (citation omitted).

The declarations submitted by Plaintiff utterly fail to provide the requisite specificity.  None of the declarants identifies which "NCR policies or practices" allegedly required them to report their time

in the manner that they describe, or deprived them of pay for their pre-shift work. [15]  In fact, none of the declarants actually attest to *anything* unlawful, but only that they performed certain activities "off-the-clock."  But such work is not compensable unless NCR directed that it be performed, or was aware that it was being performed, neither of which is remotely established by any of the declarants.  *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (holding that an employee asserting an overtime claim must show that the employer "had actual or constructive knowledge of [the] overtime work"); s*ee also, Allen v. City of Chicago*, 2015 WL 8493996, at *16 (N.D. Ill. Dec. 10, 2015) (To avoid summary judgment on an off-the-clock claim "[a] plaintiff must show *which* [employees] were working, how frequently they were doing it, and why it was occurring.  It is not enough that managers knew or should have known that 'unidentified' employees were performing off-the-clock work without being paid.") (emphasis in original) (citations omitted); *Boelk v. AT &T Teleholdings, Inc.*, 2013 WL 3777251, at *10 (W.D. Wis. July 19, 2013) (same).

Plaintiff also submits seven emails allegedly sent by TMs "requiring [CEs] to begin work 30 minutes before their scheduled start time."  (Dkt. No. 136, at *9-10)  But five of the seven emails pre-date the claim period applicable to this case; *i.e.*, they were sent prior to June 15, 2013.  (Dkt. No. 136, Ex. G)  Moreover, four of these untimely emails were sent by Neatha Ahrens ("Ahrens"), a former NCR Field Resource Specialist (not a TM).  Ahrens did not supervise Plaintiff or any other CE, and she was not empowered to provide any directives concerning timekeeping or pay practices to Plaintiff or any CEs.  (*Id.*; *see also* Ex. O, Ahrens Depo., at 73:20-74:24.)  On their face, the emails in question do not contain any directives or statements instructing Plaintiff or any other CE to work "off-the-clock," or to under-report their actual hours of work.  (Dkt. No. 136, Ex. G)  As the Court found in its January 10

---

[15] (Dkt. No. 136-5: *See* ¶ 10 of Taylor, Seaton, Varner, Conrad, Kiefer, Caley, Nyaberi, Hershberger, Rivera, Hammett, Hoffman, Morel, Vargas, Meadows, Zack, Mullens, Williams, Bratt, Barnett, Hunsberger, Campos, McCartney, and Belcher)

Order, "[n]one of the emails reference compensation generally, nor do they make a more specific statement, for example, that CEs are only compensated when they are in a certain status." (January 10 Order, at *4)

NCR anticipates that Plaintiff may also attempt to use testimony by Frank Ivic ("Ivic"), a TM in the Chicago metropolitan area, to support Plaintiff's allegations that CEs are required to work "off-the-clock." (Ex. N, Ivic Depo., at 7:6-23) Mr. Ivic testified that he never instructed any CE to work "off-the-clock." In fact, Ivic emphatically maintained throughout his deposition that he instructs CEs to record all of their hours worked for NCR. (*Id.*, at 48:22-49:8, 69:8-17, 86:3-10, 100:9-16) Ivic does not require CEs to go dispatch/traveling with respect to their first work location at any set time in the morning, but rather simply instructs CEs that they must be at the first work location by the scheduled start of their shifts. (*Id.*, at 58:13-59:4, 66:22-67:11, 68:15-69:7, 168:9-169:22) Although Ivic's directives are the "final word" for the CEs he manages, he has only ever managed CEs within the Chicago metropolitan area during his employment with NCR. (*Id.*, at 7:6-23; 66:8-20)

1. **Plaintiff Has Failed To Show That The Individuals He Seeks To Represent Are Similarly Situated**

a. **The Variations In CEs' Work Locations Weighs Heavily Against Certification**

Courts consistently decline to certify collective actions comprised of employees working in disparate locations where, as here, there is no evidence that members of the proposed collective were subject to the same unlawful practices. *See Collazo v. Forefront Educ., Inc.*,, 2010 WL 335327, at *5 (N.D. Ill. Jan. 28, 2010); *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1235 (M.D. Ala. 2003) ("[A] plaintiff must demonstrate that employees outside of the work location for which the plaintiff has provided evidence were similarly affected by alleged work policies in order for the court to certify a collective action which extends beyond the plaintiff's own work location.").

