# EXHIBIT C

**ABBRUSCATO DECLARATION**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) | |
| | ) | Case No. 1:16-cv-6221 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Manish S. Shah |
| | ) | |
| NCR CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>DECLARATION OF THOMAS ABBRUSCATO</u>**

I, THOMAS ABBRUSCATO, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.      I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR").  I have held this position with NCR since January 2017, when the former TM, Evangelos Lizarzos, retired.  Prior to that time, I held the positions of TM for NCR from March 2015 to roughly November 2016, and Regional Technical Support Specialist for NCR from 2008 to March 2015.

3.      In my position as TM, my duties include working on daily and long-term schedules for Customer Engineers ("CE"s), approving time entries for CEs, providing training for CEs, and helping CEs fix problems they may face in the field.

4.      In my position as TM, I have responsibility for the field service operations within my assigned territory in New York.  This is the same territory in which I worked as a TM from

roughly March 2015 to roughly November 2016. I currently oversee 46 CEs, who are unionized employees. There are no Team Leads in my territory.

5.      In my territory, CEs generally perform repair and maintenance work on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*i.e.*, point-of-sale equipment) or financial (*i.e.*, ATM equipment) customers. Prior to March 2015, there were separate retail and financial zones. Since the March 2015 restructuring, about 85% of my CEs work on the financial side, and 15% work retail; 6 or 7 CEs work on both sides. Daniel Conrad has always worked on the financial side.

6.      Under the union contract, CEs are scheduled for 5 days per week and can work up to 12 hours per day but are permitted to go home instead. CE shifts begin at different times throughout the day. All shifts are set out in the union contract, and any changes to a CE's schedule require two weeks' notice under the contract.

7.      In my territory, CEs are not required to turn on their phones before the start of their shifts. Rather CEs are required to be within the territory by the start of their shift. Of the 46 CEs in my territory, 42 CEs live within the territory. The four CEs who do not live in the territory are required to be at the territory's border by the time their shift starts.

8.      CEs are required to input their work via an application called WorkDay on their NCR-issued Android handheld devices. As TM, I verify the times reported in Workday. I stress to CEs that they must be accurate in everything they do regarding time reporting.

9.      If any CE in my territory works any hours prior to or after their shift, the CE is able to record that time and will be compensated for overtime. This routinely happens within my territory.

10.     In addition to NCR's electronic timekeeping application WorkDay, CEs use an electronic call activity application called ES Mobility to update the status of customer service calls.  The two applications are completely different: WorkDay is used exclusively to record CEs' work time, while the call activity system is used to record the status of service calls (*e.g.*, "traveling" "on site," "cancel call," "working on call," "complete call," *etc.*).  Entering these service call activity inputs on the handheld only takes a few seconds.

11.     Daniel Conrad is a CE working in my territory.  I have reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated March 6, 2017, and I know that his declaration contains numerous inaccuracies.  For example, there is no NCR requirement that CEs "charge up the track key for customer access" before or after their shift.  Similarly, there is no NCR requirement that CEs check their emails or assignments 30 minutes before their shifts start, and I have never instructed Mr. Conrad or any other CE working under me to do this.  Contrary to what Mr. Conrad states in his declaration, there is no NCR requirement that CEs enter their ETAs before leaving home.  Moreover, CEs in my territory do not call customers; indeed, for the vast majority who service ATMs (including Mr. Conrad) there is no customer for them to call.

12.     I consider the alleged time for daily pre- and post-shift off the clock work that Mr. Conrad estimates in his declaration to be outlandish.  According to NCR policies and practice, none of this work needs to be or should be done off the clock.  Moreover, even if such tasks are performed, the time necessary to complete them has been greatly exaggerated by Mr. Conrad.

//

//

//

- 3 -

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Executed this _12_ day of _June_, 2017, at _Hickville_, New York.

THOMAS ABBRUSCATO

- 4 -

**BASS DECLARATION**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) | |
| | ) | Case No. 1:16-cv-6221 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Manish S. Shah |
| NCR CORPORATION | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF CHARLES BASS

I, CHARLES BASS, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.      I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position with NCR since late 2013. Prior to that time, I held the positions of Senior Customer Engineer ("CE") for NCR from July 22, 2013 to late 2013, and Customer Engineer II ("CE") for NCR from January 7, 2008 to July 22, 2013.

3.      In my position as TM, I have primary responsibility for the field service operations within my assigned territory in Ohio. I am also currently overseeing a second territory that includes parts of Ohio, West Virginia and Virginia. In each territory, I have approximately 35 CEs and 2 Team Leads who report to me. I am responsible for managing and overseeing the 70 CEs' and 4 Team Leads' daily work activities in the field. I do so by monitoring the progress of their work orders and their timekeeping entries on NCR's ES Mobility and WorkDay systems, respectively. I also hold conference calls with all employees

who I supervise every other week to address any field operations problems and reinforce positive practices.

4.     In my territory, CEs generally complete maintenance and repair work orders on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*i.e.*, point-of-sale equipment) or financial (*i.e.*, ATM equipment) customers. My primary Ohio territory is divided into the following service areas: Cleveland, Toledo, Canton/Akron, and Lima. My secondary, temporary territory is divided into the following service areas: Columbus, Charleston, Willing, Eckley, Clarksburg and Appalachia. In all of the service areas except Cleveland, CEs are generalists who perform both retail and financial work orders. In Cleveland, CEs either primarily or exclusively perform one type of work order.

5.     The CE I position is an entry level position. In that regard, a CE I does not work on complex customer call assignments. For instance, retail CE Is are assigned simple customer calls and are not qualified or authorized to work on networking or self-checkout issues. Financial CE Is perform customer calls that do not require the use of tools or parts. CE IIs are trained and are equipped to handle complex customer calls. CE IIIs (also known as Senior CEs) are experienced CEs and they often perform special projects like installations and trainings. Finally, Team Leads provide the first level troubleshooting for the CEs and assist with scheduling CEs in the territory.

6.     Each service area within my territories has its own rotating work schedule. CEs provide me with their preferred shift start times and I draft the schedule. The standard work shifts in my territories are 8:00 a.m. to 5:00 p.m., 12:00 p.m. to 9:00 p.m., and 3:00 p.m. to 12:00 a.m.

7.     CEs receive work assignments through the ES Mobility application, which is accessed on the CE's NCR-provided Android device.  CEs use the same application and device to communicate service-related information to NCR's Group Service Planners and NCR management, update the status of service calls and order parts.  CEs use a completely separate application, WorkDay, for timekeeping.

8.     As a CE, I would check my NCR-provided Android device to find the location of my first service call of the day.  When I was a CE, I absolutely reported and was paid for all the time that I worked.  I was able to report all of my hours worked and I was never discouraged from doing so.  Every CE knew that NCR prohibited off the clock work.

9.     In my territories, I have communicated my expectation that CEs should generally arrive at their first service call location by the beginning of their work shift.  For example, if a CE's shift begins at 8:00 a.m. and the first service call is 10 minutes away, the CE should leave by 7:50 a.m. to arrive at the customer site by 8:00 a.m.

10.     I have also communicated to the CEs who I supervise that off the clock work is prohibited.  I regularly reinforce this prohibition to my CEs and remind them that they should be reporting all of their work time in the WorkDay timekeeping application on a daily basis.  I make sure that each CE is paid for all of their work time.

11.     Regarding meal breaks, I regularly remind CEs of the importance of meal breaks and instruct them that they need to take their meal breaks.  CEs are aware that it is my expectation and NCR policy that they take an off-duty meal break each day.  However, if a CE works through the meal break, he or she will be paid for any time worked and reported.

