UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL MEADOWS,

        Plaintiff,

v.

NCR CORPORATION,

        Defendant.

No. 16 CV 6221

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Meadows brings this action against his employer, defendant NCR Corporation, for unpaid wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and the Illinois Minimum Wage Law, 820 ILCS § 105/1, *et seq.* NCR moves for summary judgment. For the following reasons, NCR's motion is denied.

## I.     Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view all facts and reasonable inferences in the light most

favorable to the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

## II. Background

Meadows has worked for NCR as a Customer Engineer for over eight years. [166] ¶ 8.[1] He is a non-exempt employee who is paid on an hourly basis. *Id.* Although Meadows acknowledges that NCR has written policies deeming all work time as compensable time and prohibiting employees from failing to record their work time, he explains that in practice, the policies are routinely ignored. [165-2] at 26, 95:3–96:7. Each of Meadows's territory managers have instructed him not to follow NCR's written policies, *id.* at 26, 97:5–10, and they have encouraged him to work off-the-clock, *id.* at 23, 83:24–84:1.

### A. NCR's Written Policies

NCR requires CEs to read and periodically review the NCR U.S. Customer Engineer Human Resources Handbook so that they are familiar with and can abide by NCR's policies. [165-3] at 3–4. If CEs have a question about "the content or interpretation" of the policies, the handbook directs CEs to contact their managers or to consult with "HR Central." *Id.* at 4. These written policies provide specific details about how CEs should schedule their workdays.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of the filings. The facts are largely taken from Meadows's responses to NCR's Local Rule 56.1(a)(3) statement, [166], and NCR's responses to Meadows's Local Rule 56.1(b)(3) statement, [182], where both the asserted fact and the opposing party's response are set forth in one document. Any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record) will be disregarded. Only facts that are properly controverted will be considered disputed.

NCR assigns each CE a "regular work shift," which territory managers have the discretion to change based on staffing needs, workload, and other factors. *Id.* at 7. At least thirty minutes before a CE's scheduled shift, the CE must check in with the "Operations Center" and update his whereabouts. *Id.* at 8. The handbook states: "In total, these activities should take no more than one or two minutes to complete." *Id.* Beyond this requirement for CEs to "briefly" check their mobile devices to determine the location of their first assignment, CEs are prohibited from performing any work before the start of their scheduled shifts. *Id.* at 15. The first thirty minutes of a CE's commute to his first customer worksite is not compensable; accordingly, the handbook prohibits CEs from performing work (taking calls or answering emails for longer than one or two minutes) during that time.[2] *Id.* at 9.

At some time during their shift, NCR expects CEs to take an unpaid lunch break. *Id.* at 11. Since a CE's schedule "flexes to meet customer needs," NCR asks CEs to use their "best judgment" in deciding when to take a lunch break during their shift. *Id.* Immediately before taking a lunch break, CEs must inform the Operations Center that they are doing so, and CEs must update their status via their mobile devices to indicate that they are taking a lunch break until a specified time. *Id.* CEs may not work during their unpaid lunch break; NCR requires CEs to contact their managers if they are being interrupted during their reported lunch break *Id.* at 11, 15 ("If you receive a business call, text or email from NCR or a

---

[2] The handbook states: "If your manager or a co-worker calls or messages you during your unpaid commute to your first job site, you are to delay your response until you go back on the clock." [165-3] at 15.

customer during your lunch break, you are to delay your response until you are back on the clock; you have the right not to answer or respond to it until that time.").

In addition to repairing point-of-sale machines in the field, [182] ¶ 2, CEs also have to perform any number of administrative tasks during their shifts: answering phone calls, responding to emails[3], inputting details about service calls, processing and ordering parts, attending mandatory training, and recording their hours. [165-3] at 14, 15. The handbook makes clear that the time CEs spend completing these duties is compensable work time, and that CEs should fit such duties into their regular work shift "to meet productivity goals." *Id.* at 14, 15 ("You may need to ask your supervisor to schedule 'admin time' for you to accomplish tasks requiring an internet connection, because you are not permitted to perform these tasks at home outside of your regularly scheduled shift.").