Amongst Plaintiff and the Opt-ins, there are varying, inconsistent and contradictory statements

concerning the nature of the alleged "off-the-clock" work. Plaintiff and his declarants identify different "off-the-clock" work being performed by CEs working in different states and under different TMs. Moreover, the deposed Opt-in declarants admit that they *actually failed to perform* some of the "off-the-clock" work identified in their cookie-cutter (and obviously inaccurate) declarations. (Ex. K, Flood Depo., at 253:2-254:5; 265:8-267:4; Ex. L, Seaton Depo., at 39:1-19; 81:8-82:3; 86:9-12; 130:3-131:17; 136:20-137:20; Ex. M, Williams Depo., at 133:20-135:21; 141:11-142:8) For example, Flood admits that he was compensated for commute time when he reported it on his timekeeping records. (Ex. K, Flood Depo., at 122:17-123:1; 195:23-196:13; 199:24-200:10; 261:4-10) Similarly, Seaton admits that he did not perform any "off-the-clock" work while working as a CE in California. (Ex. L, Seaton Depo., at 119:19-120:14) Conversely, Seaton contends that he performed "off-the-clock" work when he was a CE in Tennessee and working under the supervision of a different TM. Seaton's testimony thus confirms that an *individual* CE may not be similarly situated *with himself* as to different periods of his own employment with NCR.

Again, a review of the compensation paid to individual CEs, as well as the deposition testimony of Plaintiff, Flood, Seaton and Williams, reveals that CEs routinely record and receive compensation for their overtime work. The inescapable conclusion arising from such evidence is that there is no common policy or plan prohibiting CEs from recording *any* work time. *See Postiglione v. Crossmark, Inc.*, 2012 WL 5829793, at *5 (E.D. Pa. Nov. 15, 2012) (conditional certification denied, in part, because the plaintiffs' time records contradicted the plaintiffs' allegations that they were prohibited from working or recording overtime hours); *see also Velasquez v. HSBC Finance Corp.*, 266 F.R.D. 424, 431-32 (N.D. Cal. 2010).

Plaintiff, Flood, Seaton and Williams were all aware of NCR's policy prohibiting "off-the-clock" work, and they admit that they were not prevented, by instructions or otherwise, from reporting

any of their actual work hours.  In addition, Plaintiff, Flood, Seaton and Williams each provide different (and purely personal) reasons as to why they allegedly performed "off-the-clock" work.  (Ex. J, Meadows Depo., at 79:19-23 (due to his shift not starting until 8:00 a.m.); Ex. K, Flood Depo., at 166:1-12 (due to "NCR culture"); Ex. L, Seaton Depo., at 147:4-18 (due to unidentified "pressures"); Ex. M, Williams Depo., at 101:23-102:6; 105:20-24; 146:22-147:4 (due to being told pre-shift time was "de minimis")).  They also admit that some of the allegations of "off-the-clock" work made by Plaintiff and the Opt-in declarants are nonsensical.  (*See, e.g.*, Ex. J, Meadows Depo., at 68:12-16; Ex. K, Flood Depo., at 106:14-107:10; 254:6-10; Ex. L, Seaton Depo., at 122:13-19; Ex. M, Williams Depo., at 66:3-18; 67:14-17; 99:1-100:10)

The TM declarations further highlight the dissimilarities amongst the members of the proposed collective.  TMs working in New Jersey and New York confirm that the CEs working in those states under NCR's CBA with Local 202 are subject to commuting time and pay practices that are unique to those CEs.  (Ex. C, Abbruscato ¶¶ 7-11, Mousaad ¶¶ 5-7, Wolven ¶¶ 6, 10)  Similarly, in California and Washington, CEs are subject to commuting time policies that apply only to them.

### b.      The Individualized, Fact-Intensive Inquiries Necessitated By Plaintiff's Claims Also Weigh Heavily Against Certification

Individualized questions as to whether (and why) any particular CE worked "off-the-clock" preclude a finding that all CEs are similarly-situated.  *See, e.g., Forney v. TTX Co.*, 2006 WL 1030194, at *3 (N.D. Ill. Apr. 17, 2006) (conditional certification denied where individualized, fact-intensive determinations were required); *Williams v. Accredited Home Lenders, Inc.*, 2006 WL 2085312, at *4 (N.D. Ga. July 25, 2006) (denying certification because "there must be a fact-specific, individualized inquiry into each Plaintiff's day-to-day activities" to determine whether "off-the-clock" violations existed).  Here, Plaintiff seeks certification of a nationwide collective consisting of more than 4,300 employees across 70 different territories.  Plaintiff's own evidence confirms that the alleged

timekeeping, compensation, commuting and pay practices upon which he bases his claims are not consistent from territory to territory. When faced with similar "off-the-clock" allegations, courts have frequently denied certification of a collective under the FLSA.[16] As explained in *Williams*, "[l]iability cannot be determined by considering the employee's job duties. Rather, every employee must testify about his awareness of the overtime policy, and his or her violation of that policy and whether it was compelled by his branch manager." *Williams*, 2006 WL 2085312, at *4.