12.     David Caley and Michael Zack work as CEs in my primary Ohio territory.  I have reviewed their declarations that they signed in connection with the *Meadows* lawsuit, dated

- 3 -

March 4, 2017 and March 5, 2017, respectively, and I know that each declaration contains many inaccuracies. For example, the only thing that a CE has to do before a shift begins is see where the first customer location is, which only takes a minute or two—at most. There is absolutely no NCR policy or practice that requires CEs to review any emails or assignments prior to the start of their shift. I have never instructed Mr. Caley, Mr. Zack, or any other CE to do so, or to perform any work off the clock. Instead, my expectation is that emails are read and responded to when the CE is on the clock. Likewise, pre-calling customers is simply not something that is necessary, instructed, or permitted to take place off the clock. Similarly, there is no requirement that CEs order or pick parts or communicate with NCR dispatch in "the tower" prior to the start of their shift. Such activities are only to be conducted after the CE is on the clock. Moreover, the processing of service parts should take place immediately after each job. I have never instructed any CE to process parts, order parts, or perform any work for NCR whatsoever off the clock. Finally, training is typically assigned when a CE does not have service calls to complete, and is only permitted to be completed during on the clock, compensated time.

I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

Executed this 12 day of June, 2017, at Martins Ferry, Ohio.

Charles Bass

- 4 -

**BEAVERS DECLARATION**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated )))) | |
| Plaintiff, | Case No. 1:16-cv-6221 |
| v. | Judge Manish S. Shah |
| NCR CORPORATION | |
| Defendant. | |

## DECLARATION OF HAROLD BEAVERS

I, HAROLD BEAVERS, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.      I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position with NCR since early 2016. Prior to that time, I held the position of Field Operations Senior Manager ("FOSM") for NCR from 2014 to 2015. I have also worked as a TM with NCR multiple, additional times in the last 15 years, in addition to working in other field operations positions for NCR during that time.

3.      In my position as FOSM, I was responsible for service delivery for all customers within my assigned territory in the Mid-Atlantic region. As FOSM, I was responsible for direct oversight of the 11 TMs in the Mid-Atlantic market from 2014 to 2015.

4.      In my current position as TM, I have responsibility for the field service operations within my assigned territory located in North Carolina. I oversee the work performed by 33 Customer Engineers ("CE"s) and two Team Leads that report directly to me. For roughly the

- 1 -

first six months of 2016, I oversaw a different geographic territory. That territory had about 44 CEs and two Team Leads. As a TM, my main job is to manage and oversee the CEs' and Team Leads' daily work activities in the field. This requires me to communicate with my field team throughout the work day via email and telephone, communicate with my assigned Service Planner, hold weekly conference calls with my field team, and monitor metrics performance of my area and the dashboard report.

5.      CEs generally complete maintenance and repair work orders on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*i.e.*, point-of-sale equipment) or financial (*i.e.*, ATM equipment) customers. My territory is divided into the following geographic service areas: (1) Charlotte, (2) Hickory/Boone, and (3) Asheville. Most CEs solely perform either retail or financial work, but a limited number of CEs are cross-trained to be able to respond to both types of work orders. For example, in Asheville and Hickory/Boone, the CEs are trained for and dispatched to both types of service calls.

6.      I currently have CEs with varying job responsibilities who report to me. For example, I currently have four CE Is. In general, CE Is do not work on complex problems, as it is an entry level position. The other CEs on my team have more training and ability to handle complex service calls and troubleshooting. Finally, Team Leads on my team provide first line technical support for CEs on my team, complete special projects and run service calls.

7.      The schedule in my territory is created by my Team Leads in consultation with the CEs. CE shift times vary and rotate by service area, but the standard shift times are 8:00 a.m. to 5:00 p.m., 9:00 a.m. to 6:00 p.m., 11 a.m. to 8:00 p.m., and 1:00 p.m. to 10:00 p.m. CEs receive their assignments electronically via their NCR-issued Android handheld devices. I instruct my CEs generally to check their first assignment 30 minutes before the start of their

shift, which only takes a few seconds. I also explicitly instruct them not to do any work prior to their scheduled shift start time. Further, I have informed the CEs on my team that if any work is performed before or after their scheduled shift times, that work time must be reported in NCR's timekeeping system.

8. I have communicated to my team that NCR requires all time worked to be reported and that off the clock work is prohibited. I have never instructed a CE or any other NCR employee who I supervised to perform any work off the clock. Rather, I regularly remind my CEs that they need to report all of their work time in Workday, NCR's timekeeping application. In fact, I have raised this issue during our weekly team conference calls.

9. I have consistently instructed CEs under my supervision that they are required to take a daily, one hour off-duty lunch break. On occasion, I have approved that a CE could take an abbreviated lunch break, but only if they requested permission beforehand.

10. Sheri Campos works as a CE in my territory. I have reviewed the declaration that she signed in connection with the *Meadows* lawsuit, dated February 15, 2017, and I know that it includes many inaccuracies. For example, Ms. Campos is scheduled to work five days per week, not six. Further, there is no NCR requirement that CEs check their emails or assignments, or perform any work 30 minutes before the start of a shift, and I have absolutely never told Ms. Campos or any other CE to do so, or to work off the clock in any other way. In fact, I have had to coach Ms. Campos regarding the necessity of reporting time she spent responding to emails and phone calls outside her scheduled shift; I did not instruct her to respond to the emails or phone calls, but once I found out that she did I required that she report the time so that she could be paid for it. Similarly, there is simply no requirement that CEs pre-call customers and I have never instructed or encouraged a CE to do so; any such calls can and should take place during the

shift. Finally, Ms. Campos should not be removing parts from her vehicle at home, meaning there is no reason for her to load or unload the vehicle.

11.     When I was a CE, I always reported and was paid for all the time that I worked and never worked off the clock. I knew that NCR prohibited off the clock work and I never had a TM or any other supervisor instruct me to work off the clock at all.

I declare under penalty of perjury under the laws of the United States of America and the State of North Carolina that the foregoing is true and correct.

Executed this _12th_ day of _June_, 2017, at _Sherrills Ford_, North Carolina.

Harold Beavers

- 4 -

**BETHEA DECLARATION**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL MEADOWS, Individually, and )
on Behalf of All Others Similarly Situated, )
 )
   Plaintiff, ) Case No. 1:16-cv-6221
 )
  v. )
 )
NCR CORPORATION, ) Judge Manish S. Shah
 )
   Defendant. )
 )

## DECLARATION OF CHRYSTAL BETHEA

I, CHRYSTAL BETHEA, declare:

1. I have personal knowledge of the facts set forth in this declaration, and I could and would testify competently to these facts under oath if called as a witness in this matter.

2. I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position continuously with NCR for the past 5 years and have been employed by NCR for a total of 10 years.

3. As a TM, I am responsible for the field service operations within my assigned territory. My current territory covers NCR's field service operations within Atlanta, Georgia and the surrounding area. I manage the daily work activities of 41 CEs, 3 Senior CEs and 2 Team Leads.

4. CEs in my territory are categorized as either CE Is or CE IIs. CE Is performs "first line maintenance" work, which is generally limited to performing relatively simple work, such as clearing paper jams. CE IIs perform "second line maintenance" work, which includes

more complex jobs. For any support or assistance, I direct my CEs to first contact Senior CEs and then the Team Leads, who are focused on reducing revisits on customer jobs. All of my CEs have company-owned vehicles.

5.      CEs are scheduled about a month at a time. Any change to the schedule must be submitted two weeks in advance. A typical schedule for a CE in my territory is nine hours per day, five days per week, with a one hour off-duty lunch period each day. CEs are expected to take an hour off-duty lunch break every day. CEs are paid for all time worked and reported by the CEs.

6.      Every CE has a NCR-issued Android phone with various applications, including an electronic call activity application for updating the status of customer calls. Just before commencing their commute, CEs are expected to "go dispatch" (or "go travel") on the call activity application. CEs are expected to begin their commute 30 minutes before the start of their shift, if their first assignment requires a 30-minute commute. Thus, if the first assignment is only 5 minutes away, the CE can wait to begin his commute 5 minutes before his shift. In my territory, CEs are generally organized or "zoned" geographically in order to reduce their commute time.