Once a CE completes his last call of the day, the handbook directs him to stop working, unless otherwise instructed by his manager. *Id.* at 9. At the end of a shift, CEs must check in with the Operations Center and (1) close out any completed incidents, (2) move any active calls that continue into the next work period to an available CE on the next shift, and (3) update their whereabouts as unavailable. *Id.* at 8. The last thirty minutes of a CE's commute from his last worksite to his home

---

[3] The handbook states that NCR uses email to "communicate important company and specific team information," thus CEs should check their email throughout the workweek, but that "Territory Managers will give general direction regarding the frequency with which [CEs] should check email based upon the frequency with which email is used in [a specific] territory." [165-3] at 14.

is not compensable; as a result, the handbook prohibits CEs from performing work (taking calls or answering emails for longer than one or two minutes) during that time. *Id.* at 9. CEs may not resume working once they arrive at their homes. *Id.*; *see also id.* at 15 ("Unless you have received prior approval from your supervisor, you are prohibited from processing parts at your home.").

Even though "NCR expects CEs to work within the work schedules set by their managers," CEs are nevertheless required to report any time they spend working, even if they worked outside of their scheduled shift and even if they worked overtime without prior approval. *Id.* at 15, 18. The handbook expressly prohibits supervisors from "encouraging or even suggesting" that CEs should work off-the-clock, but ultimately NCR places responsibility with the CEs for accurately reporting the time they spend working. *Id.* at 15.

## B. Meadows's Off-the-Clock Work

NCR assigned Meadows a "regular work shift" from 8:00 a.m. to 4:00 p.m., [166] ¶ 8, but Meadows says that NCR required him to work before and after that time, and that NCR did not compensate him for that additional work, [165-1] ¶¶ 10–15; [176] ¶¶ 3, 6–13. When asked about his allegations that NCR requires him to perform off-the-clock work in reference to NCR's written policies, Meadows acknowledged that the handbook prohibits off-the-clock work, but he explained that

each of his territory managers have directed him to work off-the-clock. [165-2] at 22, 79:24–80:4[4]; *id.* at 23, 83:21–84:4[5]; *id.* at 27, 99:15–18.[6]

On a daily basis, Meadows says he performs about 1.3 hours of unpaid work for NCR.[7] [182] ¶ 38. Specifically, he spends ten to forty minutes per day on pre-shift work, *id.* ¶ 21, and ten minutes per day on post-shift work, *id.* ¶ 35. Additionally, Meadows says he is not compensated for the time he spends working through his lunch break each day (NCR's timekeeping system deducts a thirty-minute lunch break from his daily hours, and Meadows submits his daily hours without manually editing the deduction to reflect the time he spent working through his break). *Id.* ¶ 28; [107] at 7.

At least thirty minutes before his shift is scheduled to begin, Meadows says that NCR requires him to read his emails. [165-1] ¶¶ 11, 14; [176] ¶¶ 3, 6. He checks emails from his cell phone to get general instructions and to make sure that

---

[4] "Q: Has anybody ever told you to not enter 7:20 under the circumstances and to enter 8:00 o'clock instead? A: Well, yes. Q: Who has told you that? A: All the people I named that were my bosses."

[5] "Q: Nobody at NCR has instructed you not to work off the clock? A: No. They want you to work off the clock. Q: So nobody at NCR has conveyed to you in any way that you're not to work off the clock? A: Exactly."

[6] "Q: And would you agree that language does not encourage employees to work off the clock? A: No, that language does not, but our territory managers do."

[7] On two separate occasions, Meadows kept a personal log of the unpaid hours he worked—the first time he did this was several years ago and the second time he did this was the week before his deposition in this case. [166] ¶ 27. He kept the recent log in order to show what he does before starts his shift starts each day, from approximately 7:20 to 8:00 am. [165-2] at 5, 11:21–12:7.

he does not have to re-prioritize particular service calls.[8] [165-2] at 13–14, 45:1–46:2. The number of emails Meadows receives daily varies, but typically, he receives emails from his manager or someone at the Operations Center who is overseeing dispatching. *Id.* at 14, 46:2–20.

Before his shift, Meadows says that NCR also requires him to review work orders from his cell phone and to communicate with the Operations Center.[9] [165-1] ¶¶ 11, 14; [176] ¶¶ 3, 6. Some days, Meadows inherits a work order from another CE, which may require him to call the Operations Center to find out where the part for that work order is, and then plan to pick up that part before driving to that worksite. [165-2] at 15, 50:7–24. Next, Meadows says he is required to map out his route for the day, update his estimated times of arrivals for each assignment, and update his status as "traveling," "dispatch," or "DS." [165-1] ¶¶ 11, 12, 14; [176] ¶¶ 3, 6–7. In order to develop a route to follow from one worksite to the next, Meadows looks at his queue and then he can determine ETAs for each customer. [165-2] at 14, 47:19–48:1; *id.* at 15, 51:1–5. Sometimes he may need to restock his

---

[8] Due to NCR's service license agreements with some customers, CEs may have to respond immediately to a customer's work order despite what the CE already had in his queue for that day. [165-2] at 14, 47:4–11.