Work that is "preliminary to or postliminary to" an employee's principal work activities, no matter the amount of time it takes, is not compensable under the FLSA. 29 U.S.C. § 254(a)(1)-(2); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-28 (2005). Thus, a factfinder will also have to consider, for each CE and for each workweek, whether and to what extent the individual performed any activities "off-the-clock," and whether these activities constituted compensable work or non-compensable preliminary and/or postliminary activities under the FLSA. *See, e.g., Sandifer v. US Steel Corp.*, 678 F.3d 590, 595-97 (7th Cir. 2012); *see also* Dkt. Nos. 142 -144, Defendant's Motion for Summary Judgment. Even then, a factfinder will have to decide whether a CE's "off-the-clock" work for each workweek pushed his total work time above the 40-hour overtime threshold, and, if so, by how much. *See* 29 U.S.C. § 207(a)(1)-(2); *see also England,* 370 F. Supp. 2d at 511 (assessing damages would "require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective class").

In addition, a factfinder will have to determine whether NCR management knew or should have known that any of the CEs performed unpaid work for purposes of imposing employer liability.

---

[16] *See, e.g., Steger,* 2016 WL 245899, at *3; *Boelk,* 12-CV-40-bbc, Doc. 124, Op. & Order, at 9-10; *Bradley,* 2015 WL 2189284, at *4, 7 and 8; *Allen,* 2013 WL 6237852, at *7-9; *England,* 370 F. Supp. 2d at 511; *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 864-65 (S.D. Ohio 2005); *Lawrence v. City of Philadelphia*, 2004 WL 945139, *2 (E.D. Pa. Apr. 29, 2004); *Marsh,* 242 F. Supp. 2d at 1094; *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, *2-3 (E.D. La. July 2, 2004); *Sheffield v. Orius Corp.*, 211 F.R.D. 412, 413 (D. Or. 2002); *Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d 433 (E.D. Va. 2002); *Dudley v. Texas Waste Sys., Inc.*, 2005 WL 1140605, at *1 (W.D. Tex. May 16, 2005).

*See* 29 C.F.R. § 785.11.14.  FLSA violations stemming from the decisions of individual TMs, rather than a common corporate policy or plan, are not appropriate for collective treatment under the FLSA. *Adair*, 2008 WL 4224360, at *7.  The individualized nature of this inquiry is only exacerbated where, as here, the alleged "off-the-clock" work took place at a CE's home, or in the field without any direct NCR supervision.

### 2.  To The Extent Conditional Certification Is Granted, Plaintiff's Proposed Form And Method Of Notice Is Inappropriate

Finally, if the Court decides to grant Plaintiff's Renewed Motion and authorize notice, it should deny Plaintiff's request for the telephone numbers and email addresses of members of the putative collective.  Providing such information would constitute an unnecessary intrusion into the privacy of individuals who are not yet parties to this action.  *See, e.g., Blakes*, 2011 WL 2446598, at *7 (and cases cited therein).  NCR also submits that in order to safeguard the privacy of members of the collective, and prevent improper attorney solicitation, a third-party vendor should administer any approved notice. *See In re Amer. Family Mut. Ins. Co. Overtime Pay Litig*., 2009 WL 248677, at *4 (D. Colo. Feb. 3, 2009).  Finally, any approved notice should incorporate the revisions to Plaintiff's proposed notice (Dkt. No. 59-3) set forth in Ex. R.

## IV.  CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiff's Renewed Motion For Conditional Certification And To Facilitate Notice Pursuant to 29 U.S.C. § 216(b) in its entirety.

Date:  June 19, 2017                    Respectfully submitted,

<div style="margin-left:40%">

NCR Corporation
By:_____*/s/ Thomas E. Hill*_____
Thomas E. Hill (admitted *pro hac vice*)
Christina T. Tellado (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:  (213) 457-8000
Email:  thill@reedsmith.com, ctellado@reedsmith.com

</div>

James A, Burns, Jr. (Bar No. 3126908)
REED SMITH LLP
10 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 207-1000
Email:  jburns@reedsmith.com

Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2017, I filed the foregoing document with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system which automatically served all counsel of record.

/s/ Thomas E. Hill