7.      Jared Nyaberi is a CE with NCR who works within my territory performing ATM work for NCR's financial customers. Mr. Nyaberi does not perform any work for NCR's retail customers. I manage Mr. Nyaberi through my role as a TM. I have certain observations regarding various statements contained in the declaration Mr. Nyaberi has signed and submitted in this lawsuit, as set forth in paragraphs 9 and 10 of this declaration.

8.      Caroline Varner is a CE, formerly with NCR, who worked within my territory performing ATM work for NCR's financial customers. Ms. Varner did not perform any work

for NCR's retail customers. I managed Ms. Varner through my role as a TM. I have certain observations regarding various statements contained in the declaration Ms. Varner has signed and submitted in this lawsuit, as set forth in paragraphs 9 and 10 of this declaration.

9.      "Pre-calling" customers before the start of a shift is not required of CEs, particularly those performing ATM work for NCR's financial customers. In fact, pre-calling customers is not even possible; because they service ATMs, there is no one for them to call. CEs are also not required to check their email before the start of their shift and do not have any parts to load onto their service vehicle.

10.     Tasks such as entering time on a timesheet, order processing, and daily "key audits" should be performed while on the clock. Any ordering of parts should also be performed while on the clock because it occurs while a CE is still at the customer site.

11.     Although I schedule online trainings during shifts, there have been CEs who performed online trainings outside of their shift hours. I told these CEs to report their time, after which I approve it. NCR has a strong policy prohibiting off-the-clock work and ensuring that all of my CEs are paid for every hour reported.

I declare under penalty of perjury under the laws of the United States of America and the State of Georgia that the foregoing is true and correct.

Executed this 13th day of June, 2017, at Decatur, Georgia

*Chrystal D Bethea*
Chrystal Bethea

- 3 -

**DOSIE DECLARATION**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) | |
| | ) | Case No. 1:16-cv-6221 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Manish S. Shah |
| | ) | |
| NCR CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DECLARATION OF MILTON SCOTT DOSIE</u>

I, MILTON SCOTT DOSIE, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.      I am currently employed as a Team Lead with NCR Corporation ("NCR"). I have held this position with NCR since January 2016. Prior to that time, I held the positions of Territory Manager ("TM") for NCR from April 2015 to January 2016, and Customer Engineer ("CE") for NCR from 2004 to April 2015.

3.      In my position as Team Lead, I provide troubleshooting support to CEs as needed regarding issues/problems they may face in repairing and/or maintaining NCR-manufactured equipment in the field. I also provide training to CEs from time to time, and help coach CEs to higher levels of performance.

4.      In my position as TM, I had responsibility for the field service operations within my assigned territory in California. This is the same territory in which I currently work as a Team Lead, and in which I previously worked as a CE. As a TM, I had CE Is, CE IIs, CE IIIs

(aka Senior CEs), a CE-S (assigned to a specific district) and Team Leads who reported to me. I was responsible for managing the daily work activities for as many as 22 NCR CEs in the field. I did so by reviewing their activities on NCR's call activity system, as well as through GPS monitoring. I also received reports regarding call activities and certain performance metrics, and I routinely called CEs throughout the day to check in with them regarding their work and to offer encouragement and help.

5.      In my territory, CEs generally perform repair and maintenance work on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*e.g.*, point-of-sale equipment) or financial (*e.g.*, ATM equipment) customers. CEs are organized into work groups based on where they live and whether they do retail or financial work. This organizational structure is intended in part to keep CEs working reasonably close to where they live in order to reduce their drive times.

6.      The CE I position is the entry level CE job. A CE I is generally limited to performing relatively simple work such as clearing paper jams. Per NCR policy, a CE I is not supposed to use any tools on the job -- not even a screwdriver. CE IIs have more experience and training and are authorized by NCR to use tools. They also can troubleshoot problems in a way that is beyond the capability and scope of authority of a CE I. CE IIIs generally have even more training/capability than CE IIs, and may have more seniority. Team Leads provide troubleshooting support to CEs regarding specific issues, as well as some training and coaching where needed.

7.      CEs receive their assignments electronically each morning via their NCR-issued Android handheld devices. As a CE, I would usually take two or three minutes to review my assignments for the day while drinking my morning coffee at home. I did this solely for my own

benefit and to ensure a more relaxed start to my day. My scheduled shift as a CE was 8:00 a.m. to 5:00 p.m., with a one hour off-duty lunch break. I generally clocked in for my shift by 8:00 a.m. while still at home, and I was generally on the road in my NCR service vehicle and on my way to my first assignment of the day by 8:15 a.m. I did not clock out for the day until I had returned to my home after my final assignment of the day. I routinely (on at least 95% of my work days) took a one hour lunch break as a CE, and, whenever I failed to do so, it was always because I voluntarily chose to forego the break. In my view, it is very easy for a CE to find time to take a one hour off duty lunch break during his shift.

8. The foregoing schedule and timekeeping practices are consistent with what applies to me today as a Team Lead. I currently record my time in Workday, an application on my NCR-issued handheld device that is dedicated exclusively to timekeeping. Workday is very simple to use and includes error screens to alert me if I have missed a required time entry. There is nothing about Workday that prevents me from entering clock-in or clock-out times outside the time parameters of my scheduled work shifts, and I have clocked in for the day as early as "4:00 a.m." when that was my correct start time. I have always been paid by NCR for all the time that I have recorded, including all overtime.

9. As a TM, my general expectation was that my CEs be on site at their first customer assignment for the day by 9:00 a.m., but that they clock in for their shift while at home and prior to commencing their commute to their first assignment, and that they clock out for the day no sooner than when they returned home from their final assignment. I also expected and instructed the CEs under my supervision to take a one hour off-duty lunch break each day, and to record all of their work time accurately on NCR's electronic timekeeping system (originally Ceridian and now Workday). I never instructed or otherwise required a CE working for me to

- 3 -

work off the clock, and I know now as a Team Lead and knew before as both a TM and CE that

off the clock work is prohibited by NCR's policies.

10.     In addition to NCR's electronic timekeeping application, an electronic call

activity application exists on NCR-issued handhelds for purposes of updating the status of

customer orders/assignments. For example, just before commencing my commute as a CE (and

now as a Team Lead), I would (and still do) enter "go travel" on the call activity application

(originally D-1 and now ES Mobility). The electronic timekeeping and call activity applications

on the NCR-issued handheld are completely independent of each other, require separate entries

or inputs on the device, and record different information. In that regard, the electronic

timekeeping system is used exclusively to record CE work time, while the call activity system is

not used for timekeeping at all, but rather to record the status of a call/customer service order

(*e.g.*, "on site," "cancel call," "working on call," "complete call," *etc.*). Making these call

activity inputs on the handheld literally takes but a few seconds.

11.     Consistent with the above description of my own schedule and timekeeping

practices as a CE and now as a Team Lead, CEs and Team Leads in California are required to

record as time worked all of their commute time, and they are in fact paid for all such time.

Again, this is how I recorded my time and was paid as a CE, it is how the CEs under my

supervision recorded their time and were paid, and it is how I now record my time and am paid

as a Team Lead.