[9] NCR's control or dispatch "tower" is synonymous with NCR's "Operations Center." *Compare* [182] ¶ 8 ("As a general rule, at least thirty (30) minutes before the start of your shift: (1) you should check in with the Operations Center either via phone or handheld mobile device for call assignments"); *with* [165-2] at 14, 46:2–7 ("Q: And when you say your e-mails, where do the e-mails you check in the morning emanate from? Who sent the e-mails? A: It could be from the territory manager. Or it could be from the control tower who does the dispatching.").

company-owned vehicle with various parts, depending on what he needs at the worksites that day.[10] [166] ¶ 8.

By 7:30 a.m., Meadows is in his company-owned vehicle commuting to his first assignment of the day. *Id.* ¶ 8. It typically takes Meadows thirty minutes to commute to his first worksite. *Id.* ¶ 25. Despite the fact that Meadows is not compensated for the first thirty minutes of his commute, he often spends this time working because he makes or receives calls from the Operations Center in order to understand where the parts are located for specific service calls, or he commutes to pick up or drop off parts at FedEx. *Id.*; [165-2] at 17, 60:20–23. For the remainder of his shift, Meadows responds to service calls, commutes between worksites, and performs other related activities; his schedule is very tight and it usually does not allow him enough time to take a lunch break.[11] [182] ¶ 7; [165-2] at 25, 90:21–91:2; *see also* [176] ¶ 9 (explaining that he rarely gets an uninterrupted lunch break due to the high volume of work orders and his manager's requirement that he answer emails and phone calls from his manager and the NCR control tower immediately).

After Meadows completes his last job in the field, he clocks out for the day, per NCR policies, even though he is often required to perform additional work: dropping off parts at FedEx, unloading his company car, ordering parts for his assignments the next day, entering his time for payroll purposes, undertaking

---

[10] Meadows uses a company car to travel between customer locations during the day, and to commute from his home to his first assignment and to his home from his last assignment each day. [166] ¶ 7. NCR and Meadows have an agreement regarding the use of the car. *Id.*

[11] No one employed by NCR has ever told Meadows not to take his lunch breaks, nor has anyone ever disciplined him for taking a lunch break. [166] ¶ 32.

additional recordkeeping, and commuting home.[12] [165-1] ¶¶ 10, 15; [166] ¶¶ 8, 21; [176] ¶ 11.

Meadows never complained to or through anyone at HR Central that he had been required to work off-the-clock. [165-2] at 28, 105:2–6. He attempted to communicate with HR Central via a hotline many years ago about a different issue, *id.* at 28–29, 105:14–106:2; but, he explained that when an NCR employee leaves a message with HR Central, they do not usually return the employee's call. *Id.* at 28, 105:19–22. None of Meadows' managers have questioned him about his time entries, refused to approve his time entries, or told him that he needed to change his time entries. *Id.* at 25, 90:11–20. In fact, Meadows has worked overtime without prior approval, and as far as he knows, NCR has not denied him payment for that work. *Id.* at 25, 91:23–92:3. Meadows says that when he recorded his time accurately, NCR paid him the for work that he performed before and after his shift, as well as during his lunch break. [182] ¶ 36.

## III. Analysis

Meadows argues that he was not properly compensated for the time he spent working before his shift, during his lunch break, and after his shift. In response, NCR says that the activities Meadows performed before and after his shift are not

---

[12] There are some inconsistencies in Meadows's testimony about whether and how he was instructed to underreport his time. Meadows said that the only way he was instructed to work off-the-clock was through the requirement that he "go dispatch by 7:30," even though he was not compensated for time between 7:30 and 8:00 a.m. [165-2] at 24, 88:10–18. This testimony conflicts with Meadows's other testimony concerning instruction from his territory managers to work off-the-clock. *See* [165-2] at 22, 79:20–80:11; *id.* at 23, 83:13–84:8; *id.* at 27, 98:16–99:18. A court does not weigh credibility on a motion for summary judgment.

compensable under the FLSA, and even if those activities were compensable as a matter of law, NCR did not know that Meadows was performing those acts and therefore it cannot be held liable under the FLSA.[13] NCR also argues that Meadows failed to provide an adequate explanation for the estimates of his uncompensated work time.