12.     Bryan Seaton was a CE working in my territory while I was a TM. I have

reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated March 3,

2017, and I know that declaration contains many inaccuracies. For example, there is no NCR

requirement that CEs check their emails, assignments or anything else 30 minutes prior to their

- 4 -

shifts, and there is no NCR policy setting forth any such requirement. I certainly never instructed Mr. Seaton or any other CE working under my supervision to do this, and I never considered this to be something I was required to do as a CE or that I am now required to do as a Team Lead. Moreover, CEs can easily perform tasks such as ordering parts, reviewing emails and assignments, and completing key audits during their scheduled shifts, and there is no NCR requirement that such work be done off the clock and pre- or post-shift. The same applies to a CE picking up parts at FedEx off the clock and before clocking in for a shift; indeed, FedEx offices are generally not even open before the start of a CE shift. Contrary to what Mr. Seaton suggests in his declaration, there is no reason for a CE to "map out" his daily "routes" prior to commencing his shift inasmuch as most CEs are very familiar with how to get around their well-defined geographic work areas, have a GPS system in their service vehicle that they can use to guide themselves, and, as a practical matter, only need to know how to get to their first assignment of the day at the start of their shift. Similarly, the "pre-calling" of customers to which Mr. Seaton refers in his declaration, and doing so off the clock and before the start of a shift, makes absolutely no sense because NCR's customer contacts are generally not at work and available to receive such calls at that time. Indeed, with respect to CEs who work on ATMs, there usually isn't even a "customer" to call, since most ATM service calls are generated by the ATM itself. In addition, there is generally no reason for a CE to "load" or "unload" tools or parts/equipment in or from his service vehicle at the beginning or end of the work day as Mr. Seaton also suggests in his declaration. CE Is are not even permitted to use tools or change out parts per NCR policy, and CE IIs and IIIs can (and do) leave the tools and parts they use in their service vehicles overnight. Finally, the "key audits" to which Mr. Seaton refers in his declaration generally take seconds and no more than a minute or two at most to complete, and

are not even necessary if the CE does not use one or more of his keys during the workday, which is routinely the case.

13.     I consider the time estimates for daily pre- and post-shift off the clock work that Mr. Seaton provides in his declaration to be ridiculous.  First, none of this work needs to be or should be done off the clock consistent with NCR's policies.  Second, the time necessary to complete the specified tasks has been grossly inflated by Mr. Seaton.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this ___12th___ day of __June__, 2017, at ___Alpine___, California.

Milton Scott Dosie

- 6 -

**FISHER DECLARATION**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:16-cv-6221 |
| v. | ) ) | |
| NCR CORPORATION, | ) ) | Judge Manish S. Shah |
| Defendant. | ) ) ) | |

## DECLARATION OF DAVID FISHER

I, DAVID FISHER, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would testify competently to these facts under oath if called as a witness in this matter.

2.      I am currently employed as a Team Lead with NCR Corporation ("NCR"). I have held this position with NCR since August 2016. Prior to voluntarily assuming the position of Team Lead, I was a Territory Manager ("TM") with NCR for 8 years and a Customer Engineer ("CE") with NCR for 29 years.

3.      As a TM, I had responsibility for the field operations within my assigned territory in Pennsylvania. I managed the daily work activities of 47 CEs and 3 Team Leads. The Team Leads helped distribute information to CEs, performed ride-alongs, and were the first line of support to the CEs.

4.      In the territory I managed as a TM, all of the CEs outside of the Pittsburgh area performed both point-of-sale work for NCR's retail customers and ATM work for NCR's

financial customers. The CEs covering the Pittsburgh territory performed work for either retail or financial customers, but not both. My CEs were generally organized into seven "work groups" based on geography.

5. A typical schedule for a CE in my territory was nine hours per day, five days per week, with a one hour off-duty lunch period each day. For example, some CEs were scheduled from 12 p.m. to 9 p.m. or 8 a.m. to 5 p.m., with a one hour off-duty lunch. Every third week CEs would be on-call for "Availability" ("AV") on the days they were not on the schedule. When CEs are on AV, they are paid from the moment they leave their home to respond to a service call.

6. CEs are required to view and confirm their work order assignments 30 minutes before the start of their shift. CEs do not necessarily need to start their commute 30 minutes before their shift, but rather merely need to be on-site at their first assignment at the start of their shift. Any commute time over 30 minutes is compensated.

7. Every CE has a NCR-issued Android phone with various applications that are used for work purposes. One of those applications is "ES Mobility," which is used for customer work order management. Prior to the start of his shift, a CE simply has to turn on ES Mobility to see where his first assignment is located. CEs should not have been doing anything else work related before the start of their shift.

8. CEs were required to report their time in the "WorkDay" application, which is used exclusively for timekeeping purposes and is a separate application from ES Mobility. During my time as TM, I regularly followed up with any CE that failed to report their work time.

9. In my role as TM, I did not receive any complaints from CEs regarding off the clock work or any alleged unpaid work time. If a CE ever contacted me saying they could not

complete an assignment or task during their shift, I would always instruct them to report their work time.

10.     Based on my 29 years of experience as a CE, I can confirm that all of the time I spent working for NCR and reported was always paid. I was never prohibited or discouraged from accurately reporting all of my work hours as a CE. As a TM, I regularly discussed and reiterated to my CEs that any work time outside of their shift hours needed to be reported and that they were not supposed to work off the clock. I also worked with my CEs to make sure that they were taking their meal breaks in the middle of their shift.

11.     Timothy Belcher is a CE II with NCR who worked in my territory while I was a TM. I have reviewed the declaration signed in connection with the *Meadows* lawsuit, dated February 3, 2017, and I know that declaration contains many inaccuracies. For example, before the start of their shift, CEs were required to merely turn on their phone, see where they were going, and hit "go traveling" on ES Mobility. This action takes mere second to complete. Further, there was no reason for Mr. Belcher to make any phone calls prior to the start of his shift. As a TM, I did not tell anyone to perform any work off-the-clock. Additionally, Mr. Belcher should not be taking anything into his home at the end of his shift. All parts must be kept in the service vehicle or at his assigned storage shed. Although keys are supposed to be kept in a safe place, CEs are allowed to leave them in the service vehicle if the CE has a garage. Moreover, contrary to Mr. Belcher's declaration, CEs should not be entering estimated times of arrival ("ETA") on the routing application because there is a default ETA automatically recorded by the application.

12.     Mary Karen Hoffman was a CE II working in my territory while I was a TM with NCR. She performed ATM work for NCR's financial customers only. I have reviewed the

- 3 -

declaration signed in connection with the *Meadows* lawsuit, dated February 3, 2017, and I know that declaration contains several inaccuracies. For example, Ms. Hoffman was not required to perform any work after she closed her last job in the field. Specifically, after the end of her shift, Ms. Hoffman was not required to order or process parts, complete expense reports, enter time on a timesheet, or complete "out of scope" reports on outstanding calls. If Ms. Hoffman decided to perform such tasks on her own, she was aware that she would have been paid for that time if she had reported it.

I declare under penalty of perjury under the laws of the United States of America and the State of Pennsylvania that the foregoing is true and correct.

Executed this __June__ day of __13__, 2017, at __Birdsboro__, Pennsylvania

David Fisher

- 4 -

**KARRULI DECLARATION**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NCR CORPORATION, <br><br> Defendant. | Case No. 1:16-cv-6221 <br><br> Judge Manish S. Shah |

## DECLARATION OF BILLY KARRULI

I, BILLY KARRULI, declare:

1. I have personal knowledge of the facts set forth in this declaration, and I could and would testify competently to these facts under oath if called as a witness in this matter.

2. I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position continuously with NCR since 2011. Prior to assuming the position of TM, I was a Customer Engineer ("CE") with NCR for four years, which includes experience as a Senior CE.

3. As a TM, I am responsible for the field service operations within my assigned territory. My current territory covers NCR's field service operations in Dallas and Fort Worth, Texas, where I also worked during my time as a CE. I manage the daily work activities of 74 CEs who work in the field within my territory.

4. In my territory, CEs generally perform either point-of-sale work for NCR's retail customers, or ATM work for NCR's financial customers, although some CEs are trained to

- 1 -

handle both types of work orders. My CEs are organized into five "work groups": Dallas Financial North, Dallas Financial South, Fort Worth Financial, DFW Retail and the Install Group. These groups are led by the Team Leads. The Team Leads generally help CEs with any technical issues that may arise and make sure that CEs have the proper tools and training to complete their service calls.