The FLSA requires employers to pay overtime to non-exempt employees who work more than forty-hours in a workweek. 29 U.S.C. § 207(a). The employee bears the burden of proving that he performed overtime work and that he was not compensated for that work. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011). The employer bears the burden of establishing that the FLSA exempts it from liability. *Id.*

### A. Compensability of Meadows's Off-the-Clock Work

Not all work-related activities are compensable under the FLSA. 29 U.S.C. § 254; *Musch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir. 2009). The Portal-to-Portal Act of 1947 amended the FLSA to exempt employers from liability based on two categories of work-related activities:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to [the] principal activity or activities,

---

[13] Given that the IMWL parallels the FLSA, and the Illinois Administrative Code states that FLSA regulations provide guidance in interpreting the IMWL, courts generally apply the same analysis to both statutes. *Haynes v. Tru–Green Corp.*, 154 Ill.App.3d 967, 977 (1987); *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010).

> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a). In 1996, the Employee Commuting Flexibility Act added the following language to § 254(a)(2) of the PPA:

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

H.R. Rep. 104-585, 1. The term "principal activity or activities" refers to activities which the employee is employed to perform, and it includes all activities that are "integral and indispensable" to those activities. 29 C.F.R. § 790.8(b); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005). An activity is "integral and indispensable" if it is an intrinsic element of the principal activity and one that the employee cannot dispense with if he is to perform his principal activities. *Integrity Staffing Sols., Inc. v. Busk*, 135 S.Ct. 513, 517 (2014). In sum, activities that are "integral and indispensable" to an employee's principal activities are compensable, but activities that are "incidental" to the employee's use of a company-owned vehicle for commuting are not. *See Chambers v. Sears Roebuck & Co.*, 428 Fed.App'x. 400, 414 (5th Cir. 2011). It is undisputed that Meadows's principal activity as a CE for NCR was to service point-of-sale machines and systems at NCR's client sites. [182] ¶ 2.

What the parties dispute is whether the other activities he performed before and after his shift were integral and indispensable to that principal activity.

NCR notes that the two elements outlined in § 254(a)(2), as amended by the ECFA, are present here: Meadows uses a company car to travel to worksites, which are approximately thirty minutes away from his house, and he uses the car pursuant to an agreement with NCR; consequently any activities he performs that are "incidental" to his use of the car for travel should not be considered as part of his principal activities under the statute. It is NCR's position that the pre- and post-shift work that Meadows performs (reviewing his emails, work orders, and assignments; checking in with the Operations Center; mapping his route and establishing ETAs; loading his company car; logging mileage; and entering his hours) are incidental to his commute and are not compensable under the FLSA. *See* [144] at 17–19. Other courts have found that this type of work by field service technicians was not compensable.[14]

Meadows says that NCR minimizes the importance of his pre- and post-shift duties, which he believes are an intrinsic element of his duty to service point-of-sale

---

[14] *See Chambers,* 428 Fed.App'x 400 (time spent by dispatch technician loading equipment into van held non-compensable); *Brand v. Comcast Corp.*, 135 F.Supp.3d 713 (N.D. Ill. 2015) (time cable line technicians spent logging before their shifts reviewing or obtaining assignments for the day held non-compensable); *Espenscheid v. DirectSat USA, LLC*, No. 09-CV-625-BBC, 2011 WL 10069108, at *23 (W.D. Wis. Apr. 11, 2011) ("Receiving and mapping routes and performing vehicle maintenance are tasks inherently related to plaintiffs' commute and not related uniquely to the activities of installing and upgrading cable services."); *Butler v. DirectSAT*, 55 F.Supp.3d 793 (D. Md. 2014) (time spent by cable technician reading emails, mapping out directions, and prioritizing routes held non-compensable); *Donatti v. Charter Commc'ns, L.L.C.*, 950 F.Supp.2d 1038, 1054 (W.D. Mo. 2013) ("While the technician must check his first assignment early enough to ensure he or she has allotted sufficient commute time for the morning to his first job site, this by its very nature is incidental to use by the technician of [the company-owned vehicle].").