5.     CEs who perform work for NCR's financial customers respond to service calls created and reported by ATMs automatically when an issue arises. The response time for such ATM calls is approximately between two to three hours. Financial CEs are scheduled in multiple shifts, the earliest of which begins at 7:00 a.m. The latest shift begins at 3:00 p.m. and ends at 12:00 a.m. CEs who perform work for NCR's retail customers are scheduled on shifts that begin at 8:00 a.m., 9:00 a.m. or 10:00 a.m. All of the schedules are nine hour shifts with a required one hour off-duty meal break. Anyone working outside of those hours or not taking the mandated meal break is required to notify me.

6.     CEs are required to be at their first assignment of the day when their shift begins. For example, if a CE lives 15 minutes away from his first assignment, he can leave his house whenever he chooses, as long as he arrives by the start of his shift. If the CE arrives on site early, he is then required to enter his "call" activity (i.e., work order status) as "work in progress" in ES Mobility and report his start of work in WorkDay using his NCR-provided Android phone.

7.     CEs are required to enter their "call" activity via an Oracle application on their NCR-provided Android device. For example, when a CE commences his morning commute or any other travel time during the day, he will enter "going traveling" in the application and then will change the status to "work in progress" upon on-site arrival. Although certain types of work orders may be dispatched to a CE's device up to one hour before his shift, CEs are not required

- 2 -

to review their work orders or begin their commute any earlier than 30 minutes before their shift. Additionally, CEs will be paid for any travel time home that exceeds 30 minutes.

8.      WorkDay is used exclusively for timekeeping purposes. CEs record their time by "clocking in" on WorkDay. I review the time entries recorded on WorkDay and have never denied or altered any time reported by a CE.

9.      All CEs get paid for any time spent performing work for NCR. As a CE, I would often work overtime, but no manager ever asked or forced me to work overtime or to work off the clock. Moreover, during orientation and basic training in my territory, the Team Leads inform the CEs that they need to record all of their time, which I reiterate to my CEs during our weekly calls. In order to ensure that CEs are reporting their time correctly, all CEs are required to obtain approval before participating in any training, conference calls or other personal tasks outside of their scheduled shifts. Additionally, any time spent on the maintenance or repair of their NCR-issued service vehicles, purchasing special tools, or picking up parts, is supposed to occur during their shift hours.

10.     Ryan Barnett was a CE working in my territory while I was a TM. I have reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated March 8, 2017, and I know that the declaration contains many inaccuracies. For example, Mr. Barnett performed ATM work for NCR's financial customers only. He did not perform any work for NCR's retail customers. Also, contrary to his declaration, Mr. Barnett was not scheduled to work six days per week because I never scheduled any CE to work six day per week. I certainly never instructed Mr. Barnett to enter his start time when he arrived at the first customer site of the day or his end time when he completed his last customer job in the field. In addition, Mr. Barnett's statement regarding "pre-shift work" updating work order notes for customers or

- 3 -

entering an estimated time of arrival ("ETA") on NCR's routing application is also incorrect. The Oracle routing application automatically enters the ETA, and a live agent updates the work order notes for customers. Moreover, Mr. Barnett should not have spent any time manually entering his time into a timesheet because the WorkDay application automatically enters it in real time.

I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct.

Executed this 06, day of 13, 2017, at Fort Worth , Texas.

_Billy Karruli_
Billy Karruli

- 4 -

**KENT DECLARATION**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) | |
| | ) | Case No. 1:16-cv-6221 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Manish S. Shah |
| NCR CORPORATION | ) ) | |
| Defendant. | ) ) ) | |

### DECLARATION OF JAMES R. KENT

I, JAMES R. KENT, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.      I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position with NCR since 2008. Prior to that time, I held the position of Customer Engineer ("CE") for NCR from 1995 to 2008.

3.      In my position as TM, I have responsibility for the field service operations within my assigned territory in North Carolina. I oversee 39 CEs and two Team Leads that report to me. My responsibility as TM is to manage and oversee the CEs' and Team Leads' daily work activities in the field. I do so by holding conference calls with my team, monitoring their productivity metrics, and staying in communication with them throughout the work day.

4.      In my territory, CEs generally complete maintenance and repair service calls on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*i.e.*, point-of-sale equipment) or financial (*i.e.*, ATM equipment) customers. My territory is divided into

the following five service areas: (1) Winston/Salem, (2) Raleigh/Durham, (3) Rocky Mount, (4) Goldsboro, and (5) Fayetteville. Most CEs perform either retail or financial work, but some of the CEs are "geo-trained" to be able to respond to both types of service calls.

5.      The skills and job responsibilities of the CEs on my team are varied. I currently have six entry-level CEs (CE Is) on my team. In general, CE Is do not work on complex service calls. For example, retail CE Is are not qualified or authorized to work on self-checkout service calls. Instead, these CEs perform simpler point-of-sale tasks and only use very basic tools. Financial CE Is do not use any tools or parts except for ribbon replacement; they work on the most basic issues. The other 33 CEs on my team have more training and capability to handle complex service calls. Some of these CEs are dedicated to performing installation work only. Finally, Team Leads respond to service calls but are also the first line of technical support for CEs.

6.      I review and approve all CE work schedules in my territory, but each service area has different people who initially create the proposed schedule. For example, in Winston/Salem and Fayetteville, the Team Lead creates the schedule for my approval. The standard shifts are staggered nine hour shifts, with a one hour off-duty lunch break.

7.      Regarding commute time, my expectation is that a CE is en route to his first service call before the start of his shift. If the location is less than 30 minutes away from the CE's home, then the CE merely needs to arrive at the work site by the beginning of the shift. If the service call is located 30 minutes or more from the CE's home, the CE still is expected to leave 30 minutes before the start of his scheduled shift to travel to the service call. There are times when a CE does not have a service call assigned to him first thing in the morning. In such

- 2 -

cases, the CE must contact the Service Coordinator and record that time as work time in Workday.

8.     The CEs in my territory are well aware that NCR requires all time worked to be reported and that off the clock work is completely prohibited. In my role as TM, I regularly remind my assigned CEs that they need to report all of their time worked in the Workday application. Specifically, during my weekly conference calls, I remind the CEs on my team that all time worked is time paid that must be reported in Workday, and that NCR's timekeeping policies are not optional—they must be followed. I have instructed my CEs to enter their actual time in Workday on a daily basis, and I review and approve all of the CEs' time entries on a weekly basis. I have never changed any time entries made by any CE, nor have I ever instructed any CE to misreport their work time.

9.     I have also continually instructed my CEs to take lunch breaks and reinforce the expectation that they take an off-duty lunch break on a daily basis. However, I am aware that sometimes CEs choose not to take a lunch break. I instruct my CEs to let me know when they choose not to take a lunch break, and I remind them that any time spent working during what would have been their lunch break must be reported in Workday. It is time worked and the CE is compensated for that time.