machines. To support his theory, Meadows points to five other cases. *See* [167] at 17, 19–20. Three of the cases pre-date the ECFA (and so shed no light on whether work that is incidental to commuting is integral to principal activity),[15] one of the cases did not address the ECFA,[16] and the other case, which did address the ECFA, held that many tasks were not compensable because of the ECFA.[17] Meadows also says that he could not have performed his primary activity without going through his pre- and post-shift tasks. But "[t]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity.'" *IBP*, 546 U.S. at 40. It is well settled that an employer's requirement that an employee complete tasks does not elevate such tasks to the level of a principal activity. *Id.* 40–41. And as the cases that NCR cites tend to show, Meadows's pre- and post-shift activities are in kind with the types of activities that courts typically consider to be incidental to commuting in a company car. Yet, Meadows does not explain why such tasks that are commonly held as incidental to commuting should be viewed differently in this case, where NCR employed Meadows to service point-

---

[15] *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345 (10th Cir. 1986) *disapproved of by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); S*ec'y of Labor, U.S. Dep't of Labor v. E. R. Field, Inc.*, 495 F.2d 749 (1st Cir. 1974); *D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552 (10th Cir. 1958).

[16] *Integrity*, 135 S.Ct. 513.

[17] *Butler*, 2014 WL 5342729. Meadows cites the *Butler* court holding that a genuine issue of material fact existed as to whether the time the cable technicians spent pre-calling customers, filling out paperwork, and attending meetings was *de minimis*; but, as noted above, *supra* note 9, at 7, the *Butler* court also concluded that activities such as reading emails, mapping out directions, and prioritizing routes were incidental to the technicians' commute.

of-sale machines. NCR hired CEs to service machines at client sites. As in other industries that employ technicians in the field, some basic, but necessary, tasks to get to those assignments are merely preliminary (or postliminary) to the principal activity of field service.

The ECFA does not define which activities are "incidental" to commuting in a company-owned vehicle because "it is not possible to define in all circumstances what specific tasks and activities would be considered 'incidental' to the use of an employer's vehicle for commuting." H.R. Rep. 104-585, 5. The House Report offers some guidance, though:

> Communication between the employee and employer to receive assignments or instructions, or to transmit advice on work progress or completion, is required in order for [company-owned vehicle] programs to exist. Likewise, routine vehicle safety inspections or other minor tasks have long been considered preliminary or postliminary activities and are therefore not compensable. Merely transporting tools or supplies should not change the noncompensable nature of the travel.

H.R. Rep. 104-585, 5. Lawmakers understood activities like contacting the Operations Center and establishing ETAs are an unavoidable consequence of using a company car and they decided that such activities should be viewed in the same way as were the minor tasks that existed before company-owned vehicle programs, which the FLSA and its implementing regulations have long characterized as non-compensable. Considering this language and the weight of the persuasive authority available after the enactment of the ECFA, it follows that Meadows's pre- and post-shift activities (reviewing his emails, work orders, and assignments; checking in with the Operations Center; mapping his route and establishing ETAs; loading his

company car; logging mileage; and entering his hours) are incidental to his use of the company car for commuting. These activities are routine communications tied to receiving instructions, related to updating work progress, or transportation of supplies—these are incidental to the act of commuting and distinct from the principal activity of servicing point-of-sale machines.

Meadows offers two alternate theories of compensability for his off-the-clock work. First, Meadows argues that even if the court finds that his pre- and post-shift work is incidental to his commute, those activities nevertheless constitute the start and end points of his workday, and thus, they are compensable under the continuous workday doctrine. To support his argument, Meadows points to *Butler*, which held that a *de minimis* activity can constitute a principal activity that triggers the start of the continuous workday. 55 F.Supp.3d at 817.

The FLSA's implementing regulations are quite clear that the start and end of the continuous workday are only triggered when an employee engages in a principal activity. 29 C.F.R. § 790.6(a); *see also IBP*, 546 U.S. at 28 (2005); *Kellar*, 664 F.3d at 174. And while the facts in *Butler* suggested that some *de minimis* activities were integral to the principal activity at issue, as discussed above, Meadows's pre- and post-shift activities in this case do not qualify as principal activities because they were merely incidental to his commute in a company-owned car, and they were not integral to the work of servicing point-of-sale machines. *See also* H.R. Rep. 104-585, 5 ("Activities which are merely incidental to the use of an employer-provided vehicle for commuting [are] not considered part of the employee's

principal activity or activities."). As a result, Meadows's pre- and post-shift activities do not trigger the start or the end of the continuous workday, and the continuous workday doctrine does not render Meadows's off-the-clock work compensable.