10.     Kenneth Cline works as a CE in my territory. I have reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated August 19, 2016, and I know that it includes many inaccuracies. For example, contrary to his claim in his declaration that he typically works six days a week, Mr. Cline only works five days a week. Moreover, there is no instruction or requirement—from me or anyone else at NCR—that Mr. Cline or any other CE check emails, review assignments, enter estimated times of arrival ("ETA"s) or do anything else

- 3 -

work-related before their shifts or any other time off the clock. Similarly, the post-shift work that Mr. Cline claims he performs can and should be completed on the clock. Nothing is being sent to CEs that they need to look at off the clock. Indeed, I am aware that some of my CEs almost never look at their email and still complete their work without any problems. Regarding pre-shift phone calls, if a CE such as Mr. Cline were to receive a work-related phone call, he would be required to report that time in Workday as time worked. Neither I nor anyone else at NCR encourages or instructs CEs to make phone calls off the clock; Mr. Cline's claim that management encourages such calls is absolutely untrue. I would never do that. Similarly, there is simply no reason for Mr. Cline or any CE to ever take any parts from his vehicle into his house. Therefore, his claims in his declaration that he loads and unloads his vehicle make no sense to me; I certainly never instructed him to do so. Mr. Cline's claim that he completes 6-9 jobs per day is an exaggeration; he typically completes 4-5 jobs per day. Moreover, my CEs know that parts processing and ordering should be completed on the clock, during the shift. Indeed, the processing and ordering of parts is supposed to be noted in the service call's notes section, so it makes no sense to do so off the clock, after the service call task has been closed. As I mentioned above, I have repeatedly communicated to my CEs—including Mr. Cline—that time entries are to be completed and submitted on the clock, ideally in real time. Mr. Cline's claim that he instead makes his time entries at home is therefore a direct violation of my instructions. Similarly, I have repeatedly told Mr. Cline and my other CEs to take their one hour off-duty lunch breaks. I have told them not to answer the phone during their lunch breaks, but if those breaks are interrupted by work, the CE must report that time as time worked. CEs are always paid for such time reported.

11.     Scott Hunsberger works in my territory as a CE.  I have reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated February 28, 2017, and I know that it includes many inaccuracies.  In addition to the applicable inaccuracies highlighted in Paragraph 10, above (regarding pre-shift emails, reviewing assignments, ETAs, pre-calling, loading parts, post-shift time entries and unloading parts), Mr. Hunsberger's declaration includes the following additional inaccuracy:  review of the left-over call analysis (aka "LOCA") is not supposed to be conducted until the CE has begun his or her shift.  There is no NCR policy or practice instructing or even suggesting to CEs that LOCA review or any other work should be performed off the clock before a CE's shift begins, and I have never instructed Mr. Hunsberger or any other CE to do so.

12.     Patrick Williams works in my territory as a CE.  I have reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated February 9, 2017, and I know that it includes many inaccuracies.  In addition to the applicable inaccuracies highlighted in Paragraphs 10-11, above (regarding pre-shift emails, reviewing assignments, ETAs, and loading parts), Mr. Williams' claim that he performs any work before his shift begins strikes me as unbelievable.  Mr. Williams has over 37 years of experience as a CE; he knows that neither NCR as a company nor I as a TM encourage, instruct, or permit off the clock work.  If Mr. Williams did anything more than identify his first assignment before starting his shift, I am confident that he would have brought such activity to my attention right away and requested payment for any associated time.

13.     Joshua Hammett worked in my territory as a CE.  I have reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated February 16, 2017, and I know that it includes many inaccuracies.  In addition to the applicable inaccuracies highlighted in

Paragraphs 10-12, above (regarding pre-shift emails, reviewing assignments, ETAs, pre-calling, loading parts, post-shift time entries and unloading parts), Mr. Hammet's declaration includes the following additional inaccuracies: his standard schedule was only five days per week, for nine hours per day (including a one hour off-duty lunch break and not including any overtime worked). Mr. Hammett's claim that he was required to check his assignments at least 60 minutes before the start of his shift is not even remotely true. I have never instructed or even encouraged a CE to do so, and no NCR policy or practice would support that action by Mr. Hammet. As I stated above, there was no expectation that CEs leave home any earlier than 30 minutes before their shift; if they did leave more than 30 minutes before, that additional time was time worked that had to be reported. Finally, Mr. Hammett and all of my other CEs knew that any training should have been completed on the clock.

14.     When I was a CE I always was paid for all of the work time that I reported to NCR. I was responsible for self-reporting my hours worked to NCR. Every CE I worked with knew that NCR prohibited off the clock work and I never had a TM or any other NCR supervisor require, instruct, or encourage me to work off the clock.

I declare under penalty of perjury under the laws of the United States of America and the State of North Carolina that the foregoing is true and correct.

Executed this __13__ day of __June__, 2017, at __Wake Forest__, North Carolina.

_____
James R. Kent

- 6 -

**MOUSAAD DECLARATION**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:16-cv-6221 |
| v. | ) ) | |
| NCR CORPORATION, | ) ) | Judge Manish S. Shah |
| Defendant. | ) ) ) | |

**<u>DECLARATION OF RAYMOND MOUSAAD</u>**

I, RAYMOND MOUSAAD, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would testify competently to these facts under oath if called as a witness in this matter.

2.      I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position with NCR for the past two years. Prior to assuming the position of TM, I was a Technical Support Specialist for a year and half, and a Customer Engineer ("CE") for two and half years. Thus, I have been employed with NCR for over six years.

3.      As a TM, I am responsible for the field service operations within my assigned territory. My current territory covers NCR's field service operations in Brooklyn and Queens, New York. I manage every aspect of the daily work activities of 47 CEs who work in the field within my territory. I do so by reviewing calls closed throughout the day and by regularly communicating with CEs. In addition, I also regularly check in with CEs who work late at night via telephone.

4.      In my territory, five CEs perform point-of-sale work for NCR's retail customers, while 42 CEs perform ATM work for NCR's financial customers.  Although all of my CEs work throughout the entirety of my territory, I cluster work order assignments geographically for CEs to alleviate traffic concerns.

5.      All of the CEs within my territory are union employees, and the terms and conditions of their employment are governed by a collective bargaining agreement ("CBA") between NCR and Local 202 of the International Brotherhood of Teamsters ("Local 202").  The current CBA between NCR and Local 202 took effect on July 1, 2014, and runs through June 30, 2017.

6.      For the CEs in my territory their schedules and the rules related to a CE's hours of work are set forth in the CBA with Local 202.

7.      CEs who live within my territory are paid for all of their commute time to their first assignment of the day.  Thus, a CE will clock in at the start of his shift while sitting in his vehicle at his home before heading to his first assignment.  The CE can then access his assignments and other information on his NCR-provided Samsung Android phone and begin his commute.  CEs who live outside of the territory are merely expected to be on the border of the territory at the start of their shift.  At the end of their shifts, all CEs are expected to immediately suspend or close their current assignment.

8.      Every CE has a NCR-issued Samsung Android phone with various applications that are used for work purposes.  One of those applications is "WorkDay," which is used exclusively for timekeeping purposes.  CEs also enter their "call" activity (*i.e.*, work order status) via an Oracle application called "ES Mobility" on their Android phone, which is a separate and distinct application from WorkDay.

9.      Wayne Rodriguez is a Senior CE with NCR who lives and works within my territory.  I manage Mr. Rodriguez through my role as TM with NCR.  Mr.  Rodriguez performs ATM work for NCR's financial customers.  I have certain observations regarding various statements contained in the declaration Mr. Rodriguez has signed and submitted in this lawsuit, as set forth in paragraph 10 of this declaration.

10.      I have never instructed any CE to do any type of work before or after his shift. Any exceptions to the scheduled shift start and end time require approval.   In fact, I have regularly approved overtime for Mr. Rodriguez.  Any work that Mr. Rodriguez has performed outside of his scheduled shift was in accordance with the CBA for which he received overtime pay.

11.      I review and approve CE time entries each Sunday.  If there is an issue with respect to any missing time, a missed meal break, or any other unusual entry, I will call the CE to confirm that their time entry is accurate before approving it.  My CEs are paid for all time worked and reported to NCR, including overtime hours.  I have repeatedly instructed CEs in my territory to report all of their work time and to take an off-duty lunch break in the middle of their shift.  In my time as TM, I have not received any complaints about missed meal breaks or unpaid work time.

12.      In my own union territory, if there is an employment problem or CE complaint, I will certainly hear about it from the union shop steward.  In that regard, I am not aware of any complaints or grievances having been made by CEs regarding off the clock work or any other unpaid time. The union has clearly communicated to my CEs that they are not allowed to work outside of the rules set by the CBA.