Second, Meadows asserts that his pre- and post-shift activities are compensable under § 254(b), which provides that notwithstanding the exemptions to employer liability in subsection (a), an employer will be liable under the FLSA if it does not compensate an employee for activities for which the employer otherwise agreed to compensate the employee through contract, custom, or practice.[18] Meadows points to several pieces of evidence in the record to demonstrate that NCR has a custom and practice of compensating CEs for the activities Meadows engages in before and after his shift. The most concrete evidence Meadows offers is NCR's handbook, which expressly states that NCR will compensate CEs for taking calls, answering emails, time reporting, parts management, mandatory training, and other administrative duties (but not for the first thirty minutes of the CE's morning commute or the last thirty minutes of the CE's evening commute). That evidence is further supported by Meadows's factual assertion that he has been paid by NCR in the past for overtime, as well as the argument that NCR repeatedly makes in its summary judgment briefs that if Meadows had recorded his off-the-clock work, NCR

---

[18] The activity is only compensable under subsection (b) during the time that the contract, custom, or practice deemed it compensable; for example, if an employer had the custom of paying an employee for work performed before his shift, the employee would not be entitled to compensation for performing that same activity after the end of his shift under. *See* 29 U.S.C. § 254(c).

would have paid Meadows for that work. Finally, Meadows cites testimony from NCR's Employee Relations Consultant, who explained that any work done before an employee's shift should be paid (excluding commute time that is thirty minutes or less), [165-5] at 4, 8:19–9:7; *id.* at 18, 62:3–12, and that any work that takes an employee longer than two or three minutes should be reported, *id.* at 18, 62:14–24.

In *Blakes v. Illinois Bell Telephone Company*, cable splicers and a class of opt-in plaintiffs brought an FLSA claim against their employer for its failure to pay overtime wages; the employer moved for summary judgment on the plaintiffs' certified claim and the court denied that motion. 77 F.Supp.3d 776 (N.D. Ill. 2015). The employer argued, in relevant part, that the time plaintiffs spent filling out timesheets was a non-compensable postliminary activity under the FLSA. *Id.* at 780. The undisputed record in *Blakes* showed that when cable splicers recorded the time they spent completing timesheets during and after their shifts, the employer paid for that time. *Id.* at 781. Additionally, the record showed that the employer's manual provided that timesheet completion was compensable work. *Id.* The *Blakes* court reasoned: "it appears that [the employer's] policy has been to compensate for timesheet entry, even if done post-shift," therefore, under § 254(b)(2), "[the employer's] custom and practice of paying technicians for [completing timesheets] obligates the company to compensate for that time, even if it would otherwise be non-compensable." *Id.* at 782 (internal citations omitted).

NCR argues that the record in this case does not support a finding that a *Blakes*-like "custom or practice" exists. According to NCR, Meadows has not

produced evidence of NCR's "longstanding acquiescence" to pay for the specific pre- and post-shift activities—commuting between his home and his first and last field assignments; reviewing, mapping, and prioritizing his assignments; and loading and unloading his car—on which Meadows bases his claim. [180] at 12 (citing *Blakes*, 77 F.Supp.3d at 781). NCR is correct insofar as its argument involves commute time lasting thirty minutes or less. NCR's handbook and the testimony from NCR's Employee Relations Consultant expressly state that NCR will not pay CEs for the first thirty minutes of their commute in the morning and last thirty minutes of their commute in the evening. Meadows does not submit any evidence to controvert those facts. With respect to the other activities, though, NCR's handbook and the testimony from NCR's Employee Relations Consultant explain that Meadows's pre- and post-shift activities should only take one to two minutes, *but*, in the event that those activities take longer than one to two minutes, the CE is expected to record that time for the sole purpose of allowing NCR to pay the CE for that work. This evidence is enough to raise an issue of material fact about NCR's custom and practice of paying for pre- and post-shift activities that take a CE more than one to two minutes to complete, such as the activities on which Meadows predicates his claim. NCR is not entitled to summary judgment on the issue of whether Meadows's pre- and post-shift work was compensable.[19]