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Executed this __14th__ day of __June__, 2017, at __New York__, New York.

_____
Raymond Mousaad

- 4 -

Scanned by CamScanner

**TEDEROUS DECLARATION**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) | |
| | ) | Case No. 1:16-cv-6221 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Manish S. Shah |
| | ) | |
| NCR CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF CHRISTOPHER TEDEROUS**

I, CHRISTOPHER TEDEROUS, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.      I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position with NCR since January 2014. Prior to that time, I held the positions of Field Resource Specialist for NCR from January 2013 to January 2014, and Customer Engineer ("CE") for NCR from March 2009 to January 2013.

3.      As a TM, I currently have responsibility for the field service operations within my assigned territory of Connecticut and Orange County, New York. I have CE Is, CE IIs, CE IIIs and Team Leads who report to me. I am responsible for managing the daily work activities for 42 CEs in my assigned territory, including 3 Team Leads. I hold weekly conference calls with each service area regarding field operations. I also routinely conduct customer visits and ride alongs with CEs in the field.

4.     In my territory, CEs generally complete maintenance and repair work orders on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*i.e.*, point-of-sale equipment) or financial (*i.e.*, ATM equipment) customers. The CEs work in five service areas within my territory: (1) Orange County, NY; (2) Danbury, CT; (3) Hartford, CT; (4) Norwich, CT; and (5) New Haven, CT.

5.     The CE I position is the lowest level CE job. CE Is generally perform relatively simple work such as clearing paper jams—their goal is to get customers back up and running as quickly as possible. They do not troubleshoot or perform tests on equipment. Under NCR policy, a CE I is not supposed to use any parts or tools on the job. CE IIs have more experience and training and are allowed to use parts and tools that CE Is cannot. They also can troubleshoot problems that are beyond a CE I's skill set and authority. CE IIIs are the highly skilled technicians that primarily handle problem units. Team Leads provide on the job training and support as needed, and sometimes facilitate service area conference calls.

6.     CEs receive their assignments electronically each morning via their NCR-issued Android handheld devices. In my territory, the standard scheduled shift for a CE is 9:00 a.m. to 6:00 p.m., with a one hour off-duty lunch break; however, there are numerous variations on the shift hours.

7.     I constantly reinforce to CEs in my territory —including during our conference calls—that off the clock work is not allowed, that lunch breaks should be taken, and that all time worked must be reported in NCR's WorkDay timekeeping system. I have also communicated to CEs individually that they need to record all time worked, that no off the clock work is allowed, and that they need to take lunch breaks. My expectation is that CEs enter their time every day, making timekeeping entries when they leave the house in the morning, arrive at the first

customer site, begin and end lunch, finish at the last customer site, and arrive at home. I review CE time entries almost every day. I have never received any complaints from employees who I supervise about alleged unpaid pre- and/or post-shift work. I have never instructed or otherwise required a CE working for me to work off the clock, and I knew during my time as a CE that off the clock work was prohibited by NCR's policies. If I ever suspect that a CE might be working off the clock, I remind him or her to report all of their work time.

8.    Regarding commute time, my general expectation is that CEs are at their first work location of the day at the start of their shift. For example, if the CE's first call of the day is 20 minutes from his home then he must status himself as "traveling" 20 minutes before of the his shift begins via the ES Mobility call activity application on the handheld device. In instances where the CE's first work location of the day is 60 minutes from his home then he must status himself as "traveling" 30 minutes before his shift begins and arrive at the customer location 30 minutes after the start of his shift. The electronic timekeeping system, WorkDay, is used exclusively to record CE work time, while the call activity system is not used for timekeeping at all, but rather to record the status of a call/customer service order (*e.g.*, "on site," "cancel call," "working on call," "complete call," *etc.*). Making these call activity inputs on the handheld only takes a few seconds. This is the only thing CEs are supposed to do on their phones before their shift begins. I instruct CEs that I do not want them to do anything other than go traveling and that they are not supposed to make calls or review or send emails. When a CE statuses as "traveling" more than 30 minutes before the shift begins, they are paid for that time.

9.    Thomas McCartney is a CE III working in my Orange County, NY service area, and I am familiar with him and his work since March 2016. Mr. McCartney frequently seeks to work overtime and has never complained to me about alleged off the clock work. I have

reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated February 9, 2017, and I know that his declaration contains numerous inaccuracies. For example, there is no NCR requirement that CEs check their emails, assignments or anything else 30 minutes prior to their shifts, and there is no NCR policy setting forth any such requirement. I have never instructed Mr. McCartney or any other CE who works under my supervision to do this, and I never considered this something I was required to do when I was a CE. All I expect of Mr. McCartney and my other CEs is that they check their route at 8:30 a.m. (which takes seconds). I have held meetings on this topic and the CEs know that if NCR business is conducted before a shift, that time must be reported in WorkDay so that it can be paid. Moreover, contrary to Mr. McCartney's claim in his declaration, estimated times of arrival ("ETA") are entered into work orders by default—the CE is not supposed to enter anything before the start of his shift. Similarly, there is no NCR policy or requirement that CEs "pre-call" customers, and I have never told Mr. McCartney or any CE to do so before their shifts begin. In addition, there is no reason for a CE to load or unload equipment or parts before or after a shift. CEs who do have parts and equipment in their vehicles should leave them in the vehicle—there is no reason to bring into a CE's home. Finally, any training that CEs undergo is scheduled during shift hours and is to be completed on the clock.

10. During my years working as a CE for NCR, I always reported all time worked and was compensated for all time that I reported. I understood and continue to understand that NCR's policies and practices prohibit off the clock work and I now demand that CEs report all time worked, including overtime and work performed outside of the CE's scheduled shift.

I declare under penalty of perjury under the laws of the United States of America and the State of Connecticut that the foregoing is true and correct.

Executed this ___13ᵗʰ___ day of ___June___, 2017, at ___Middletown___, Connecticut.

_____
Christopher Tederous

- 5 -

**WEBB DECLARATION**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) | |
| | ) | Case No. 1:16-cv-6221 |
| Plaintiff, | ) ) | |
| v. | ) | Judge Manish S. Shah |
| | ) | |
| NCR CORPORATION | ) ) | |
| Defendant. | ) ) | |
| | ) | |

## DECLARATION OF DAVID R. WEBB

I, DAVID R. WEBB, declare:

1.    I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.    I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position with NCR since February 2015. Prior to that time, I held the positions of Senior Customer Engineer ("CE") for NCR from 2012 to 2015, Regional Technical Support Specialist for NCR from 2008 to 2012, CE II for NCR from 2004 to 2008, and CE I from October 1980 to 2004.

3.    In my position as TM, I have responsibility for the field service operations within my assigned territory in Michigan, which includes Lansing/Flint, Midland, Grand Rapids and parts of Northern Michigan. I oversee the daily work activities for 27 NCR CEs in the field. I do so by monitoring their activities on NCR's call activity system throughout the day, by reviewing reports that are produced for me regarding call activities and certain performance metrics, and by staying in contact with my CEs throughout the day to check in with them

regarding logistics and their work. I also hold weekly conference calls with my group to review any field issues.

4.      In my territory, CEs perform repair and maintenance work on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*i.e.*, point-of-sale equipment) or financial (*i.e.*, ATM equipment) customers. All 27 of my CEs generally handle both financial and retail work. I have a handful of CEs in the Grand Rapids area who provide either exclusively financial or retail services. My territory is divided into four service areas and each represents different challenges based on either customer density or geographic area. Part of my job is to balance the schedules based on the respective areas. Each area is exclusive, meaning CEs do not cross over to perform work in other areas.

5.      I set the CEs' schedules approximately a month in advance, after gathering input from the Senior CEs in my territory. The CE schedule is modified based on installation job needs and changed circumstances that arise regarding coverage capacity. The base work shift is 9:00 a.m. to 6:00 p.m., Monday through Friday, but certain CEs have different shifts or days off, as the specific rotation is based on availability.