---

[19] Meadows argues that his commute time is compensable under the IMWL even though it is not compensable under the FLSA, as amended by the ECFA, because the Illinois Department of Labor, which makes and revises administrative regulations, incorporated the 1994 edition of the FLSA regulations, and that edition predates the ECFA. Meadows notes that when the FLSA and the IMWL differ, "the stricter of the two laws shall prevail." [167] at 24 (quoting 56 Ill. Admin. Code § 210.100) (citing *Driver v. AppleIllinois, LLC*, 917

## B. NCR's Knowledge

Knowledge is an element of an FLSA claim. *Kellar*, 664 F.3d at 177. NCR argues that it is entitled to summary judgment because Meadows cannot show that NCR knew about Meadows's off-the-clock work. Meadows worked in the field on his own; Meadows failed to accurately report the hours he worked; no one employed by NCR changed Meadows's time records; no one employed by NCR reprimanded Meadows for the hours he submitted; Meadows never complained to or through HR Central about his off-the-clock work; and NCR paid Meadows in the past for his overtime work whenever Meadows recorded those hours, even when he did not seek prior approval to work those hours as required by NCR policy. In essence, NCR argues that it had robust timekeeping policies that prohibited off-the-clock work and inaccurate time reporting, and an employee's unilateral decision to work before his shift began, through his lunch period, after his shift ended, and to fail to report that time, is not something NCR should be aware of, nor is it something that should make NCR liable under the FLSA.

The FLSA seeks to prevent employers from evading liability by burying their heads in the sand when their employees are performing overtime work. *Allen v. City*

---

F.Supp.2d 793, 799 (N.D. Ill. 2013)). Since the ECFA applies to the FLSA, but not to the IMWL, Meadows reasons, the IMWL is stricter than the FLSA and it should govern the compensability of his commute-time claim. But, Meadows does not cite any case law to support his interpretation of the interplay between these statutes, and I find his reasoning to be inconsistent with broader precedent. Illinois courts "have recognized that in light of their substantial similarities, provisions of the FLSA and interpretations of that legislation can be considered in applying the [IMWL]." *Kerbes v. Raceway Assocs., LLC*, 2011 IL App (1st) 110318, ¶ 25. It follows that courts may refer to the ECFA, which amends the FLSA through the PPA, in interpreting the IMWL. As such, the compensability of Meadows's pre- and post-shift activities, including his commute time, under Illinois and federal law depends on the same analysis.

*of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017) (citing 29 U.S.C. § 203(g)). In light of this, the statute defines the verb "employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), and its implementing regulations make clear that liability extends to an employer when the employer knew or had reason to believe that its employees were performing overtime work. 29 C.F.R. §§ 785.11–785.13. That is true even if the employer did not request that the employee perform the work, *id.* § 785.11; even if the employee performs the work away from the worksite or at home, *id.* § 785.12; and even if the employer had promulgated a rule against such work, *id.* § 785.13. An employer can only escape liability by showing that in addition to not having actual knowledge of the work, it did not have constructive knowledge because reasonable diligence would not have helped the employer learn of the work. *Allen*, 865 F.3d at 938. An employer cannot be held liable under the FLSA for work that it did not know about and that it had "no reason to know about." *Kellar*, 664 F.3d at 177.

Given Meadows's testimony that NCR's written policies prohibiting off-the-clock work were being violated in practice, that territory managers wanted CEs to work off-the-clock, and that each of Meadows's managers have instructed him to work off-the-clock (*e.g.* to enter 8:00 a.m. as his start time in NCR's timekeeping system even if he had begun working before then), there is a genuine issue of material fact as to NCR's knowledge. *See* [165-2] at 22, 79:20–80:11; *id.* at 23, 83:13–84:8; *id.* at 27, 98:16–99:18. That NCR had clear written policies prohibiting off-the-clock work and inaccurate time recording is no defense. *See Allen*, 865 F.3d

at 939 ("an employer's formal policy or process for reporting overtime will not protect the employer if the employer prevents or discourages accurate reporting in practice"). Similarly, evidence that NCR has paid Meadows for overtime in the past does not negate the fact that Meadows was encouraged to and did underreport his hours on other occasions. *See id.* ("the employees' jobs demanded 'long and irregular hours,' but their supervisors 'insisted that all work be completed within certain defined time limits.' The employer's practices effectively 'squelched truthful responses' in overtime reports") (citing *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827–28 (5th Cir. 1973)). Direction or pressure from a supervisor is sufficient here to raise an issue of material fact about NCR's constructive knowledge of Meadows's off-the-clock work.