6.      I require CEs to enter their time in real time throughout the day, through the WorkDay application, which is NCR's timekeeping system. On the rare occasions that a CE does not have a work order at the start of the shift, the CE will be tasked with training or other administrative assignments.

7.      I have frequently reinforced to the CEs working for me that all time worked is time paid, and that they must accurately report their time. I review and approve CEs' time entries. I have never unilaterally altered a CE's time entry. All time worked and reported by my CEs is paid. For example, if I instruct CEs to complete training on a day off, they are paid for it.

8.      Regarding commute time, CEs are not paid for the first 30 minutes of their commute time to the first customer location and the last 30 minutes of the drive from the last customer location.  For example, if the morning commute to the first customer takes 60 minutes, the CE will be paid for the second 30 minutes of drive time.  Likewise, if the evening commute home from the last customer takes 75 minutes, the CE will be paid for the first 45 minutes of drive time.

9.      I have not heard of or received any complaints from CEs regarding working off the clock or unpaid work.  I have never directed or required a CE working for me to work off the clock or not report time worked.  As a TM and during my 35 years as a CE, I understood that NCR prohibits off the clock work.

10.     Dave Kiefer currently works as a CE in the Northern Michigan area of my territory.  We interact frequently, and Mr. Kiefer has never raised any issues with me regarding his time entries or being paid for his time worked; he has also never told me he was working off the clock.  I have reviewed the declaration that he signed in connection with the *Meadows* lawsuit, dated March 3, 2017, and I know that his declaration includes many inaccuracies.  For example, NCR does not require CEs to check their emails, make phone calls or do anything else off the clock, and there is no NCR policy setting forth any such requirement.  I have never instructed Mr. Kiefer or any other CE working in my territory to do this, and I absolutely did not consider this to be something I was required to do as a CE.  Moreover, CEs do not need to enter an estimated time of arrival ("ETA") on service calls (*i.e.*, work orders) as ETAs are set by system default and are updated by the Service Planners.  I am similarly not aware of any NCR policy or requirement that CEs "pre-call" customers off the clock and certainly do not require Mr. Kiefer or my other CEs to do so.  If CEs choose to make calls from their queue before or

- 3 -

after their scheduled shift, that is work time and they are paid for all such time they record. Time entry itself, contrary to the claim in Mr. Kiefer's declaration, is to be completed while CEs are on the clock. Finally, the "key audits" to which Mr. Kiefer refers in his declaration should take place during the work day and while on the clock. No NCR policy or requirement directs CEs to perform key audits off the clock, and I have never instructed CEs to perform audits off the clock.

11.     John Hilla worked as a CE in the Northern Michigan area of my territory until roughly January 2016. Mr. Hilla never raised any issues with me regarding his time entries or being paid for his time worked; he also never told me he was working off the clock. I have reviewed the declaration that Mr. Hilla signed in connection with the *Meadows* lawsuit, dated August 24, 2016, and I know that his declaration contains many inaccuracies, including those I outlined above regarding Mr. Kiefer. Moreover, I never instructed Mr. Hilla to work off the clock in any form, and Mr. Hilla was very well-versed in the NCR requirement that all work time be reported.

12.     When I was a CE, I always entered all of my time worked and was paid for all reported work time that I submitted, including overtime.

I declare under penalty of perjury under the laws of the United States of America and the State of Michigan that the foregoing is true and correct.

Executed this __13TH__ day of __JUNE__, 2017, at __STURGIS__, Michigan.

David R. Webb

**WOLVEN DECLARATION**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) |
| Plaintiff, | ) Case No. 1:16-cv-6221 ) |
| v. | ) Judge Manish S. Shah ) |
| NCR CORPORATION | ) ) |
| Defendant. | ) ) ) |

**DECLARATION OF PETER WOLVEN**

I, PETER WOLVEN, declare:

1.      I have personal knowledge of the facts set forth in this declaration, and I could and would competently testify to these facts under oath if called as a witness.

2.      I am currently employed as a Territory Manager ("TM") with NCR Corporation ("NCR"). I have held this position with NCR since 2007.

3.      In my position as TM, I have responsibility for the field service operations within my assigned territory in New York, including Westchester, the Bronx and Upper Manhattan. I have 36 Customer Engineers ("CEs") who report to me. Specially, I have 32 CE IIs and 4 CE Is working in my territory. All of these CEs are union members. I am responsible for managing their daily work activities. CEs work in the field without direct supervision.

4.      The CEs in my territory generally perform repair and maintenance work on NCR-manufactured equipment sold to NCR customers, and do so primarily for retail (*i.e.*, point-of-sale equipment) or financial (*i.e.*, ATM equipment) customers. The 36 unionized CEs are broken into

- 1 -

three work groups: retail, financial, and cross-trained. Of the CEs, 86% of them work primarily for financial customers.

5. I distribute a weekly schedule to my CEs every Friday. There are numerous shifts in my territory. The majority of the CEs work 8:30 a.m. to 5:15 p.m. There are also shifts that run from 7:00 a.m. to 3:30 p.m., 2:00 p.m. to 10:30 p.m., 3:30 p.m. to 12:00 a.m., and 9 p.m. to 5:30 a.m. Under the union contract, there are different wages for different shifts. CEs are assigned to a shift based on seniority in accordance with the union contract.

6. Regarding commute time, CEs need to be in the territory at the start of their shift. For CEs who live in the territory, the expectation is that they be in their van, ready to turn on their vehicle and their phone at the start of their shift. The CEs then turn on their NCR-provided Android mobile device at the start of their shift and go to their queue in the ES Mobility application, which lists the CE's work orders.

7. The NCR-provided Android device also has a timekeeping application called WorkDay. I consistently remind my CEs to enter their time into WorkDay each day they work. CEs are allowed to report their time spent entering their time worked. I have never had a complaint or union grievance regarding unpaid work time or alleged off the clock work. I have never denied or altered CEs' time entries. I have also never instructed any CE to work off the clock.

8. I also expect that CEs under my supervision take a meal or lunch break. Under the union contract, the first shift gets 45 minutes; other shifts get 30 minutes. I am constantly reiterating to my CEs the need to take lunch. When CEs tell me they did not have time for lunch, I tell them that they need to make time during their work day. However, if a CE works through lunch, they are paid for any time that they report.

9.     Luis Morel is a CE working in my territory. I know Mr. Morel well, as I have been his TM for over two years, and he regularly reaches out to me requesting to be given more work assignments. Mr. Morel records every second that he works and receives more overtime than anyone else in my territory. Mr. Morel requests to be put on call (*i.e.*, availability) and consistently states that he wants to get as much work as possible.

10.     I have reviewed the declaration that Mr. Morel signed in connection with the *Meadows* lawsuit, dated February 10, 2017, and I know that declaration includes numerous inaccuracies. For example, Mr. Morel is on the shift beginning at 3:30 p.m. and has been since I became his TM. As is common knowledge among my CEs, the expectation is that a CE such as Mr. Morel has to be within the border of his work area by the start of his shift. Contrary to Mr. Morel's statement in his declaration, there is absolutely no NCR requirement or policy that he has to check his assignments, emails, or anything else an hour before his shift begins. He is not required to do anything before the start of his shift. Instead, the expectation is that Mr. Morel should not turn on his phone until he is in his work area at the start of his shift. Similarly, the expectation is that at the end of Mr. Morel's shift that he should be at home or on his way home; if not, he should have been in contact with me regarding potentially working overtime.

11.     I consider the time estimates for the alleged daily pre and post shift off the clock work that Mr. Morel provides in his declaration to be ridiculous. For example, if Mr. Morel does perform key audits, they take a few minutes and far less than 20 to 30 minutes to complete.

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Executed this 15th day of June, 2017, at Montgomery, New York.

Peter Wolven

- 4 -