NCR's remaining arguments—that it did not have knowledge of Meadows's off-the-clock work due to the fact that Meadows worked in the field on his own and unilaterally decided to perform work off-the-clock—need not be addressed since Meadows has sufficiently raised an issue of material fact through other evidence as to whether NCR knew that he was working off-the-clock; nevertheless, those arguments also fail. The facts of this case are distinguishable from those that NCR cited where the employees' actions or other circumstances prevented the employer from learning of the overtime work. *See, e.g., Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 271 (7th Cir. 2014) ("In this case, Gaines presents no evidence that his arriving at work early should have raised a flag that he was working unauthorized overtime."). As Meadows notes, NCR should have learned about his off-the-clock

work through reasonable diligence because NCR has electronic records of the emails Meadows sends, the changes he made to his status throughout the workday, the updates he made to work orders and assignments, as well as GPS records from his company car, all of which would have shown when and what work Meadows performed. NCR argues that it does not have a "forensic duty" to uncover Meadows's unrecorded hours, and that its ability to access those electronic records does not establish its constructive knowledge because the standard is what NCR should have known, not what it could have known. I agree with NCR's articulation of the standard, but I am persuaded by Meadows's argument that NCR's access to these electronic records is evidence that NCR should have acquired the information through a reasonably diligent search; they do not represent merely what NCR could have known. NCR is not entitled to summary judgment on the issue of knowledge.

### C.    Damages

NCR argues that Meadows lacks specificity regarding his damages for his uncompensated work, and as a result, NCR is entitled to judgment as a matter of law. While it is true that an employee who brings an action for unpaid wages "has the burden of proving that he performed work for which he was not properly compensated," *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946); *Kellar*, 664 F. 3d at 173, 177, the standard by which the employee must make that showing is lower when the employer failed to keep accurate records.

The FLSA requires employers to "make, keep, and preserve" its employees' records concerning "wages, hours, and other conditions and practices of employment." 29 U.S.C. § 211(c). If an employer's inadequate records cause the

plaintiff to have difficulty proving his damages, the plaintiff can meet his burden by showing the "amount and extent of [his unpaid] work as a matter of just and reasonable inference." *See Anderson,* 328 U.S. at 687; *see also Brown v. Family Dollar Stores of IN, LP,* 534 F.3d 593, 595 (7th Cir. 2008) ("To place the burden on the employee of proving damages with specificity would defeat the purpose of the FLSA where the employer's own actions in keeping inadequate or inaccurate records had made the best evidence of such damages unavailable."). If the plaintiff meets that low burden, then the burden shifts to the employer to produce evidence of the precise amount of work the employee performed or evidence to negate the reasonableness of the inferences that can be drawn from the employee's evidence. *Anderson,* 328 U.S. at 687–88. If the employer fails to meet that burden, a court may award damages even though they are approximations. *Id.* at 688.

Meadows's evidence that each of his managers instructed him to perform off-the-clock work in direct contravention of NCR's policies is sufficient to raise a genuine issue of material fact about the accuracy of NCR's records. In response to the shifted burden, NCR does not provide any evidence about the amount of work Meadows performed, even though, according to Meadows, NCR could glean such information by cross-referencing Meadows's time entries, status updates, emails, and GPS data.[20] Instead, NCR attempts to discredit Meadows's estimates of his

---

[20] NCR argues that it was Meadows's obligation to produce such evidence and that he cannot "evade summary judgment *now* by promising to come up with evidence *later*." [180] at 20. This is incorrect. Since NCR moved for summary judgment, Meadows's only obligation is to raise an issue of material fact as to whether he can prove his damages with the requisite specificity—a lower burden under the *Anderson* burden shifting rule because here, it can be inferred at this stage that NCR failed to keep accurate records.

unpaid work by arguing that Meadows cannot rely on "self-serving, speculative assertions allegedly based on roughly two weeks' worth of self-reporting over an eight year period." [144] at 24. While Meadows may not speculate about the amount of his damages, he may rely on his recollection. *See Brand*, 135 F.Supp.3d at 742 (citing *Blakes v. Ill. Bell Tel. Co.*, 75 F.Supp.3d 792, 814 (N.D. Ill. 2014)). Given that Meadows's routine was fairly consistent from day to day, a reasonable jury could find Meadows's testimony about when he clocked in and out, and when he worked off-the-clock credible. NCR is not entitled to summary judgment on the issue of damages.

## IV. Conclusion

Defendant's motion for summary judgment, [142], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: November 9, 2017