# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MEADOWS, Individually, and on Behalf of All Others Similarly Situated | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 1:16-cv-6221 |
| v. | ) ) | Honorable Manish S. Shah |
| NCR CORPORATION | ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT NCR CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DECERTIFICATION OF THE FLSA COLLECTIVE ACTION

Date:        July 12, 2019

Respectfully submitted,

NCR CORPORATION

By: */s/ Thomas E. Hill*
Thomas E. Hill (*admitted pro hac vice*)
Christina T. Tellado (*admitted pro hac vice*)
Deisy Castro (*admitted pro hac vice*)
HOLLAND & KNIGHT LLP
400 S. Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: (213) 896-2400
Fax: (213) 896-2450
thomas.hill@hklaw.com
christina.tellado@hklaw.com
deisy.castro@hklaw.com

Jennifer J. Froehlich (Bar No. 6295017)
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Tel: (312) 263-3600
Fax: (312) 578-6666
jennifer.froehlich@hklaw.com

*Attorneys for NCR Corporation*

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. PROCEDURAL HISTORY OF THE CASE ........................................................................5

    A. Meadows' Allegations At The Conditional Certification Stage ....................................5

        1. Meadows' Complaint Raises Discrete Factual Allegations And Theories ...............5

        2. Meadows Moves For Conditional Certification Based On Allegations Contained In The Complaint and  In Opt-In Plaintiff Declarations ......................6

        3. Meadows Moves For Conditional Certification A Second Time Based On The Same Off-The-Clock Theories ...............................................................8

    B. The Court Grants Conditional Certification Based On The Additional Allegations Contained In Declarations ...........................................................................8

    C. Court-Approved Notice Is Issued To More Than 4,200 CEs, Resulting Ultimately In Over 1,600 Opt-In Plaintiffs ................................................................10

    D. Plaintiffs Raise A New Theory Based On NCR's Performance Metrics ....................11

III. FACTUAL BACKGROUND .............................................................................................11

    A. NCR's Policies Mandate Compliance With The FLSA .............................................11

        1. CEs Must Accurately Report All Time Worked .....................................................11

        2. Plaintiffs Understood That They Should Report And Be Paid For All Hours Worked ...................................................................................................14

    B. Plaintiffs Had Disparate Work Experiences ..............................................................16

        1. Plaintiffs' Work Experiences Vary Based On Their Territory Managers ...............17

        2. Plaintiffs' Work Experiences Vary By State ..........................................................18

        3. Plaintiffs' Work Experiences Vary By Type Of Work Assignments ......................20

    C. Plaintiffs Do Not Exhibit Any Common Pattern Of Alleged Off-The-Clock Work ...20

        1. Alleged Pre-Shift and Post-Shift Activities ...........................................................21

        2. Varying Lengths of Time Spent Performing Alleged Off-the-Clock Work ...........23

        3. Additional Dissimilarities Amongst The Plaintiffs ...............................................23

    D. Plaintiffs Point to Disparate Reasons For Allegedly Working Off-The-Clock ..........26

IV. ARGUMENT .....................................................................................................................28

    A. Plaintiffs Cannot Demonstrate By A Preponderance Of The Evidence That They Are Similarly Situated .........................................................................................28

    B. Plaintiffs Experienced Disparate Factual And Employment Settings .......................30

        1. Plaintiffs Fail To Establish A "Single Policy, Custom or Practice" That Caused Them To Perform Off-The-Clock Work ...............................................30

2. Plaintiffs Cannot Avoid Decertification Based On Their *Post-Hoc* Reliance On NCR's "5 Star" Program ....................................................... 36

3. Plaintiffs' Disparate Work Experiences Also Support Decertification ...................... 41

C. NCR Has Individualized Defenses To Plaintiffs' Claims ......................................... 46

1. Whether NCR Had Actual Or Constructive Knowledge Of The Alleged Off-The-Clock Work Will Require Individualized Inquiries ........................... 47

2. NCR Has Additional Individualized Defenses ............................................... 50

D. Fairness and Procedural Concerns Require Decertification ....................................... 53

1. A Collective Action Would Prove Unmanageable and Inefficient ....................... 53

2. Plaintiffs Have No Viable Method For Calculating Damages For All Plaintiffs ...... 55

V. CONCLUSION ................................................................................................. 56

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adair v. Wisc. Bell Inc.*,
    No. 08-c-280, 2008 WL 4224360 (E.D. Wis. Setp. 11, 2008) ..............................................36

*Anderson v. Cagle's, Inc.*,
    488 F.3d 945 (11th Cir. 2007) ...............................................................................................45

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
    772 F. Supp. 2d 1111 (N.D. Cal. 2011) (*abrogated on other grounds by
    Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018))....................................34, 37

*Blakes v. Ill. Bell Tel. Co.*,
    No. 11 CV 336, 2013 WL 6662831 (N.D. Ill. Dec. 17, 2013) (Kim, J.) ........31, 35, 41, 47, 53

*Boelk v. AT&T Teleholdings, Inc.*,
    No. 12-cv-40-bbc, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013).........................31, 35, 36, 37

*Boelk v. AT&T Teleholdings, Inc.*,
    No. 12-cv-40-bbc, 2013 WL 3777251 (W.D. Wis. July 19, 2013) ........................................48

*Brand v. Comcast Corp.*,
    No. 12 CV 1122, 2012 WL 4482124 (N.D. Ill. Sept. 26, 2012) (Kim, J.) .............................29

*Brickey v. Dolgencorp., Inc.*,
    272 F.R.D. 344 (W.D.N.Y. 2011)..........................................................................................38

*Briggins v. Elwood TRI, Inc.*,
    882 F. Supp. 2d 1256 (N.D. Ala. 2012)..................................................38, 40, 42, 51, 52, 54

*Brown v. ScriptPro, LLC*,
    700 F.3d 1222 (10th Cir. 2012) .............................................................................................47

*Camilotes v. Resurrection Health Care Corp.*,
    286 F.R.D. 339 (N.D. Ill. 2012) (St. Eve, J.)........................................2, 29, 30, 33, 41, 47, 53

*Coleman v. Jenny Craig, Inc.*,
    No. 11cv1301-MMA (DHB), 2013 WL 6500457 (S.D. Cal. Nov. 27, 2013) ........................35

*DeMarco v. Northwestern Memorial Healthcare*,
    No. 10 C 397, 2011 WL 3510905 (N.D. Ill. Aug. 10, 2011) (Feinerman, J.)..........................1

*Desilva v. North Shore-Long Island Jewish Health System, Inc.*,
    27 F. Supp. 3d 313 (E.D.N.Y. 2014) ......................................................................................45

*Diaz v. Elecs. Boutiques of Amer., Inc.*,
  No. 04-CV-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ..............................50

*Doyel v. McDonald's Corp.*,
  No. 4:08-CV-1198 CAS, 2010 WL 3199685 (E.D. Mo. Aug. 12, 2010)..............................55

*Elder v. Comcast Corp.*,
  No. 12 C 1157, 2015 WL 3475968 (N.D. Ill. June 1, 2015) (Holderman, J.) ..3, 29, 32, 33, 35

*Espenscheid v. DirectSat USA, LLC*,
  705 F.3d 770 (7th Cir. 2013) .................................................................1, 30, 31, 55

*Espenscheid v. DirectSat USA, LLC*,
  No. 09-cv-625-bbc, 2011 WL 2009967 (W.D. Wis. May 23, 2011)..............................29, 35

*Franks v. MKM Oil, Inc.*,
  No. 10 CV 00013, 2012 WL 3903782 (N.D. Ill. Sept. 7, 2012) (Chang, J.) .........................29

*Gaines v. K-Five Constr. Corp.*,
  742 F.3d 256 (7th Cir. 2014) .......................................................................46, 49

*Gatewood v. Koch Foods of Mississippi, LLC*,
  No. 3:07CV82-KS-MTP, 2009 WL 8642001 (S.D. Miss. Oct. 20, 2009) ............................36

*Ginsburg v. Comcast Cable Commnc'ns MGMT LLC*,
  No. C11-1959RAJ, 2013 WL 1661483 (W.D. Wash. Apr. 17, 2013)....................................50

*Griffith v. Wells Fargo Bank, N.A.*,
  No. 4:11-CV-1440, 2012 WL 3985093 (S.D. Tex. Sept. 12, 2012)..................................31, 38

*Hadley v. Journal Broadcast Group, Inc.*,
  No. 11-C-147, 2012 WL 523752 (E.D. Wis. Feb. 16, 2012)...................................................44

*Hart v. JPMorgan Chase Bank, N.A.*,
  No. 8:12-cv-00470-T-27TBM, 2012 WL 6196035 (M.D. Fla. Dec. 12, 2012) ....................36

*Hawkins v. Securitas Sec. Servs.*,
  280 F.R.D. 388 (N.D. Ill. 2011) (Feinerman, J.) ..................................................................51

*Hernandez v. Ashley Furniture Indus., Inc.*,
  No. 10-5459, 2013 WL 2245894 (E.D. Pa. Mar. 22, 2013) ...................................................55

*Hoffman-La Roche Inc. v. Sperling*,
  110 S. Ct. 482 (1989).............................................................................................................53

*Howard v. Securitas Sec. Servs., USA Inc.*,
  No. 08-C-2746, 2009 WL 140126 (N.D. Ill. Jan. 20, 2009) (Gottschall, J.) .........................29

*Hundt v. DirectSat USA, LLC*,
294 F.R.D. 101 (N.D. Ill. 2013) (Gottschall, J.) ....................................................54

*IBP, Inc. v. Alvarez*,
126 S. Ct. 514 (2005) .............................................................................................50

*Johnson v. Big Lots Stores, Inc.*,
561 F. Supp. 2d 567 (E.D. La. 2008) ....................................................................53

*Johnson v. TGF Precision Haircutters, Inc.*,
No. Civ.A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ............31, 34

*Kellar v. Summit Seating, Inc.*,
664 F.3d 169 (7th Cir. 2011) .................................................................................47

*King v. CVS/Caremark Corp.*,
No. 07-21824-CIV, 2008 WL 5973490 (S.D. Fla. Sept. 11, 2008) ........................42

*Knott v. Dollar Tree Stores, Inc.*,
897 F. Supp. 2d 1230 (N.D. Ala. 2012) .................................................................53

*Kuznyetsov v. W. Penn. Allegheny Health Sys., Inc.*,
No. 10-948, 2011 WL 6372852 (W.D. Pa. Dec. 20, 2011) .........................46, 47, 53

*Lawrence v. City of Philadelphia*,
No. 03-CV-4009, 2004 WL 945139 (E.D. Pa. Apr. 29, 2004) .........................40, 55

*MacGregor v. Farmers Ins. Exch.*,
No. 2:10-CV-03088, 2011 WL 2981466 (D.S.C. July 22, 2011) .....................43, 49

*Marshall v. Amsted Rail Co., Inc.*,
No. 10-CV-0011-MJR-SCW, 2012 WL 5499431 (S.D. Ill. Nov. 13, 2012)..29, 33, 39, 41, 46, 50, 51

*Martin v. Citizens Fin. Group, Inc.*,
No. 10-260, 2013 WL 1234081 (E.D. Pa. Mar. 27, 2013) ...................36, 43, 53, 54

*Mielke v. Laidlaw Transit, Inc.*,
313 F. Supp. 2d 759 (N.D. Ill. 2004) (Castillo, J.) ...............................................29

*Norceide v. Cambridge Health Alliance*,
No. 10-11729-NMG, 2014 WL 775453 (D. Mass. Feb. 24, 2014) ........................31

*Pacheco v. Boar's Head Provisions Co.*,
671 F. Supp. 2d 957 (W.D. Mich. 2009) ...............................................................43

*Prise v. Alderwoods Group, Inc.*,
817 F. Supp. 2d 651 (W.D. Pa. 2011).............................................................47, 50

*Proctor v. Allsups Convenience Stores, Inc.*,
250 F.R.D. 278 (N.D. Tex. 2008) ............................................................30, 34, 42, 43, 46, 53

*Ray v. Motel 6 Operating Ltd. P'ship*,
No. 3-95-828, 1996 WL 938231 (D. Minn. Mar. 18, 1996)....................................................43

*Reed v. County of Orange*,
266 F.R.D. 446 (C.D. Cal. 2010) (*abrogated on other grounds by Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018))....................................................30, 31, 43

*Richardson v. Wells Fargo Bank, N.A.*,
No. 4:11-CV-00738, 2012 WL 334038 (S.D. Tex. Feb. 2, 2012) ........................31, 37, 44, 49

*Rosenberg v. Renal Advantage, Inc.*,
No. 11-cv-2152-GPC-KSC, 2013 WL 3205426 (S.D. Cal. June 24, 2013) ...........................55

*Russell v. Ill. Bell Tel. Co.*,
575 F. Supp. 2d 930 (N.D. Ill. 2008) (Kennelly, J.) .......................................................28, 29

*Russell v. Ill. Bell Tel. Co., Inc.*,
721 F. Supp. 2d 804 (N.D. Ill. 2010) (Kennelly, J.) .......................................................28, 29

*Sandifer v. U.S. Steel Corp.*,
678 F.3d 590 (7th Cir. 2012), *aff'd*, 134 S. Ct 870 (2014) ....................................................51

*Schremp v. Langlade County*,
No. 11-C-590, 2012 WL 3113177 (E.D. Wis. July 31, 2012) ................................................49

*Simmons v. T-Mobile USA, Inc.*,
No. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007)................................................35

*Slayton v. Iowa College Acquisition Corp.*,
No. 09 C 6977, 2010 WL 3937455 (N.D. Ill. Oct. 5, 2010) (Lindberg, J.) ...........................50

*Smith v. Family Video Movie Club, Inc.*,
No. 11 CV 1773, 2013 WL 1628176 (N.D. Ill. Apr. 15, 2013) (Lee, J.) ...............................55

*Smith v. Micron Elecs., Inc.*,
No. CV-01-244-S-BLW, 2005 WL 5336571 (D. Id. Feb. 4, 2005)................30, 35, 43, 46, 47

*Strait v. Belcan Eng. Group, Inc.*,
911 F. Supp. 2d 709 (N.D. Ill. 2012) (St. Eve, J.) ................................................................29

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016).............................................................................................................55

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................................30, 32

*White v. Baptist Mem'l Health Care Corp.*,
    699 F.3d 869 (6th Cir. 2012), *pet. for reh'g denied*, 134 S. Ct. 296 (Oct. 7,
    2013) ......................................................................................................47, 48

*Williams v. Accredited Home Lenders, Inc.*,
    No. 1:05-CV-1681-TWT, 2006 WL 2085312 (N.D. Ga. July 25, 2006) ..............................35

*Yang v. Kohler Co.*,
    488 Fed. Appx. 146 (7th Cir. 2012) .......................................................................30

*Zivali v. AT&T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011) ............................................................47, 51, 54

**Statutes**

Fair Labor Standards Act Section 216(b), 29 U.S.C. § 16(b) .......................................................1

**Other Authorities**

29 C.F.R. § 785.11 ......................................................................................................47

29 C.F.R. § 785.16(a) ..................................................................................................51

29 C.F.R. § 785.47 ......................................................................................................51

Defendant NCR Corporation ("NCR"), by and through its counsel of record, submits the following Memorandum of Law in Support of its Motion for Decertification of the FLSA Collective Action.

## I.    INTRODUCTION

This court previously granted Plaintiff Michael Meadows' ("Meadows") second motion for conditional certification under Section 216(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 16(b).  But in so doing, the Court recognized that "[i]t is possible that too many individual questions exist" regarding whether, why and when NCR's home dispatched customer engineers ("CEs") performed pre- and/or post-shift off-the-clock work.  (Dkt. 192, at p. 5)  For that reason, the Court expressly cautioned that "if Meadows ultimately fails to produce sufficient evidence of a national policy or practice at work, *then decertification should follow* because it is likely that individualized inquiries will predominate in the case."  (*Id.*, emphasis added)

It's now "show time" for Meadows.  And, importantly, he can no longer rely on the "lenient" standard of review that helped him obtain "first stage" certification.  (*Id.*, at pp. 1-2)  To the contrary, Meadows now has the *burden of proving by a preponderance of the evidence*, and subject to a "*rigorous and fact-intensive review*," that he and more than 1,600 Opt-In Plaintiffs (collectively with Meadows, "Plaintiffs") are "similarly situated" so as to make the collective adjudication of their claims appropriate.  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) (a plaintiff must establish that members of a FLSA collective are similarly situated by a preponderance of the evidence in response to a motion for decertification); *DeMarco v. Northwestern Memorial Healthcare*, No. 10 C 397, 2011 WL 3510905, at *2 (N.D. Ill. Aug. 10, 2011) (Feinerman, J.)[1] (when considering a motion to decertify a collective, a court conducts a rigorous and fact-intensive review,

[1] For the Court's convenience, attached hereto as Ex. 53 are true and correct copies of all unpublished authority cited herein.

and uses a more stringent standard).  (*See also*, Dkt. 192, at pp. 1-2)  As explained herein, Meadows

cannot come close to satisfying this burden of proof.

   The post-certification discovery conducted in this case reveals that the off-the-clock claims of

more than 1,600 home dispatched CEs – *individuals who worked in more than 40 different states for*

*more than 100 different managers, and who did so without direct supervision and at different times*

*over more than six years* – cannot feasibly be adjudicated on a collective basis.  Indeed, the sworn

testimony of those Plaintiffs who have actually been cross-examined in this case confirms exactly

what this Court predicted was possible; *i.e.*, that the "when" and "what" and "why" of a particular

CE's off-the-clock claims are too individualized to support "second stage" certification, "because the

tasks performed by CEs, when they performed them, and the reason why the work was

uncompensated [are] specific to a particular CE, territory manager, or geographic area."  (Dkt. 192, at

p. 5)  Here, the deponent Plaintiffs' claims lack any nexus, vary significantly if not altogether by

individual, are subject to differing and individual defenses, and otherwise cannot be tried together in a

fair or efficient manner.

   First, Plaintiffs cannot identify a "factual nexus that binds the plaintiffs together as victims of a

particular violation of the overtime laws."  *See Camilotes v. Resurrection Health Care Corp.*, 286

F.R.D. 339, 346 (N.D. Ill. 2012) (St. Eve, J.) (citations and quotations omitted).  The deponent Plaintiffs

have *collectively* identified a panoply of off-the-clock work activities that allegedly occurred pre- and

post-shift, including answering calls from other CEs, checking/responding to e-mails, calling

customers, reviewing work assignments, processing parts, completing training, performing vehicle

maintenance, entering time, and communicating with NCR's control tower.  But the deponents do not

agree on the off-the-clock tasks that they *personally* performed or found necessary, and they fail to

identify any nationwide and common policy or practice that caused them to work off-the-clock in

violation of NCR's written prohibitions against such work. Instead, the deponent Plaintiffs proffer a variety of _individual_ reasons for their alleged off-the-clock work, ranging from personal preference, convenience, their desire to be a team player or "good employee," unspoken rules, unmanageable workloads, customer demands and individual customer contracts, and/or NCR's performance metrics. The simple truth is that the only _common_ policies identified during discovery were NCR's _lawful_ ones forbidding off-the-clock work, and requiring CEs to accurately self-report all of their hours worked.

With nothing to "glue" Plaintiffs together as victims of "a national policy or practice" (Dkt. 192, at p. 5), it is plain that only individualized analyses can resolve their claims. Thus, as Judge Holderman found in granting the defendants' motion for decertification in _Elder v. Comcast_:

> Plaintiffs have failed to identify a common practice or policy of instructing technicians to work before their shift starts, during lunch, or after their shift ends. In the absence of any standardized conduct toward the members of the proposed classes, the court must make a series of individual inquiries to determine whether technicians in fact worked pre-shift, post-shift, or during their meal breaks. And the answer for one technician does not necessarily shed light on the answer for another.

No. 12 C 1157, 2015 WL 3475968, at *7 (N.D. Ill. June 1, 2015) (Holderman, J.) (internal citations omitted). The disparate work experiences of the deponent Plaintiffs in this case echo the concerns that caused Judge Holderman to grant decertification in _Elder_. The extent of the deponents' alleged pre-shift work activities varied depending on their personal preferences, positions, shifts, the demands of a given work day, the location of a job assignment, and even the day of the week. The same can be said of the extent and variety of the deponents' alleged post-shift activities – _e.g._, time entry, training, key audits and telephone calls. In fact, many deponents disclaimed performing _any_ post-shift tasks.

The deponent Plaintiffs' work experiences also varied based on the assigned Territory Manager ("TM") to whom they reported. Some Plaintiffs (such as Meadows) blame specific TMs for causing them to work off-the-clock, whereas others admit that their TMs never instructed them to work off-the-clock. In addition, Plaintiffs' work experiences vary based on whether they were union or non-union

- 3 -

employees, as well as on whether the Plaintiff worked in California or Washington, as opposed to some other state. In that regard, California and Washington CEs are paid "portal-to-portal;" *i.e.*, from when they depart their homes at the start of the workday until they return to their homes at the end of the workday.

Second, a collective action is inappropriate here because NCR has a host of individualized defenses. One such defense is that NCR's management neither knew nor should have known of the alleged off-the-clock work of a particular Plaintiff. Several Plaintiffs testified at deposition that their TMs could not have known of their off-the-clock work because they spent their work days "in the field" without direct supervision. Indeed, virtually all of the off-the-clock work claimed by deponent Plaintiffs was performed while at home, and thus completely free from direct oversight by their TMs. NCR's "lack of knowledge" defense is by necessity individualized as to each Plaintiff and his or her TM. Other defenses are also individualized, including NCR's defenses that (1) a particular Plaintiff's pre- and post-shift work activities failed to trigger the continuous workday doctrine, (2) the off-the-clock work alleged by a particular Plaintiff is non-compensable under the *de minimis* doctrine, and (3) NCR is entitled to a setoff for any Plaintiff who is bound by an individual or class action settlement agreement. Moreover, a collective proceeding will deprive NCR of its ability to contest fully the credibility of individual Plaintiffs via cross-examination, particularly where a Plaintiff's time records and/or deposition declaration testimony flatly contradict his or her off-the-clock allegations.

Finally, fairness and efficiency concerns also justify the decertification of this action. Based on the deposition testimony of just 40 out of 1,600+ Plaintiffs, it is clear that determining whether a particular Plaintiff engaged in any pre- or post-shift off-the-clock activities, why they did so, how long the activities took, the reasons why they failed to report the time, whether NCR was aware of the work, and whether there is otherwise any basis to impute liability to NCR, will require a painstaking, Plaintiff-

by-Plaintiff, individualized analysis. The inevitable need for such "mini-trials" directly contravenes the purpose of a collective action under the FLSA.

In sum, and as discussed more fully below, collective adjudication of Plaintiffs' claims is manifestly inappropriate, and the Court should grant NCR's motion to decertify the collective and dismiss without prejudice all individuals who filed consents to join this action.[2]

## II. PROCEDURAL HISTORY OF THE CASE

### A. Meadows' Allegations At The Conditional Certification Stage

#### 1. Meadows' Complaint Raises Discrete Factual Allegations And Theories

In his Complaint (filed in June 2016), Meadows alleges that "[t]his action is properly maintained as a collective action because the Representative Plaintiff is similarly situated to the members of the collective class with respect to job title, job description, training requirements, job duties, Defendant's failure to pay overtime hours, [and] time spent working off the clock." (Dkt. No. 1, Complaint, at ¶ 20) Meadows further alleges that NCR "*encouraged*" CEs "to perform work before the start and after the end of their scheduled shift, but did not record or pay them for such time worked." (*Id.*, at ¶ 13) This alleged off-the-clock work consists of "reviewing and responding to job assignments and emails; checking their routes; loading and unloading their vehicles with NCR equipment, parts and tools; logging mileage; documenting estimated times of arrivals ('ETA'); filling out timesheets; discounting up to 30 minutes of their first and last drives; and performing other work that was not recorded or paid by Defendant." (*Id.*) Significantly, Meadows' Complaint makes no mention of alleged off-the-clock work performed due to the pressure on CEs to satisfy certain performance metrics.

---

[2] It bears noting that decertification will not divest any Plaintiff of his or her off-the-clock claims. Rather, such action will only bar the collective adjudication of those claims.

**2. <u>Meadows Moves For Conditional Certification Based On Allegations Contained In The Complaint And In Opt-In Plaintiff Declarations</u>**

In August 2016, Meadows moved this Court to conditionally certify and issue notice to a collective consisting of :

> Similarly situated Customer Engineers ("CEs") who: (1) were not paid for *time spent before or after their scheduled shifts* accessing Defendant's software programs to receive, review, and acknowledge their work assignments; providing their work status on Defendant's routing system, including going dispatch ("DS"); pre-calling customers and/or providing estimated times of arrival ("ETAs"); communicating via cell phone and electronic messaging with supervisors and dispatch; loading and unloading their work vehicles with NCR equipment, parts and tools; completing key audits; filling out timesheets and performing other work that was not recorded or paid by Defendant; (2) were required to deduct a thirty-minute to one-hour meal break regardless of whether they took a meal break or whether CEs worked through such meal breaks; and (3) were not paid at an overtime rate of one-and-a- half (1.5) times their regular rate for all time worked in excess of 40 hours in any given week.

(Dkt. No. 59, Plaintiff's Motion For Conditional Certification And To Facilitate Notice Pursuant To 29 U.S.C. § 216(b) ("First Conditional Certification Motion"), at pp. 1-2, emphasis added) In the First Conditional Certification Motion, Meadows contended that all CEs "work under common employment policies maintained in Defendant's CE Handbook and are subject to the same compensation scheme." (*Id.*, at pp. 2-3) Meadows set out a list of alleged "similarities" to support the issuance of notice to the putative collective, citing to allegations contained in declarations obtained from seven opt-in Plaintiffs.[3] (*Id.*, at p. 8) Those declarations do not contain any reference to off-the-clock work allegedly performed

---

[3] The aforementioned list of alleged "similarities" includes: (a) same job duties; (b) same pay policies and practices; (c) scheduled to work 40 hours or more per week; (d) classified as non-exempt and paid hourly; (e) required to open NCR's routing application every morning to get assignments and check their routes without pay; (f) required to report their work status at least 30 minutes before the start of their shifts; (g) required to load and unload their work vehicles with computers, parts, tools and keys without pay; (h) required to clean and maintain their work vehicles after hours; (i) required to perform key audits each day outside scheduled work shifts without pay; (j) required to provide ETAs before their scheduled work shifts without pay; (k) required to order parts, check emails and complete paperwork without pay; (l) subjected to a one hour deduction and not compensated for work performed during their breaks and meal periods; (m) hours worked were not accurately recorded by NCR; (n) not compensated for all the work that they were required, encouraged or permitted to perform; and (o) not paid an overtime premium for all work performed in excess of 40 hours per week. (Dkt. No. 59, First Conditional Certification Motion, at p. 8)

due to CE concerns over NCR's performance metrics. (Dkt. No. 59, First Conditional Certification Motion, at Ex. B)

In his reply brief in support of the First Conditional Certification Motion, Plaintiff stated that CEs "were subjected to *two common schemes* by NCR": (1) CEs were not paid for pre- and post-shift time spent receiving, reviewing and acknowledging their work assignments; providing their work status and ETAs on NCR's system; communicating via telephone and email with supervisors and dispatch; loading vehicles with equipment, parts and tools; completing key audits; filling out timesheets; picking up and dropping off parts and equipment at FedEx; driving to and from their first and last jobs; and performing other unrecorded, unpaid work; and (2) CEs were subjected to a one-hour unpaid meal break regardless of whether meal breaks were actually taken or interrupted. (Dkt. No. 97, Plaintiff's Reply In Support Of Conditional Certification And To Facilitate Notice Pursuant To 29 U.S.C. § 216(b), at p. 4, emphasis added) Meadows further stated that the "crux of Plaintiff's allegations" is "NCR's own attendance and timekeeping policies, both stated in the Handbook and relayed to Plaintiffs from their supervisors, [that] require Plaintiffs to begin working prior to the start of their shift." (*Id.*, at pp. 4-5) Again, there was no mention in this reply brief of off-the-clock work being performed due to CE concerns over NCR's performance metrics. Rather, the alleged off-the-clock work was attributed *solely* to NCR's attendance and timekeeping policies as set forth in the CE Handbook.

On January 20, 2017, this Court denied Plaintiff's First Conditional Certification Motion and refused to issue notice to members of the putative collective because "Plaintiffs have not made a sufficient showing that they were victims of a common NCR policy or plan that violates the law." (Dkt. No. 118, Jan. 20 Order, at p. 5)

**3.** **Meadows Moves For Conditional Certification A Second Time Based On The Same Off-The-Clock Theories.**

Following his failed first attempt to obtain conditional certification, Meadows filed a Renewed Motion And Memorandum In Support of Conditional Certification As Collective Action And Issuance Of Notice Pursuant To 29 U.S.C. § 216(b) ("Renewed Conditional Certification Motion"). (Dkt. No. 136) In the Renewed Conditional Certification Motion, Meadows argued that CEs "are 'similarly situated' with respect to NCR's common policy to begin work at least 30 minutes before the start of their shifts, as well as other off-the-clock claims." (Dkt. No. 136, Renewed Conditional Certification Motion, at p. 6) Specifically, Meadows contended that all CEs begin their work days by checking in with NCR via their mobile devices 30 minutes before their work shifts, as required by NCR's policies as set forth in the CE Handbook. (*Id.*, at pp. 5-6) Meadows again asserted that this NCR policy requires CEs to perform the following off-the-clock work: "fielding calls, emails, or text messages with NCR's Operations Center, mapping their routes, entering estimated times of arrival ('ETAs') on NCR's routing application, pre-calling customers, loading their company owned vehicles ('COVs'), updating their status to 'dispatch,' 'DS,' or 'traveling' on NCR's routing application, and driving to their first jobs of the day." (*Id.*, at p. 6) All of this work was allegedly performed before the start of CEs' shifts and went unrecorded and unpaid. (*Id.*)

In sum, Meadows argued that he had met his evidentiary burden to support conditional certification because "NCR's own Handbook demonstrates that Plaintiffs and putative opt-in plaintiffs were the victims of a common policy requiring them to perform off-the-clock work that they allege violates the FLSA." (*Id.*, at p. 16) As with his Complaint and First Conditional Certification Motion, Meadows made no mention of NCR's performance metrics in his Renewed Conditional Certification Motion.

**B. The Court Grants Conditional Certification Based On The Additional Allegations Contained In Declarations**

On November 9, 2017, this Court found that Meadows had met his "modest" first-stage burden to establish that he is similarly situated to members of the putative collective, and granted conditional certification of Meadows' pre- and post-shift claims – *and those claims only* – in approving notice to the collective. (Dkt. No. 192, Nov. 2017 Order) Again, certification was *expressly* limited to Meadows' alleged *pre- and post-shift* work activities.

> According to most of the CEs' declarations: (1) NCR's policies and practices required CEs to complete a number of tasks before their shift each day (*review assignments, read emails, order parts, pick up parts from FedEx, communicate with the "NCR Tower," map routes, pre-call customers, enter ETAs, load parts into the company-owned vehicle, and drive to the first worksite*), but NCR's policies instructed CEs to enter their start time each day as the time they arrived at their first worksite, not as the time they first started working . . .; (2) NCR's policies and practices required CEs to complete a number of tasks after their shift each day (*key audits, unload parts from the company-owned vehicle, order parts, communicate with other employees and their territory manager, review emails, answer correspondence, and enter time on the electronic timesheet*), but NCR's policies also instructed CEs to enter their end time each day as the time they completed their last job in the field, not as the time they ceased working . . .
>
> Such information from the CEs' declarations, along with similar deposition testimony from Meadows, is enough to establish, at this stage, that NCR had nationwide policies or practices that required its CEs to perform off-the-clock work, in violation of the FLSA. Despite working in different states and for different territory managers, *the CEs performed the same core set of activities before their shift, and after their shift, but they underreported their hours in the same manner, because they were instructed to enter their time based on arrival at and departure from field assignments*. The CEs' adoption of the same habits, even though such habits were in direct contravention of NCR's handbook, shows that a "factual nexus" existed between the way NCR's policies and practices affected Meadows and the way they affected each of the other CEs.

(Dkt. No. 192, Nov. 2017 Order, at p. 4) (emphases added)

In sum, the Court found that Meadows had adduced enough evidence to demonstrate the possibility that NCR has "an unwritten policy or an unofficial practice of encouraging off-the-clock work by *requiring the performance of significant tasks before and after shifts while requiring CEs to*

*clock in and out based on their arrival and departure times,"* and thus had satisfied the "modest factual showing" necessary for "first stage" certification. (*Id.*, at pp. 4-5) (emphasis added). But importantly, the Court also determined that Meadows' proposed notice form was inappropriate because it included references to alleged off-the-clock work performed during lunch breaks and commuting time. (*Id.*, at p. 7) In that regard, the Court specifically held that "*[t]he showing for a collective action is sufficient only for pre- and post-shift work.*" (*Id.*) (emphasis added)

Finally, despite the Court's conditional certification of a collective *limited to claims of pre- and post-shift off-the-clock work*, the Court cautioned the parties that later decertification of the collective was possible.

> It is possible that too many individual questions exist, because the tasks performed by CEs, when they performed them, and the reason why the work was uncompensated may be specific to a particular CE, territory manager, or geographic area. *If Meadows ultimately fails to produce sufficient evidence of a national policy or practice at work, then decertification should follow because it is likely that individualized inquiries will predominate in the case.* But at this stage, there is enough to let CEs know that this lawsuit exists.

(*Id.,* at p. 5) (emphasis added)

### C. Court-Approved Notice Is Issued To More Than 4,200 CEs, Resulting Ultimately In Over 1,600 Opt-In Plaintiffs

Following the November 2017 Order, notice of the certified claims in this action and an opportunity to "opt in" was provided to more than 4,200 current and former NCR CEs across the nation. That notice informed CEs that an action was pending in which it is alleged that "CEs performed pre-shift and post-shift duties and were denied compensation" in violation of the FLSA. (Ex. 1, Notice of Collection Action Lawsuit) Since the issuance of that notice, over 1,600 CEs have elected to join this action as Plaintiffs.

**D. Plaintiffs Raise A New Theory Based On NCR's Performance Metrics**

The parties engaged in deposition and document discovery following the close of the opt-in period. NCR sought to depose 81 additional Plaintiffs; however, only 36 of those individuals were ultimately made available to NCR for deposition. In that regard, Meadow's counsel apparently experienced ongoing difficulties in getting their clients to appear for their noticed depositions.[4] Plaintiffs also deposed 13 current and former NCR TMs.

As this additional discovery proceeded, some Plaintiffs articulated a new theory as to why they worked off-the-clock. These Plaintiffs contend that they did such work in order to meet NCR's purportedly unrealistic performance metrics – *i.e.*, NCR's "5 Star" program – and to avoid being disciplined for their under-performance. Significantly, however, NCR's "5 Star" program has never been identified or even mentioned in any of Meadows' court filings in this case. Of course, Meadows was certainly free to cite this performance program as a cause for his off-the-clock work, but he failed to do so. In fact, he failed to do so in his Complaint, in his two conditional certification motions, in his opposition to NCR's motion for summary judgment, and during his deposition. In short, this belated performance based theory of recovery has never previously been presented to this Court, and is not mentioned in the Court's certification order or the Court-approved notice to the collective.

**III. FACTUAL BACKGROUND**

**A. NCR's Policies Mandate Compliance With The FLSA**

**1. CEs Must Accurately Report All Time Worked**

NCR policy, expressed in multiple places, requires that CEs report their time accurately and that they be paid for all time worked. NCR's CE Handbook is explicit:

---

[4] Several Plaintiffs who failed to appear for deposition informed their counsel that they no longer wanted to participate in this action. This fact and the further fact that fewer than half of the Plaintiffs who NCR selected actually appeared for their depositions underscores the unfairness of collective adjudication in this case. *Would more than half of the other Plaintiffs in this case also refuse to show up for a properly noticed deposition? And, if so, what right do they have to the benefits of collective adjudication? See* NCR's Motion to Dismiss With Prejudice the Claims of Those Opt-In Plaintiffs Who Refused to Cooperate in Discovery, filed concurrently herewith.

> NCR expects CEs to work within the work schedules set by their managers. However, all time spent performing work (regardless of whether it falls during your scheduled shift) must be reported in Workday.  Supervisors are prohibited from requiring, encouraging or even suggesting that CEs (and any other nonexempt employees) work "off the clock."  Employees that underreport or fail to report hours, or any other violation of the foregoing, may be subject to the full range of disciplinary action.  This includes managers who fail to observe this policy.  If you have any questions or concerns about the prohibition against "off the clock" work, please contact HR Central.

(Exs. 3 and 4, Handbook at pp. 14-15)  To eliminate any possible confusion with respect to NCR's prohibitions against off-the-clock work, the Handbook describes specific activities that should not be performed off-the-clock, including many of the activities upon which Plaintiffs base their off-the-clock claims.  For example, the Handbook specifically states that CEs are prohibited from checking email during non-working hours.  (Exs. 3 and 4, Handbook at p. 13) ("Territory Managers will give general direction regarding the frequency with which you should check email based upon the frequency with which email is used in your territory, but *in no event should email be used during your unpaid, non-working hours.*" (emphasis added))  Likewise, the Handbook provides that "[t]ime spent performing administrative activities (e.g., e-mail, time reporting, parts management, mandatory training and other administrative duties) are compensable as work time."  (*Id.*)

The Handbook also sets out NCR's overtime, timekeeping, administrative time, meal and rest breaks and commute time policies.  (*Id.*)  All of NCR's written policies, including those requiring CEs to report all hours worked and prohibiting off-the-clock work, are clearly stated and communicated to CEs.[5]  At the time of hire, NCR provides each CE a copy of the Handbook,

---

[5] Dkt. No. 172, Ex. D, Yeager ¶ 6; Ex. 26, Karruli Dep., 77:11-23 (states that on every team call, each Monday, he tells the CEs to record all time worked); Ex. 20, Hatcher Dep., 33:17-35:15 (testifies that, during their weekly conference calls and via emails, he tells his CEs that they should record and be compensated for any work outside of their shift); Ex. 14, Fisher Dep., 66:21-69:3 (when he was a TM, he personally directed, on a daily basis during their conference call, his CEs to "[r]ecord all time worked"); *see also* Ex. 37, Redding Dep., 43:17-44:18 (understood that

and each CE is required to acknowledge his or her receipt of it. The acknowledgement provides that the CE has read, understands and agrees to follow NCR's policies, as well as to review any updates to the Handbook by accessing NCR's intranet.[6]

NCR also provides CEs with multiple ways to raise concerns about anything related to their employment, including complaints regarding alleged unlawful pay practices.[7] The Handbook sets out NCR's Open Door Policy, and explains that CEs may contact their manager or human resources to discuss any issue arising in the workplace. (Exs. 3 and 4, Handbook at pp. 50, 51) The Handbook section prohibiting "off-the-clock" work also contains an instruction that if CEs "have any questions or concerns about the prohibition against 'off the clock' work, please contact HR Central." (*Id.*, at p. 15) To help foster such communications, if necessary, NCR maintains a dedicated HR telephone line and email account through which CEs may submit questions, concerns or complaints about any issue arising out of their employment.[8] NCR's Human Resource employees and management personnel also hold periodic in-field town hall and roundtable meetings to provide CEs with face-to-face opportunities to raise any questions, concerns or complaints about local practices or issues occurring in the field.[9] Notwithstanding all of the foregoing, Meadows and the majority of the deponent Plaintiffs never complained to any NCR employee about not being paid for off-the-clock work.[10]

---

policies within the Handbook applied to him and were available to access on the intranet)

[6] Dkt. No. 172, Ex. D, Yeager ¶ 8, *see also* Exs. 3 and 4, Handbook at p. 2

[7] Dkt. No. 172, Ex. D, Yeager Decl. ¶ 11

[8] Dkt. No. 172, Ex. D, Yeager Decl. ¶ 11

[9] Dkt. No. 172, Ex. D, Yeager Decl. ¶ 12 and Ex. B, Martinaitis Decl. ¶ 7; Ex. 22, Isho Dep., 75:21-76:7 (explaining that during town hall meetings they speak with CEs, take them to lunch, give them information, and "just see how everything's going, see how their days are going.")

[10] Ex. 30, Meadows Dep., 105:2-6; Ex. 16, Flood Dep., 204:12-205:6, 206:12-18; Ex. 44, Seaton Dep., 163:6-19; Ex. 49, Williams Dep., 97:10-18, 98:11-15, 112:13-16; Ex. 26, Karruli Dep., 82:13-83:12; Ex. 24, Jackson Dep., 104:2-14; Ex. 10, Charles Dep., 16:10-23, 50:20-23; Ex. 2, Kent ¶ 12

**2. Plaintiffs Understood That They Should Report And Be Paid For All Hours Worked**

Deponent Plaintiffs understood that NCR prohibits off-the-clock work.[11] They also understood that they were responsible for recording all of their time worked accurately in NCR's timekeeping system.[12] Moreover, the vast majority of the deponent Plaintiffs concede they were never instructed to work off-the-clock.[13] In fact, Plaintiff Bobby Scales was specifically told to record his time when he mentioned to his TM that he received a call before the start of his shift, while Plaintiff Kyle Rice ignores off-the-clock phone calls after mentioning it to his TM, who

---

[11] *See, e.g.* Ex. 34, Pfiester Dep., 24:17-25:5 ("I know it's … prohibited to do work off clock hours."); Ex. 18, Gathers Dep., 32:25-33:23 ("Q: Has anyone at the TM level or above ever told you that NCR strictly prohibits the CEs from doing work off the clock? A: Yes… The TMs that I work with."); Ex. 12, Cosby Dep., 49:7-12 (confirming that he is aware of NCR's policies that if he works "checking emails, preparing for jobs, talking to dispatch, organizing parts, [he is] supposed to record that so [that he is] paid for it); Ex. 42, Sauco Dep., 30:20-22, 119:14-25 (confirms that he is required to record all of the time he works and that he is expected to follow the policies within the Handbook); Ex. 9, Bucher Dep., 53:11-54:7 (confirms understanding that NCR prohibited off-the-clock work); Ex. 36, Presley Dep., 43:9-44:22, 88:13-91:13 (agrees that TM communicated to the CEs that off-the-clock work is prohibited)

[12] *See, e.g.,* Ex. 25, Johnson Dep., 33:3-9 ("Has any TM during your tenure at NCR ever told you that you must record all of the time you work for NCR? … A: Every boss I've had, whether it's verbal or email"); Ex. 10, Charles Dep., 36:13-20 (confirms understanding that NCR's policies require that he record all his work time); Ex. 48, Wayne Dep., 60:7-10 (understands that he is required to record his time accurately); Ex. 41, G. Santos Depo., 77:5-16 (confirms that he is required to verify that the time reported in Workday is true and complete); Ex. 11, Clark Dep., 97:21-98:8 ("Q: Do you know what the policy is on recording time? … A: Accurate reporting, timely reporting…."); Ex. 42, Sauco Dep., 30:20-22, 46:9-11 (confirms that he is required to record all time worked and responsible for entering his own time); Ex. 38, Rice Dep. 48:1-49:23 ("TM always tells [them] that if… [they] do work, like if [they] attend a conference call or show up for a lunch meeting when [they're] not scheduled to work, he will tell [them] to put in for the time.")

[13] *See, e.g.,* Ex. 21, Hineman Dep., 48:9-12 ("Q: Has anyone from NCR told you you're not to record that if you're off the clock and you work? A: No."); Ex. 12, Cosby Dep., 32:10-16 ("[N]o one's ever told [him]" to not record his time spent returning emails, mapping out his day, or calling security); Ex. 42, Sauco Dep., 62:11-15 ("Q: Has anyone told you that you should not record that time that you spend doing work before 8:00? A: Has anyone told me that I should not? No one has told me."); Ex. 39, Rodriguez Dep., 45:11-13 ("Q: No one has ever told you should not record your time if you are working? A: No one's ever told me that."); Ex. 46, Walker Dep., 63:1-9 ("Q: Am I correct that no one at NCR, a Territory Manager or management-level person, has ever instructed you that you must perform work off the clock? A: Nobody has ever said you must perform work off the clock. Q: And you're not aware of any NCR policy that implies work must be performed off the clock? A: No."); Ex. 50, Wilson Dep., 113:7-11 ("Q: Did [TM] Jeff [Clark] ever tell you to work before or after your shift? A: No. Q: How about anybody else at NCR? A: Nobody."); Ex. 45, Vona Dep., 55:3-57:4 (testifies that none of his four identified TMs have ever told him to work off the clock); Ex. 8, Brown Dep., 33:11-17 ("nobody said look, I need you to do this or that and make sure it's off the clock")

instructed him that he could "ignore them." (Ex. 43, Scales Dep., 126:1-18; Ex. 38, Rice Dep., 48:1-49:23)

Likewise, several deponent Plaintiffs understood that NCR considers many of the activities they claim to have performed off-the-clock to be work related and compensable.[14] Deponents also acknowledged that the Handbook and/or management advised them to report all of their work time.[15] Most notably, and contrary to Meadows' allegations, some deponent Plaintiffs admit to having requested *and received* "Administrative Time" for tasks not associated with a particular work order.[16] In sum, the reasons given by deponent Plaintiffs for why they failed to report all of their work time vary substantially, and thus raise individualized issues for each of those Plaintiffs.

---

[14] Ex. 13, Duncan Dep., 61:8-62:17, 80:3-7 (confirms he recorded time on his day off for parts management and was paid for it, and that if he recorded time spent "entering ETAs" before leaving home he would have been paid for it); Ex. 45, Vona Dep., 65:22-68:2 (confirms having recorded time for work he performed before and after his shift and the decision to record his time was based on the amount of time involved); Ex. 7, Bratt Dep., 84:7-17 (confirms having recorded time for checking e-mail prior to the start of his shift, stating "sometimes I hit and miss whether I put it in or not"); Ex. 12, Cosby Dep., 30:18-31:11 (confirms that he is "aware... that NCR pay for the time [he] would spending reviewing [his] emails, planning [his] day, making calls for security, thing like that")

[15] *See, e.g.,* Ex. 37, Redding Dep., 67:1-10 ("He told us the time that we worked needed to be documented in Workday and needed to be accurate...."); Ex. 9, Bucher Dep., 79:8-21 (TM Charles Bass "mentioned [] on more than one occasion" the prohibition against off-the-clock work and reminded him of expectation to report all work time in Workday on a daily basis); Ex. 7, Bratt Dep., 48:24-49:8 (TM told them on the conference calls to record their time accurately); Ex. 38, Rice Dep. 48:1-49:23 ("TM always tells [them] that if... [they] do work, like if [they] attend a conference call or show up for a lunch meeting when [they're] not scheduled to work, he will tell [them] to put in for the time.")

[16] Ex. 48, Wayne Dep., 95:2-9 (admits having requested and received "administrative time" to perform some of the discussed off-the-clock activities, including "to manage parts" and "engage in training"); Ex. 10, Charles Dep., 52:8-52:21 (testifies to having requested and received "administrative time," which he describes as "something that it's not exactly doing what your work duty is, which is to run calls. But it's other stuff that you need to do."); *see also* Ex. 15, Fitzgerald Dep., 28:3-28:8 ("If you recorded 10 minutes of admin time, would you be paid for that? A: If I recorded it that way, yeah, they would pay me."); Ex. 22, Isho Dep., 64:3-64:17 (confirms that when he was a TM, he scheduled "administrative time" for his CEs "all the time")

Virtually every deponent Plaintiff acknowledges that when they _did_ record their work time, they were _always_ paid for it – including overtime worked without preapproval.[17]  Indeed, Plaintiff Bryn Wayne admitted that he recorded and was paid for "preshift activity," _i.e._, work performed before he left his home in the morning or before his first assignment, and "for work [he] performed after [he] returned home" at the end of the workday.  (Ex. 48, Wayne Dep., 80:2-23)[18]  In fact, in calendar year 2016, NCR paid CEs over $23 million for 729,995 hours of recorded overtime hours.  (Dkt. No 172, Ex. S, Haws II ¶ 3; and Dkt. No 172, Ex. A Tellado ¶ 13)

**B.**  **Plaintiffs Had Disparate Work Experiences**

Although Plaintiffs are all considered "customer engineers," the work experiences of each Plaintiff were impacted and varied based on several different factors, such as job locations, assigned TM(s), types of assignments, and union presence.  NCR organizes its operations in the United States into six main geographic areas: Northeast, Northeast (Union), Southeast, Midwest, South Central and West.  These six areas are divided into sub-areas and territories.  There are 70 NCR territories located

---

[17] _See, e.g._, Ex. 6, Barraza Dep., 42:11-23 ("Q: And when you have worked overtime and recorded overtime hours, you've paid for the overtime correct? A: Yes."); Ex. 42, Sauco Dep., 84:18-85:4 ("And all of the time that you reported, overtime or regular, you've been paid for, is that correct? A: Correct.  Q: Do you only work overtime if you received authorization? A: No, I work overtime even though I do not receive authorization…. I do get paid overtime even though it was not authorized."); Ex. 37, Redding Dep., 35:1-4 ("I've been compensated by NCR for all the overtime I recorded."); Ex. 12, Cosby Dep., 57:2-5 (confirms that "since 2014 every time [he's] recorded that [he] worked overtime [he was] paid . . . for that overtime"); Ex. 9, Bucher Dep., 30:20-24, 75:20-23 (confirms that he has been paid for all recorded overtime); Ex. 34, Pfiester Dep., 19:15-20:1 ("Q: And were you, in fact, paid for that overtime work even though it wasn't preapproved? A: As long as I put it in my time card I've never had a problem with that being paid."); Ex. 36, Presley Dep., 26:13-27:7 (paid for all recorded overtime, including the approximate 990 hours of overtime he had worked for the year); Ex. 40, D. Santos Dep., 20:3-9, 24:4-12, 46:25-47:5 (confirms having recording and having been paid for all recorded unauthorized overtime); Ex. 21, Hineman Dep., 37:2-6 (same); Ex. 32, Od'Neal Dep., 51:23-52:2 (same); Ex. 19, Hartley Dep., 77:6-9 (same)

[18] _See also_ Ex. 13, Duncan Dep., 80:3-7 ("If you actually recorded time spent on entering ETAs on NCR's routing application before you leave home, if you actually entered that time, you'd be paid for it, correct? A. Yes."); Ex. 45, Vona Dep., 54:21-55:2, 65:22-68:2 ("Q: And if you did perform any work off the clock, you just recorded all of the time that you actually worked in Workday, there's no reason to believe that you wouldn't have been paid for it, correct, because all of the time you have recorded in Workday you've been paid for; isn't that true? A: Yes."); Ex. 7, Bratt Dep., 84:7-17 (confirms having recorded time for checking e-mail prior to the start of his shift, stating "sometimes I hit and miss whether I put it in or not")

across the 50 states. CEs are each assigned to one geographic territory, and they perform work orders solely within their assigned territory. Each of NCR's 70 territories has a designated TM who oversees the work of 30 to 50 CEs, depending on the territory. (Dkt. No. 172, Ex. B, Martinaitis ¶ 4 and Ex. D. Yeager ¶ 4)

### 1. **Plaintiffs' Work Experiences Vary Based On Their Territory Managers**

The work activities and work flows of individual CEs vary based on the CE's territory and TM. TMs develop and implement individualized practices with respect to scheduling availability (*i.e.*, "on-call") time and overtime.[19] The variability created by assigned TMs and their impact on any purported off-the-clock work is illustrated by Plaintiff Michael Rodriguez, who admitted to recording (and being paid for) pre-shift work under his current TM, including time spent getting his tools ready, reviewing work orders, and updating his keys in the morning. According to Rodriguez, his prior TM said he "need[ed] to be out the door by the time [his] shift starts." In contrast, Rodriguez's current TM has said "if you take 10 to 15 minutes or whatever to leave your house," he doesn't care about it, so Rodriguez has "started doing [the pre-shift work] on company time." (Ex. 39, Rodriguez Dep., 89:19-90:25) Moreover, Plaintiff (and former TM) Jeff Clark explained that, although he instructed his own CEs that "once you're off shift you're not required to answer any e-mails, answer any phone calls, do any work" and "you should be putting in through overtime" if you do, he contends that those same policies were not enforced by his own managers before became a TM. (Ex. 11, Clark Dep., 10:10-12:3) ("And while you were a [TM], … what instructions did you give your employees about working off the clock? A: Policies that came down from the top, or you know, once you're off shift you're not required to answer any e-mails, answer any phone calls, do any work. If you

---

[19] Ex. 23, Ivic Dep., 15:20-16:8, 38:13-39:1; 39:12-23; 49:22-51:7; Ex. 22, Isho Dep., 31:17-32:8, 74:3-14 (explaining that training "is scheduled by the TMs, so it varies from CE to CE" and that how the work schedule is drafted and how long in advance it is set varies from territory to territory)

do any work, you should be putting in through overtime, but any overtime that you take should be getting preapproval before using the overtime…. Q: Okay. And so is it your position that prior to becoming a [TM] that those same policies were not enforced by your [TMs]? A: Correct….")) Thus, the actions and comments of individual TM serves to create significant variability in the experiences of Plaintiffs, particularly given the number of different TMs one Plaintiff may have reported to during the claim period as compared to other Plaintiffs.[20]

### 2. **Plaintiffs' Work Experiences Vary By State**

The more than 1,600 Plaintiffs in this action have worked for NCR across dozens of services areas and within 49 different states. (Ex. 52, Declaration of Christina Tellado ("Tellado"), ¶ 3) This geographic diversity has created significant variability in the work experiences and compensation of particular Plaintiffs. For instance, in California and Washington, NCR pays for _all_ of a CE's commuting time. (Ex. 3 and 4, Handbook at pp. 8) Thus, CEs in California and Washington are paid from the moment they depart their homes at the start of the day until the moment they return home at the end of the day.[21] (_Id._) These state-specific pay practices make the 203 Plaintiffs from California and Washington dissimilar from all other Plaintiffs, and contradict Meadows' allegation that all CEs are directed not to report any work time until they arrive at their first customer location of the day. (_See,_

---

[20] Ex. 37, Redding Dep., 12:2-4 (identifies David Webb as the one TM who would call him during non-work hours); Ex. 38, Rice Dep., 48:1-49:23 ("Q: Have you ever informed your TM that you've received phone calls off the clock? A: Yes. Q: And what did he say? A: Well, basically I can ignore them or he would let service planners know, hey, this is the schedule, these are the people who's working. Q: And did you ignore the calls? A: Phone calls, yes....); Ex. 7, Bratt Dep., 41:1-12 (testifies that his TM, Jeff Hammon, instructed him to check his e-mails before his shift); Ex. 35, Potter Dep., 61:11-65:13 (recalls some manager saying, during a meeting in which the issue of pre- and post-shift work was raised, something to the effect of "it's only two or three minutes, what's the fuss?" but also saying they could go ahead and record that time); Ex. 11, Clark Dep., 102:23-104:8 (one of his TMs would ask him to move his overtime time to different week, which was still paid as overtime, "just improperly recorded"); _see also, e.g._, Ex. 37, Redding Dep., 25:17-26:12 (reported to six TMs within five years) _with_ Ex. 29, Li Dep., 15:3-6 (has reported to the same TM for the last six years)

[21] _See also,_ Ex. 22, Isho Dep., 61:6-15 ("California and Washington are on a portal to portal state, so we pay them from the time that they start their shift to the time they end their shift regardless of -- and it's paid from 8:00 to 5:00. So you get paid from 8:00 to 5:00. You don't leave your house 30 minutes before.")

*e.g.,* Ex. 42, Sauco Dep., 36:15-25 (confirms that he is compensated for all the time he spends traveling, including from his home to his first job site and from his last job site to his home); Ex. 40, D. Santos Dep., 69:11-70:2 (same); Ex. 28, Lane Dep., 88:1-3, 89:1-23 (same))  Moreover, some California Plaintiffs testified to being compensated for time beyond their actual commute time.  For instance, California Plaintiff  Joseph Lane stated that he receives compensation starting from the beginning of his shift—*i.e.*, when he is *supposed* to leave his house—even if he ends up leaving his house later. (Ex. 28, Lane Dep., 89:1-23)[22]  Plaintiff Bryan Seaton also testified that if he left his house later than 8:00 a.m. while working in California, he would still be compensated starting from 8:00 a.m., but that if he left at 7:45 a.m., he would be compensated starting at 7:45 a.m.  Seaton further confirmed that NCR applied different commute time and pay practices to him when he worked in Tennessee. (Ex. 44, Seaton Dep., 102:22-104:15, 130:3-131:2)

Furthermore, the terms and conditions of employment for Plaintiffs in New Jersey, New York and Michigan are governed by collective bargaining agreements ("CBAs").[23]  Pursuant to NCR's CBA with Local 202 of the International Brotherhood of Teamsters ("Local 202"), CEs who work in those states are subject to special commute time pay practices that are not applicable anywhere else within NCR.  (Ex. 2, Mousaad ¶ 7 ("CEs who live within my territory are paid for all of their commute time because "CE[s] . . . clock in at the start of his shift while sitting in his vehicle at his home before heading to his first assignment."); Abburscato ¶¶ 7-11 ("CEs are not required to turn on their phones before the start of their shifts," are only required "to be within the territory by the start of their shift" and

---

[22] *See also* Ex. 42, Sauco Dep., 61:11-16 (confirms that he leaves his home "around 8:15 and 8;20, but … start[s] recording [his] time at 8:00")

[23]  *See, e.g.,* Ex. 8, Brown Dep., 37:9-38:8 (confirming that his "employment with NCR is subject to and covered by a collective bargaining agreement with Local 202 and NCR"); Ex. 25, Johnson Dep., 8:16-9:10 ("The biggest reason why I left NCR is because the Detroit group had unionized 3 years ago…. The union made the job more difficult because I have a third party entity who is now partially in control of what I do for work…"); Ex. 32, Od'Neal Dep. 43:15-44:3 (confirms that when union "came in in 2016," the union provided him with a copy of the Handbook)

"there is no NCR requirement that CEs check their emails or assignments 30 minutes before their shift"); Wolven ¶¶ 6, 10 (explaining CEs are to "be in their van, ready to turn on their vehicle and their phone at the start of their shift")) In sum, the different commuting, timekeeping and payroll practices applicable to CEs working in California, Washington, New Jersey, New York and Michigan highlight that not all Plaintiffs are "similarly situated."

### 3. Plaintiffs' Work Experiences Vary By Type Of Work Assignments

In addition to variability resulting from a given Plaintiff's work location and supervisor, the types of work assignment received also create dissimilarities amongst the Plaintiffs. For instance, Plaintiff Alexander Bucher is on "availability" 24-hours per day in connection with a particular product line, which means that he receives additional compensation in order to be "on call."[24] Moreover, some Plaintiffs testified to working on multi-day installations or on "white glove" calls, which means that they reported to the same client site for the same work assignment for multiple days in a row, and thus did not need to perform pre-shift activities such as checking their work orders for the day or the location of their first job assignment.[25]

### C. Plaintiffs Do Not Exhibit Any Common Pattern Of Alleged Off-The-Clock Work

Discovery has established that many Plaintiffs have had very different experiences with respect to their alleged off-the-clock work. Although the deponent Plaintiffs *collectively* described a wide range of work allegedly performed off-the-clock, those same Plaintiffs often contradicted each other

---

[24] Ex. 9, Bucher Dep., 47:15-48:6 ("Q: Do you believe that you're ever performing work for NCR at the end of the day that is off-the-clock time? A: I don't believe that it's off-the-clock time because I'm on call 24/7. I'm under a special provision for being on call for a specific product line for Cisco. So I'm on call all the time, 24/7, 365 days a year. So essentially, I'm always on the clock or available."); *see also* Ex. 22, Isho Dep., 45:2-24 ("We have CEs on what's called availability, so they are on a 24 hour availability shift. So they get calls and receive calls and are required to answer their phones because they are being paid to be on call. … If they called out on a call during their availability… it's a minimum of two hours or if they post that, then they're paid for whatever hours they worked.")

[25] *See, e.g.,* Ex. 9, Bucher Dep., 41:3-42:8 ("Q: And when you are part of a multiday installation, do you have to spend time checking your phone before the half-hour commute time? … A: No. I know what my task is usually for the entirety of the day….."); Ex. 50, Wilson Dep., 43:17-44:9 (confirms working on "white glove" calls for which he "could go multiple days").

_individually_ on what types of off-the-clock work were required, why that work was necessary and how often it occurred, and how long the work took to perform.

### 1. Alleged Pre-Shift and Post-Shift Activities

Certain Plaintiffs identified the majority of their off-the-clock work as pre-shift activities, comprised of a wide range of tasks including phone calls, emails, checking work assignments, dealing with parts, and other activities.[26] Plaintiff Jude Charles explicitly stated that he is _only_ seeking recovery in this lawsuit for pre-shift work, and specifically for time spent reviewing emails and taking service calls, even though he admits that NCR has always paid him for all the time he actually records and nothing about NCR's timekeeping application prevents him from entering time for pre-shift work. (Ex. 10, Charles Dep., 10:18-12:8, 47:18-48:18). Plaintiff Charles also admits that he has not performed any post-shift off-the-clock work.

The deponent Plaintiffs testified with a similar level of variety regarding alleged post-shift activities, including, for example, processing parts, communicating with colleagues, software documentation, phone calls, and printing and reviewing paperwork in preparation for

---

[26] _See, e.g.,_ Ex. 6, Barraza Dep., 69:8-25 (states that he spends fifteen to twenty minutes each morning checking the location of his first assignment first-shift); Ex. 43, Scales Dep., 114:9-115:5 (testified to spending pre-shift off-the-clock time dealing with "work orders, e-mail notification" and "[a]ny phone calls that come in before you start your shift or anyone who's looking to give or gather information for a customer or parts or anything in that area"); Ex. 44, Seaton Dep., 38:5-38:18, 43:20-44:14, 44:20-46:17, 48:14-51:11, and 65:6-17 (listed a litany of off-the-clock work he performs, including ordering parts, reviewing orders, mapping routes, reviewing orders, inputting ETAs, checking in with the control tower, and speaking with customers); Ex. 12, Cosby Dep., 47;15-48:7 (attests to "checking before the 7:30 emails, […] where the parts was at, calling dispatch"); Ex. 17, Galle Dep., 102:25-103:19 (alleged pre-shift work includes "answering telephone calls, e-mails, ordering parts"); Ex. 49, Williams Dep., 14:3-9 (identifies his pre-shift work as "the time we spent in the morning looking at the calls"); Ex. 37, Redding Dep., 10:12-22, 12:14-21 (stating that he frequently receives calls before and after his shift, and will also answer emails); Ex. 35, Potter Dep., 61:21-62:10 (alleged off-the-clock work consists of "planning your day… and the time you answer calls and don't record it after work); Ex. 7, Bratt Dep., 36:4-10, 60:9-18 (allegedly spends one to two hours per week on off-the-clock work, consisting of "[c]hecking the e-mails before shift, checking ES before shift, loading keys, checking keys in my van" and "between five minutes and probably twenty to twenty-five minutes" checking e-mails prior to shift))

the next day's installation.[27]  And, as previously noted, some deponents (such as Plaintiff

Charles) denied performing any post-shift work at all.

Some Plaintiffs testified to working on their days off, and performing such off-the-clock tasks

as returning parts, sending emails, working on expense reports, and answering phone calls from

coworkers.[28]  These Plaintiffs' claims differ from the claims of Meadows and other Plaintiffs

who allege that they were instructed by their TMs to record the start of their workday upon their

arrival at the first customer location, and record the end of their workday when they departed

---

[27] *See, e.g.*, Ex. 42, Sauco Dep., 11:24-12:24 (describing processing parts to return to their drop-off location post-shift); Ex. 45, Vona Dep., 11:10-12:14 (describing the need to follow up with "the guys that work during the day […] when you go in at night"); Ex. 16, Flood Dep., 102:13-103:15 (describing performing mandatory software documentation work post-shift because "I was out in the field, and based on the amount of calls, I – I was swamped all day long. And there was no way to – to do it out in the field"); Ex. 11, Clark Dep., 88:13-25 (describing uncompensated after-hours phone calls participated in as a Team Lead); Ex. 15, Fitzgerald Dep., 35:13-36:15 (described his alleged post-shift work as "[m]ostly parts management"); Ex. 45, Vona Dep., 61:13-67:9 ("[T]here are some instances where we'll have some big installs going on and our install coordinators don't give us the information until … late, so I have to go home and print it out and it might be twenty pages long and I have to sit down and review it so when I go in [the next] morning I know what I have to do"); Ex. 37, Redding Dep., 12:14-21 (stating that he frequently receives calls before and after his shift); Ex. 50, Wilson Dep., 34:6-14, 65:3-16, 84:4-13 (stating that he monitors emails and calls after work, although no one had told him to do so, as well as picking up parts and reviewing job assignments); Ex. 34, Pfiester Dep., 41:18-45:21 (explaining that he does not receive necessary information for the next day's job until after his shift ends); Ex. 19, Hartley Dep., 56:14-58:14, 61:11-62:10 (sits in driveway for "about seven minutes" every day post-shift completing such tasks as closing out a ticket, entering time for the day, and daily key audits); Ex. 51, Yowonske Dep., 44:18-46:17, 96:21-98:23, 106:23-108:17 (alleged off-the-clock activities include completing post-shift paperwork, coordinating with dispatch systems, training, processing parts, cleaning van, repairing crashed laptop)

[28] *See, e.g.*, Ex. 39, Rodriguez Dep., 59:10-63:22 (claiming that on his off shift days, he waits to receive parts, picks up parts, and receives calls for technical assistance); Ex. 50, Wilson Dep., 65:3-16 (explaining "I live close to parts, maybe a mile or two down the road, and I could pick up my parts and I have a five-day – or they shipped that part back out so I have to get there. Sometimes that's on a Saturday or after hours or a day off."); Ex. 37, Redding Dep., 10:8-22 (stating that "there's plenty of times where I am asked to respond outside of the clock, help a coworker that gives me a call, answer an email that a boss sent me, answer a phone call outside of work hours to discuss something with a manager."); Ex. 7, Bratt Dep., 54:13-55:12 (claiming that "we do a lot of off shift work, whether it be working with the devices, sending out e-mails when we're not on an actual day's work that we should be getting paid for […]  I have had CE's call me when they're out in the field on my off days and I work them through the problem."); Ex. 28, Lane Dep., 78:10-80:22 (explaining that on his days off, "I do leave my phone on.  I don't carry it with me, but if I hear that go off and I see who it is, I'll answer the phone. Usually it's my coworkers. […] [T]here are occasions where people have come to my house on my off days to pick up a part, and I think I've done the same too with other people when they've been off.") ; Ex. 32, Od'Neal Dep., 60:7-63:19 (claiming compensation due for work performed on his days off, comprised of working on expense reports and dropping parts off to FedEx to be shipped); Ex. 45, Vona Dep., 13:5-15:22 (describing taking his company vehicle to be worked on at the car dealership on his day off)

from the last customer location, and that those instructions are the _sole basis_ for their off-the-clock claims.

In sum, the deponent Plaintiffs' testimony regarding pre- and post-shift activities is so varied that it does not reveal either a common _type_ of off-the-clock work, or a common _reason_ for performing off-the-clock work.

### 2. Varying Lengths of Time Spent Performing Alleged Off-the-Clock Work

The same dissimilarities extend to the amounts of time the deponent Plaintiffs contend they spent working off-the-clock. For instance, reviewing emails might take anywhere from one to 20 minutes, while mapping routes might take seconds to 30 minutes, depending on the CE. The same sort of variations exist when it comes to the time allegedly spent reviewing work orders.[29] These differences in the types of off-the-clock activities allegedly performed by particular Plaintiffs, and the lengths of time purportedly required to complete _the very same_ activities, are fatal to the collective adjudication of more than 1,600 individual off-the-clock claims.

### 3. Additional Dissimilarities Amongst The Plaintiffs

A number of Plaintiffs appear to seek relief in this action for reasons that are completely unrelated to the certified claim for _pre- and post-shift_ off-the-clock work. Indeed, the testimony of many of the deponent Plaintiffs confirms that they have neither a common motivation for litigating this matter, nor a common grievance against NCR. For example, numerous Plaintiffs

---

[29] _Compare_ Ex. 50, Wilson Dep., 35:22-25 (checking emails may take "three minutes, four, five minutes, and maybe one or two minutes before a shift"), _with_ Ex. 15, Fitzgerald Dep., 24:15-26:7 (checking email "typically" takes "about 15 minutes" and "the majority of the time it exceeds 10 minutes"). Additionally, reviewing job assignments/orders for the day may range from one minute (see Ex. 50, Wilson Dep., 84:3-16) to up to thirty minutes (see Ex. 16, Flood Dep., 223:15-224:7). Similarly, planning a route might take between seconds to thirty minutes. (Ex. 9, Bucher Dep., 37:20-39:14; Ex. 44, Seaton Dep., 38:5-11; Ex. 23, Ivic Dep., 104:14-105:12) Moreover, Plaintiff Gerardo Santos admitted there is "no real average time" he spends performing off-the-clock work. (Ex. 41, G. Santos Dep., 20:1-3; _see also_ Ex. 8, Brown Dep., 73:18-74:8 (amount of time worked off-the-clock has always been "highly variable" form day to day, including some days and "probably" weeks involving no off-the-clock work)

assert claims for off-the-clock work that relate solely to commute time and meal breaks – claims that this Court *expressly declined* to certify for collective treatment.  In addition, some Plaintiffs assert only generalized complaints regarding unpaid commute time, while others have identified specific reasons why they are dissatisfied with their compensation (or lack thereof) for commute time.[30]

Some deponent Plaintiffs testified that they opted into this lawsuit solely because of off-the-clock work allegedly performed during their meal breaks, with a variety of explanations for such work, ranging from lack of time due to high call volume, to simply "forgetting" to clock in and out.[31]  In addition, a few Plaintiffs appear to have opted into this action for reasons unrelated to alleged off-the-clock work at all.  For example, some Plaintiffs are simply unhappy over the *amount* of time NCR expects them to work.[32]  Still other Plaintiffs admit that they are unable to

---

[30]  *See, e.g.*, Ex. 37, Redding Dep., 10:8:22 (stating his belief that NCR receives compensation from its clients for thirty minutes of his commute time, but he does not); Ex. 17, Galle Dep., 104:13-24 (stating his dissatisfaction with "having to leave a half hour early every day"); Ex. 21, Hineman Dep., 46:1-7 (asserting that he is owed compensation for his thirty-minute commute time because "that van is not my personal vehicle. That van is a company vehicle provided to carry the parts I need to service the machines."); Ex. 30, Meadows Dep., 73:21-74:15 (identifying "thirty minutes every morning" of uncompensated travel time); Ex. 49, Williams Dep., 14:3-9 (stating that he joined this lawsuit because of uncompensated travel time to the calls and back home at night); Ex. 9, Bucher Dep., 33:3-12 (explaining that he chooses to look at his work phone during his commute time because "if my phone is going off and it seems like I've got a lot of work coming, then yeah, it would probably encourage me to look")

[31]  *See, e.g.*,  Ex. 16, Flood Dep., 142:6-143:17 (stating that although he received compensation for lunch time, he did not record work performed during lunch because his high volume of calls meant he "never had time to stop, park the car for an hour, and sit there and have my lunch, like I legitimately should have"); Ex. 42, Sauco Dep., 78:8-80:19 (admitting that after his TM told him to try to *take* his lunch break, "my thought process at that time was the next time I – I will record – is not to put a record that I missed a meal") ; Ex. 9, Bucher Dep., 42:13-44:22 (stating that he believes he performs work for NCR during his lunch break by eating while driving to his next call, but that he does so for his own convenience); Ex. 28, Lane Dep., 12:4-13:6, 43:12-44:14 (claiming that he is seeking compensation for work performed during his lunch break, but admitting that he would "just forget" to clock out and back in for lunch, although he understood the requirement to clock his time); Ex. 31, Miroewski Dep., 38:6-25 (stating "I don't take a lunch. Since I started at NCR, I got used to not taking lunches. I just felt I would rather work and get through the day and go home a little earlier than having to take a lunch"); and Ex. 18, Gathers Dep., 47:23-52:1 (seeking compensation for time spent receiving phone calls during her lunch break)

[32]  *See, e.g.,* Ex. 51, Yowonske Dep., 81:2-86:4; Ex. 17, Galle Dep., 104:13-104:24, 105:9-106:7; *see also* Ex. 43, Scales Dep., 69:16-73:25 ("seeking financial adjustment to [his] cost of living"); Ex. 21, Hineman Dep., 12:7-24 (his biggest problem with NCR is "the recent NCR activity of charging us for personal use of our company vans when we're not allowed to use it for company use and stating that the company expected 30-minute commute time every day that was not paid")

identify any work time for which they were not properly compensated, but they nonetheless opted into this lawsuit because they had heard that _other_ CEs were not properly compensated. These latter Plaintiffs were hard-pressed to identify specific examples to support their own off-the-clock claims.[33]

Thus, the variability between Plaintiffs extends to matters as fundamental as their understanding of their own claims and the subject matter of this litigation. It is also patently clear that the Plaintiffs are dissimilar in their levels of engagement, commitment and enthusiasm for the federal court lawsuit that they have affirmatively joined as _party-Plaintiffs_. That reality is underscored by the fact that only 36 of the 81 Plaintiffs who NCR selected for deposition – _well less than half_ – actually appeared for deposition. (_See_ footnote 4, _supra_) Query whether it is thus fair to surmise that more than 800 of the other party-Plaintiffs in this case would also refuse to invest anything more to this litigation than the few seconds it took them to sign the consent form they received via email? Whatever the answer to that question may be, the simple truth is that NCR was granted cross-examination access to less than 5% of the Plaintiffs, and fewer than half of those chosen by NCR actually appeared for their deposition. Nonetheless, the disparities within even this _restricted deponent group_ are so substantial as to justify decertification of the collective.

---

[33] _See, e.g,_ Ex. 50, Wilson Dep., 76:4-77:23 (admitting that he was paid for the time he spent driving from his home to his first job site, and from his last job site to his home, but thinks that other CEs "just don't [bill commute time] because they know not to"); Ex. 36, Presley Dep., 68:22-72:8 (stating that other CEs "who don't stay productive, who do a lot of things on the clock […] get called out and have action taken against them. I can't personally say that it's happened to me because of what I do. I will take that time to make sure – I'll make sure I'm productive during my hours paid, so I haven't had that happen to me. But I've seen it, which makes me try to avoid it."); _see also_ Ex. 6, Barraza Dep., 10:14-12:1 (opted in because TM mentioned this lawsuit in a conference call with CEs and told them it was "okay to—to make our own decision. That – to me, that sounded like an encouragement to – to look into it.")

- 25 -

**D.  Plaintiffs Point To Disparate Reasons For Allegedly Working Off-The-Clock**

As previously noted, Plaintiffs fail to identify *any single reason* for their alleged off-the-clock work, but rather provide various explanations ranging from failure to obtain administrative time, a desire to be a "team player," and/or personal preference.

Some Plaintiffs contend that they worked off-the-clock in an effort to improve their productivity and efficiency metrics.[34]  In fact, although not previously alleged by Meadows or referenced by any Plaintiff prior to this Court's conditional certification of the pre- and post-shift off-the-clock claims, several Plaintiffs have raised a new "reason" for their purported off-the-clock work; *i.e.*, NCR's "5 Star" program, a program that was not even implemented until January 2018.[35]  Under this program, "CEs are compared to their peers across several different metrics to come to a final score," including "utilization, productivity, revisits, re-trips, parts index, [and] work order parts percentage."  (Ex. 47, Warren Dep., 35:5-18)  However, and as explained further herein, a *CE's performance of off-the-clock work will not improve his or her "5 Star"*

---

[34]  *See, e.g.,* Ex. 9, Bucher Dep., 42:13-44:22; Ex. 18, Gathers Dep., 43:19-46:18 ("[T]here are times that we do work off the clock overtime as myself personally as a matter of survival. I am a productive person. I like to make sure that I'm organized, get my work done, and I want to be a good employee"); Ex. 48, Wayne Dep., 16;19-17:13 (explaining that "a lot of times, the upper managements, their directions on getting things done is too results driven, and they don't take into consideration the amount of extra time it's going to require to get those things done, a/k/a/, keeping your parts down, keeping your van clean, taking care of different in-house stuff, pulling email and whatnot"); Ex. 39, Rodriguez Dep., 60:8-15 ("doing administrative work doesn't count as productivity, which leads to being behind in the week, so you get minimal time for productivity within your eight-hour shift")

[35]  *See, e.g.,* Ex. 40, D. Santos Dep., 61;16-65:12, 67:2-14; Ex. 11, Clark Dep., 66:11-68:5; Ex. 17, Galle Dep., 73:18-74:5; Ex. 35, Potter Dep., 23:2-18; Ex. 15, Fitzgerald Dep., 28:20-29:13, 53:2-55:10; *see also* Ex. 33, Oestreicher Dep., 102:21-24 ("Q: How long have Five Star been used? A: Since January of last year.  Q: January of 2018?  A: Yes.")

_score_.[36]  In fact, Plaintiff Aaron Redding testified that his productivity score is not directly correlated to  merely closing more service orders.[37]

Other Plaintiffs state that they chose not to record all of their work time because they wished to be seen as a team player – someone who would help a coworker in need, and/or help NCR and his TM succeed.[38]

Convenience and personal preference were yet other reasons given by deponent Plaintiffs for working off-the-clock in violation of NCR's policies.[39]

---

[36] _See, e.g,_ Ex. 22, Isho Dep., 78:2-79:13; Ex. 26, Karruli Dep., 56:21-59:15, 61:3-16; Ex. 33, Oestreicher Dep., 96:23-97:21, 101:17-102:20 (explains how working off-the-clock to increase your productivity in the "5 Star" program will have hurt your utilization more than it will help productivity because "[u]tilization has much more impact when it's off than productivity does because the couple extra calls probably isn't going to bump you up much stars in productivity. Whereas being off by eight hours in utilization is going to drop you down easily two, three stars.")

[37] Ex. 37, Redding Dep., 59:1-61:24 ("They calculate various percentages based on different categories.  And I'll never understand how I can close – if they tell us we have to close a minimum of five calls a day and it's 25 calls a week and I close 42 and I'm only four stars out of five…. And yet I see people with less, you know time—or less calls closed… [S]omebody will say, well, geez, I only closed 24 calls.  Well I closed 42 and I'm only four star but your productivity is five."); _see also_ Ex. 12, Cosby Dep. 66:1-70:4 (explains different metrics considered as part of the "5 Star" metrics and confirms that since the "5 Star" metrics were implemented he was not done anything specifically to try to increase his rating because he does not know exactly how it's calculated)

[38] _See, e.g.,_ Ex. 39, Rodriguez Dep., 59:10-63:22 ("[sometimes you just do it to help out"); Ex. 21, Hineman Dep., 39:10-40:5 (explaining that he is part of a team and that helping a peer is "NCR work");  Ex. 37, Redding Dep., 15:22-16:11 ("I don't believe that NCR requires me to take those [calls], but I also know that I have coworkers that need some help and that's what I do.  I'm sorry, I answer because somebody's in a pinch."); Ex. 9, Bucher Dep., 54:8-54:24 (He did not want to be "that guy" who wouldn't answer the phone off the clock.) Ex. 40, D. Santos Dep., 75:16-76:2 ("Honestly, because I am a hard worker and I want NCR to succeed. […] I want NCR to get the job done"); Ex. 11, Clark Dep., 12:4-13:7, 22:9-24, 66:11-68:5 (he "just kind of felt [he] was helping out [his] buddies, [his] coworkers, "helping the business run smoother"); Ex. 38, Rice Dep., 55:24-56:21 (he worked before his shift to "help out" his TM because the tasks "[need] to be done"); Ex. 36, Presley Dep., 57:23-58:22 (in helping a fellow CE, "that would be more by choice, I guess, me just deciding to help the next guy out"); Ex. 45, Vona Dep., 57:13-58:8, 60:2-15 (only activity he "routinely" performs off the clock is "answer the phone from guys that I work with" and states his "whole reason for doing so is to help them out")

[39] _See, e.g.,_ Ex. 42, Sauco Dep., 40:5-11, 42:17-43:2, 111:20-112:6 (returns parts on his day off because "it's convenient to me"); Ex. 39, Rodriguez Dep., 77:16-78:77:1 (receives parts at his house because he lives "closer to the area where it's convenient for everybody to get parts from. So I do that to be helpful."); Ex. 49, Williams Dep., 126:12-127:17 (he spends pre-shift time off-the-clock determining his route for the day because "[t]he less driving we have to do, the better"); Ex. 41, G. Santos Dep., 36:19-38:8 (he processes parts only on his day off, because "when I get home, I just spend time with the wife and the kids. And Sunday we go to church and I usually baby-sit for the grandkids. So Monday is usually the only day I have left to catch up."); _see also,_ Ex. 51, Yowonske Dep., 47:4-12 (When asked about his stated practice of choosing not to record time worked under twenty minutes, stated "Good question. It's just the way we did things years ago in EDP. I don't know. I guess that's something I need to address.");  Ex. 37, Redding Dep., 17:25-18:5 (chose not to record time worked because believed it was pointless, as

The absence of any consistent explanation amongst the deponent Plaintiffs for violating NCR's prohibitions against off-the-clock work is exemplified by the testimony of Plaintiffs Tom Fitzgerald and Matthew Pressley, both of whom identified the lack of "administrative time" as the sole reason why they allegedly work off-the-clock. (Ex. 15, Fitzgerald Dep., 44:12-22; Ex. 36, Presley Dep. 68:22-72:8). But Plaintiffs Presley and Fitzgerald's complaints about not receiving administrative time directly contradict the testimony of other deponent Plaintiffs who admitted to having requested and received such time. (Ex. 48, Wayne Dep., 95:2-9; Ex. 10, Charles Dep., 52:8-21).

## IV.     ARGUMENT

### A.     Plaintiffs Cannot Demonstrate By A Preponderance Of The Evidence That They Are Similarly Situated

In an FLSA action, "following the completion of the opt-in process and further discovery, the defendant may ask the Court to reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 933 (N.D. Ill. 2008) (Kennelly, J.) (internal quotation omitted). To continue as a collective action, "the plaintiffs must demonstrate similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present." *Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 812 (N.D. Ill. 2010) (Kennelly, J.) (internal citation omitted). At this "second stage" of

---

the Workday system would round time worked taking less than seven minutes down to zero); Ex. 19, Hartley Dep., 45:1-22; 54:18-55:7 (same); Ex. 31, Miroewski, 25;20-27:18, 34:9-18 ("I guess that was my choice, but the pressure was on to do your calls over any other priority" and did not think a post-shift call with his TM "was part of the job… I didn't know that was part of the clock time.") Notably, and rather unusually, Plaintiff Bobby Scales testified that he only records overtime worked before his 2:00 p.m.-11:00 p.m. shift, but not his 8:00 a.m. to 5:00 p.m. shift, because a manager once told him to record a call he had received before his shift, which on that particular day, was from 2:00 p.m.-11:00 p.m. Although no one told him to record his time in this manner, he assumed the directive to record pre-shift calls applies only when his shift starts at 2:00 p.m. (Ex. 43, Scales Dep., 125:1-126:18)

the certification analysis, "the court's inquiry becomes more stringent." *See Camilotes v. Resurrection Health Care Corp*., 286 F.R.D. 339, 345 (N.D. Ill. 2012) (2012) (St. Eve, J). This more rigorous and exacting scrutiny is appropriate because the Court has "a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity." *Marshall v. Amsted Rail Co., Inc.*, No. 10-CV-0011-MJR-SCW, 2012 WL 5499431, at *4 (S.D. Ill. Nov. 13, 2012) (internal quotations and citations omitted); *see also Elder,* 2015 WL 3475968, at *5; *Brand v. Comcast Corp*., No. 12 CV 1122, 2012 WL 4482124, at *5 (N.D. Ill. Sept. 26, 2012) (Kim, J.).

"Plaintiffs bear the burden of demonstrating that they are 'similarly situated.'"[40] *Camilotes*, 286 F.R.D. at 345; *Strait v. Belcan Eng. Group, Inc.*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012) (St. Eve, J.). To make that determination, courts analyze "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *See, e.g.*, *Camilotes*, 286 F.R.D. at 345 (internal quotations and citations omitted); *Franks v. MKM Oil, Inc.*, No. 10 CV 00013, 2012 WL 3903782, at *10 (N.D. Ill. Sept. 7, 2012) (Chang, J.); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004) (Castillo, J.); *Strait*, 911 F. Supp. 2d at 718; *Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625-bbc, 2011 WL 2009967, at *4 (W.D. Wis. May 23, 2011). "These factors help a court determine whether it can manage the case and bring about a fair and reasonably expeditious resolution of the collective action." *Russell*, 721 F. Supp. 2d at 811. "If the Court determines that such similarities do not exist, it may revoke the conditional certification" it granted during the first stage. *Russell*, 575 F. Supp. 2d at 933.

---

[40] At this stage, Plaintiff must present admissible evidence establishing that he and Plaintiffs are similarly situated. *Howard v. Securitas Sec. Servs., USA Inc.*, No. 08-C-2746, 2009 WL 140126, at *3 (N.D. Ill. Jan. 20, 2009) (Gottschall, J.).

B. **Plaintiffs Experienced Disparate Factual And Employment Settings**

1. **Plaintiffs Fail To Establish A "Single Policy, Custom or Practice" That Caused Them To Perform Off-The-Clock Work**

In assessing whether individuals share similar or disparate factual and employment settings, courts consider whether they have "provided substantial evidence that their claims arise out of a *single policy, custom or practice that leads to FLSA violations*." *Reed v. County of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. 2010) (emphasis added) (*abrogated on other grounds by Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018)); *see also Camilotes*, 286 F.R.D. at 346. Mere allegations of "an overarching policy is generally insufficient; plaintiffs must produce substantial evidence of a single decision, policy or plan … that permitted off-the-clock work." *Smith v. Micron Elecs., Inc.*, No. CV-01-244-S-BLW, 2005 WL 5336571, at *2 (D. Id. Feb. 4, 2005) (internal quotations omitted) (finding disparate factual and employment settings when defendant did not have a common, *de facto* policy of permitting off-the-clock work). In that regard, a plaintiff must demonstrate that the alleged wage and hour violations were *companywide* and not simply the result of "supervisor-level practices." *Yang v. Kohler Co.*, 488 Fed. Appx. 146, 147 (7th Cir. 2012). In the absence of substantial evidence of a *companywide* and *common* practice to violate the law, decertification is appropriate. *Reed*, 266 F.R.D. at 450. Thus, "[d]ecertification is proper if the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *See Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280-81 (N.D. Tex. 2008) (citations and quotations omitted). Or, as the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes* in the Rule 23 context, class claims are not viable unless they depend upon a "common contention … of such a nature that it is capable of classwide resolution." 131 S. Ct. 2541, 2551 (2011).[41]

---

[41] *See generally, Espenscheid,* 705 F.3d at 771-72 ("[T]here isn't a good reason to have different standards" for Rule 23 certification and FLSA collective action certification, and "the case law has largely merged the standards, though with some terminological differences.").

As the facts above make clear (*supra* § III.D), Plaintiffs cannot point to a single common policy or practice to explain their alleged off-the-clock work. Instead, Plaintiffs blame a variety of factors, including unspoken rules regarding the recording of overtime, expectations as to when they must check and respond to emails, workload demands, their desire to impress NCR, whether a customer happens to call, personal choice, being a team player, or no reason at all.[42] Not surprisingly then, Plaintiffs likewise disagree on the type, frequency, and duration of the alleged off-the-clock work at issue – or even that they performed off-the-clock work in the first place. (*See supra* §§ III.B-C) "The foregoing conglomerate of diverse evidence indicates that some Plaintiffs may have *prima facie* claims for FLSA violations at different times, in different places, in different ways, and to differing degrees, but the evidence of varied particular violations is insufficient to show that Defendant[] implemented a uniform, systematically applied policy of wrongfully denying overtime pay to Plaintiffs." *Johnson v. TGF Precision Haircutters, Inc.*, No. Civ.A. H-03-3641, 2005 WL 1994286, at \*4 (S.D. Tex. Aug. 17, 2005); *see also Norceide v. Cambridge Health Alliance*, No. 10-11729-NMG, 2014 WL 775453, at \*3 (D. Mass. Feb. 24, 2014) ("The record suggests that the reasons for missed meal breaks and working before and after scheduled shifts varied widely as did the propensity of opt-in members to request overtime pay for extra work."); *Reed*, 266 F.R.D. at 450 ("Plaintiffs have not provided substantial

---

[42] Court routinely deny certification on the "workload" theory. *See, e.g.*, *Boelk v. AT&T Teleholdings, Inc.*, 12-cv-40-bbc, 2013 WL 261265, at \*12 (W.D. Wis. Jan. 10, 2013); *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-CV-00738, 2012 WL 334038, at \*5 (S.D. Tex. Feb. 2, 2012); *Griffith v. Wells Fargo Bank, N.A.*, No. 4:11-CV-1440, 2012 WL 3985093, at \*5 (S.D. Tex. Sept. 12, 2012); *Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2013 WL 6662831, at \*11 (N.D. Ill. Dec. 17, 2013) (Kim, J.). Furthermore, the Seventh Circuit in *Espenscheid* pointed to a "further complication" in accounting for an employee underreporting his time "not under pressure by DirectSat," but rather "because he wanted to impress the company with his efficiency in the hope of obtaining a promotion or maybe a better job elsewhere – or just to avoid being laid off." 705 F.3d at 774. The Court called this conduct "benign underreporting" as compared to "unlawful conduct" (*id.*), suggesting that deliberately misrepresenting time to improve job performance cannot give rise to an FLSA claim. *See also Blakes*, 2013 WL 6662831, at \*13 (describing *Espenscheid* as "cast[ing] doubt on the idea that an employer is liable for its employees' attempts to improve their standing by manipulating their time records").

evidence of a single [ ] decision, policy or plan to violate the FLSA with respect to those [pre-shift, post-shift, missed meal break and work taken home] claims.").

In *Elder*, 2015 WL 3475968, the district court was faced with facts that are very similar to those in this case, and found that decertification of the collective action was necessary due to the plaintiffs' failure to identify a common practice or policy that caused the alleged FLSA violations. Specifically, the *Elder* court found that:

> Plaintiffs have failed to identify a common practice or policy of instructing technicians to work before their shift starts, during lunch, or after their shift ends. In the absence of any standardized conduct toward members of the proposed classes, the court must make a series of individual inquiries to determine whether technicians in fact worked pre-shift, post-shift, or during their meal breaks. And the answer for one technician does not necessarily shed light on the answer for another.

*Id*. at *7, citing *Dukes*, 131 S. Ct. at 2552.

Thus, the *Elder* court granted the defendant's motion to decertify the FLSA collective, and denied the plaintiffs' motion for Rule 23 certification, finding that although some employees had evidence that they were instructed to perform unpaid work, "they have directed the court to no evidence of a common policy that required such work to be performed off the clock and without overtime pay." *Id*. at *8. Instead, the plaintiffs had multiple explanations for performing the alleged pre- and post-shift work, and some swore that they were never directed to work outside their shifts. *Id*. The court found that the service technicians engaged in a variety of different activities before starting work and the fact that one employee logged in or performed work early did not mean that another did the same. *Id*. ("In other words, proof as to one claimant would not be proof as to all members of the class."). The court found similarly disparate experiences with regard to the post-shift claims, all of which would also require individualized assessments. *Id*. at *9 (evidence showing that technicians engaged in different post-shift activities "prevent the court from determining 'in one stroke' whether technicians actually

performed off-the-clock work at the end of the day").  The court held that decertification of the pre- and

post-shift claims was required because:

> Ultimately, Plaintiffs have failed to establish by a _preponderance of the evidence_ that
> there is a pattern to the frequency, manner or duration of … pre-shift and post-shift
> activities.  In the absence of such a pattern, the court cannot fashion a common answer
> to the question of whether Plaintiffs actually worked pre-shift and post-shift work,
> which is a question central to Plaintiffs' claims.

_Elder,_ 2015 WL 3475968, at *9 (emphasis added).[43]

As in _Elder_, Plaintiffs here cannot establish by a preponderance of the evidence the existence of

a common policy that caused them to work off-the-clock.  And because there is no _common_ policy

applied _companywide_ upon which Plaintiffs can link their off-the-clock claims, those claims can only

be adjudicated on an _individual_ basis.  Thus, individualized inquiries will be required as to the various

activities allegedly performed off-the-clock by a particular Plaintiff, the frequency and duration of any

such work, the reasons why that work was performed off-the-clock, and NCR's knowledge of the work.

The answers to these inquiries for one Plaintiff will not shed light on the answers to the same inquiries

as to any other Plaintiff, as confirmed by the sworn testimony of the deposition Plaintiffs.  _See_

_Marshall,_ 2012 WL 5499431, at *9 ("These differences are significant because determining whether a

Plaintiff has a viable claim will require detailed and individualized factual inquiries, and those

individualized issues will predominate over any issues that are common to the class." (quoting

_Camilotes_, 286 F.R.D. at 346)).

---

[43]  The _Elder_ court also found that the plaintiffs' meal claims could not be determined "in one stroke" because while some supervisors instructed technicians to take a lunch break, other supervisors would "interrupt" their lunch breaks with work requests.  _Id_. at *9. The court also determined that there was no common answer to the frequency or duration of the meal breaks.  _Id_. at *10 ("Plaintiffs have not established by a preponderance of the evidence that any common questions central to their meal break claim could be resolved on a classwide basis.").  Here, the Court has already found that Plaintiffs have failed to demonstrate "a 'factual nexus' between the way NCR's policies and practices concerning the lunch break affected Meadows and the way they affected each of the other CEs," and denied conditional certification of any claims concerning unpaid meal breaks.  (Dkt. No. 192, at p. 7)  Thus, in this case, there is no collective claim pending regarding off-the-clock work allegedly performed during lunch breaks.

Indeed, the evidence here demonstrates that the _only common_ NCR policies are _lawful_ ones. Although some Plaintiffs may have been unaware that NCR considered certain activities to be work-related, or that they should record all of their time to the minute, each of the deponent Plaintiffs knew NCR's written policies required them to record their time accurately, and each of them was paid for all of their recorded work time. (S*upra*, § III.A). *See Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1123-24 (N.D. Cal. 2011) (decertification appropriate when defendant's official policy was to pay for all hours worked, even when plaintiffs offered "substantial evidence that many [employees] did perform off-the-clock work") (*abrogated on other grounds by Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018)); *Proctor*, 250 F.R.D. at 282 ("no evidence of a single decision, policy, or plan" causing off-the-clock work, "[i]n fact, the evidence indicates that [defendant]'s official policy was to prohibit working off the clock."); *see also Johnson*, 2005 WL 1994286, at *1, *3 (S.D. Tex. Aug. 17, 2005) (decertifying collective action because the company's employee manual did not constitute an "overarching policy to deny Plaintiffs' overtime," where the manual contained no statement that plaintiffs would not be paid for preparatory work or for time spent with customers beyond the end of their shifts, and, in fact, the manual stated that employees should ensure that timesheets "accurately [reflect] the actual hours worked").

The deponent Plaintiffs admit that NCR paid them for all of their recorded overtime.[44] Indeed, in calendar year 2016, NCR paid its CEs over $23 million for 729,995 hours of recorded overtime work. (Dkt. No 172, Ex. S, Haws II Dec. ¶ 3; Dkt. No 172, Ex. A Tellado Dec. ¶ 13) Such overtime payments are "plainly inconsistent with Plaintiff's claim that there was a common policy or practice of

---

[44] *See, e.g.,* Ex. 6, Barraza Dep., 42:11-23; Ex. 42, Sauco Dep., 84:18-85:4; Ex. 34, Pfiester Dep., 19:15-20:1; Ex. 40, D. Santos Dep., 20:3-9, 24:4-12, 46:25-47:5; Ex. 21, Hineman Dep., 37:2-6; Ex. 32, Od'Neal Dep., 51:23-52:2; Ex. 19, Hartley Dep., 77:6-9; Ex. 37, Redding Dep., 35:1-4; Ex. 12, Cosby Dep., 57:2-5; Ex. 9, Bucher Dep., 30:20-24, 75:20-23; Ex. 36, Presley Dep., 26:13-27:7

failing to compensate employees for overtime work." *Coleman v. Jenny Craig, Inc.*, No. 11cv1301-MMA (DHB), 2013 WL 6500457, at *8 (S.D. Cal. Nov. 27, 2013); *see also Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *2 (N.D. Ga. July 25, 2006) (conditional certification denied, where defendant "regularly pays considerable overtime to its loan officers"); *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *7 (S.D. Tex. Jan. 24, 2007) (pointing to evidence that employees are granted permission to work overtime and paid overtime wages when necessary for specific tasks in rejecting conditional certification of state-wide class); *Smith*, 2005 WL 5336571, at *2 (in granting decertification recognizing supervisors' testimony that they never told employees to work off-the-clock, were not aware employees were working off-the-clock, and approved all overtime that employees submitted).

Absent an illegal common policy or practice that caused the alleged pre- and post-shift off-the-clock work, it will take individual inquiries "to get to the bottom of liability" on the Plaintiffs' off-the-clock claims. *See, e.g.*, *Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2013 WL 6662831, at *11 (N.D. Ill., Dec. 17, 2013) (Kim, J.) (decertifying Illinois Bell technician's off-the-clock claims); *Elder*, 2015 WL 3475968, at *7 ("In the absence of any standardized conduct toward members of the proposed classes, the court must make a series of individual inquiries to determine whether technicians in fact worked pre-shift, post-shift, or during their meal breaks."); *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 261265, at *11-12 (W.D. Wis. Jan. 10, 2013) (denying certification because plaintiffs failed to provide proof of companywide restrictions on meal breaks and the reasons for plaintiffs working through meal breaks varied on an individual basis); *Espenscheid*, 2011 WL 2009967, at *5, *7 (decertifying Rule 23 class action and FLSA collective action because "proof of plaintiffs' claims depends on how individual technicians responded to the numerous policies and practices at issue in this case," and "the evidence shows that opt-in plaintiffs and class members have different work

experiences and were affected by defendants' policies in different ways."); *Martin v. Citizens Fin. Group, Inc.*, No. 10-260, 2013 WL 1234081, at *6 (E.D. Pa. Mar. 27, 2013) ("Even if Plaintiffs' allegations are accepted as true, Defendants' policies do not appear to be a single decision, policy, or plan, but rather policies and practices that impacted individual plaintiffs in individual ways.") (quotations and citations omitted).

### 2. Plaintiffs Cannot Avoid Decertification Based On Their *Post-Hoc* Reliance On NCR's "5 Star" Program

Plaintiffs fare no better on the theory that they were uniformly pressured to work off-the-clock to satisfy NCR's performance standards. As an initial matter, it is fundamentally unfair for Plaintiffs to posit a theory of recovery that is not alleged in the Complaint, was not the basis for this Court's conditional certification of the collective, and concerning which putative members of the collective received no notice. For these reasons, the Court should not even consider the performance metrics theory for off-the-clock work as a basis for maintaining a collective in this matter. *See, e.g.*, *Hart v. JPMorgan Chase Bank, N.A.*, No. 8:12-cv-00470-T-27TBM, 2012 WL 6196035, at *2, fn. 8 (M.D. Fla. Dec. 12, 2012) ("At a minimum, Plaintiff's attempt to broaden the scope of this action through new allegations of misconduct raised for the first time in the declarations filed in support of conditional certification is troubling as '[i]t is patently unfair to expect a defendant to respond to a *theory of liability that shifts with each response*.'") (emphasis added) (*citing Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *5 (E.D. Wis. Sept. 11, 2008)). Nonetheless, Plaintiffs cannot satisfy their burden of proof on the purported performance metrics theory either, and the fact that some Plaintiffs feel the need to conjure up "additional or different claims from those pled by the named plaintiff[]," only further supports decertification. *See Gatewood v. Koch Foods of Mississippi, LLC*, No. 3:07CV82-KS-MTP, 2009 WL 8642001, at *16 (S.D. Miss. Oct. 20, 2009) (decertifying plaintiffs'

claims because many plaintiffs sought recovery for additional or different claims from the named plaintiffs and "these discrepancies support the court's conclusion to decertify the class.").

As for NCR's "5 Star" program itself, courts have routinely rejected the proposition that such programs alone can justify class or collective treatment. In *Boelk*, service technicians alleged that they worked through lunch due to the employer's efficiency metrics, and their concern that "[a] ranking in the bottom twenty percent (or below the goal) can put a technician into Performance Improvement Plan status and on track to possible discipline or termination." *Boelk,* 2013 WL 261265, at *1-2. The *Boelk* court was not persuaded, however, explaining that "[i]n light of defendants' policy mandating that employees report and be paid for all hours worked, the crucial question with respect to this claim is *why* plaintiffs and other technicians worked through all or part of their meal breaks without reporting their doing so. Plaintiffs have failed to show that this question could be resolved on a classwide basis." *Id.*, at *12 (emphasis in original). The *Boelk* court pointed to various factors affecting "whether a technician felt rushed in completing jobs or pressure from the performance scoring and ranking system," including the size of the technician's territory, the number of technicians available to cover the territory, the type of job assigned, and the technicians' experience and supervisors' varying expectations. *Id.* Thus, the *Boelk* court ultimately concluded that certification was inappropriate because "plaintiffs' own deposition testimony proves how variable their experiences were with respect to the way performance standards affected their day-to-day work activities and with respect to how other factors affected their work." *Id.*, at *15.

When presented with similar performance based arguments for alleged off-the-clock work, many additional courts have found such theories to be insufficient to justify certification. *See, e.g.*, *Richardson v. Wells Fargo Bank,* N.A., No. 4:11-cv-00738, 2012 WL 334038, at *5 (S.D. Tex. Feb. 2, 2012) (rejecting certification based on employees' "alleged difficulty of finishing all their assigned

duties within a forty-hour workweek and managers' alleged awareness that employees worked unlogged hours. Subjective beliefs or fear about logging overtime hours is insufficient to establish an actual company-wide policy"); *Beauperthuy*, 772 F. Supp. 2d at 1124 (alleged policy of allocating a certain number of hours to certain tasks as creating an incentive for managers to make employees work off-the-clock held "insufficient to constitute evidence of a common decision, policy, or plan, especially in light of [defendant]'s formal written policies to the contrary"); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 347-48 (W.D.N.Y. 2011) (denying Rule 23 and FLSA certification premised on the existence of a "labor budget," stating that [t]he Court declines to hold that facially-lawful policies, which encourage store management to make productive use of employees' time or to report for work when scheduled, can form the equivalent of a common policy or plan that violates the law merely because they *indirectly* might encourage the minimization of overtime." (internal quotations omitted) (emphasis in original)); *Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1258 (N.D. Ala. 2012) ("The distinction between a compensation system that structurally results in unpaid overtime as opposed to one that pressures some plaintiffs to work off the clock is significant, because the extent to which plaintiffs worked off the clock – and whether such work even occurred –varies materially among the class"). As the court held in *Griffith v. Wells Fargo Bank, N.A.*, No. 4:11-CV-1440, 2012 WL 3985093, at *5 (S.D. Tex. Sept. 12, 2012):

> Essentially, [plaintiff]'s argument is that loan processors are under so much pressure to perform efficiently that they feel compelled to work overtime without seeking compensation for any additional hours. The record before the Court, however, indicates that Wells Fargo requires loan processors to report all overtime hours and automatically pays the hours that loan processors report through the time-keeping software … The "pressure" that loan processors feel therefore is based on the loan processors' individual ability to perform efficiently, subjective impressions of the degree of pressure to which they are subjected, and office-specific experiences relating to the actions of office or division supervisors. . . . While it may be the case that Wells Fargo uniformly expects efficiency from its loan processors, nothing before the Court suggests that loan processors are subject to a uniform, or even a similar, policy of unlawful pressure against overtime reporting.

Here, the Court should reject continued certification of Plaintiffs' claims based on any *post-hoc* argument that NCR's performance metrics can provide the commonality necessary to satisfy the "similarly situated" requirement. An employer has the right to establish job performance expectations and create incentives that promote efficiency without thereby exposing itself to collective and/or class actions for off-the-clock work, particularly where (as here) the employer's written policies *expressly prohibit* such work.

Just as importantly, not all of the Plaintiffs in this case felt pressured by NCR's performance standards to work off-the-clock; indeed, most of the deponent Plaintiffs failed to mention NCR's performance metrics at all when explaining why they worked off-the-clock. And some deponents in this case stated that they were always able to perform their work as a CE without working off-the-clock.[45] In short, Plaintiffs have no evidence (much less a preponderance of the evidence) that each member of the collective worked off-the-clock due to NCR's "5 Star" program or any other performance expectations. In fact, it is impossible for Plaintiffs to satisfy their evidentiary burden based on this theory because many of them ceased working for NCR *prior to the implementation* of the "5 Star" program.[46]

There also is no evidence of a "set pattern or established routine" with respect to "working" pre- and post-shift due to NCR's performance expectations. *Marshall*, 2012 WL 5499431, at *7. Individual Plaintiffs have identified a variety of different activities that they allegedly performed off-the-clock,

---

[45] *See, e.g,* Ex. 22, Isho Dep., 79:18-22 (confirms that when he was a CE he was able to, and did, report all of his time worked); Ex. 26, Karruli Dep., 119:12-14 (confirms that as a CE he recorded all of his work activities); Ex. 47, Warren Dep., 47:24-48:1)

[46] NCR did not implement its "5 Star" program until January 2018. Ex. 33, Oestreicher Dep., 102:21-24 ("Q: How long have Five Star been used? A: Since January of last year. Q: January of 2018? A: Yes.") Thus, any CE who ceased working for NCR prior to that time would not have been subject to any common policy pressuring CEs to work off-the-clock to meet performance metrics. This fact drives yet another wedge between the claims alleged by Plaintiffs.

with many disparities amongst those individuals as to what they did and when and why they did it.[47]

But again, many of the deponent Plaintiffs failed even to mention NCR's performance metrics as a

motivating reason for their off-the-clock work.[48]   Indeed, it is manifestly clear that the off-the-clock

work alleged in this case "does not involve regularly scheduled time that is worked by all members of

the class.  Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived

early or departed outside of their regularly scheduled hours and were not compensated for such. The

circumstances of those individual claims potentially vary too widely to conclude that in regard to their

'off-the-clock' claim, the Plaintiffs are similarly situated."  *See Lawrence v. City of Philadelphia*, No.

03-CV-4009, 2004 WL 945139, at *2 (E.D. Pa. Apr. 29, 2004); *see also Briggins*, 882 F. Supp. 2d at

1271 (evidence that certain employees did not work pre-shift "casts doubt on whether all plaintiffs had

to do this work incident to their job").

Finally, it is obvious that NCR did not implement its "5 Star" program to require or encourage

off-the-clock work.  That program includes a specific calculation to compare time recorded on

customer service records with time recorded in the timekeeping system for payroll purposes.  (Ex. 22,

Isho Dep., 35:24-38:24; Ex. 26, Karruli, 56:21-64:7)  If a CE records more time on customer service

records than in the timekeeping system for a given day, his "5 Star" will be <u>*negatively*</u> impacted.  (Ex.

---

[47] *See, e.g.*, Ex. 7, Bratt Dep., 60:9-18 (one to two hours per "[c]hecking the e-mails before shift, checking ES before shift, loading keys, checking keys in my van"); Ex. 49, Williams Dep., 127:18-23 (confirms that he does not usually do any work when he returns home after his shift; he "might look in a couple e-mails…. But that's all my option."); Ex. 45, Vona Dep., 57:13-58:8, 60:2-15 (only activity he "routinely" performs off the clock is "answer the phone from guys that I work with" and states his "whole reason for doing so is to help them out"); Ex. 34, Pfiester Dep., 33:6-34:12 (confirms he'll take 5-minute off-the-clock calls from fellow CEs "fairly often" or "even daily," which he answers to help out, instead of saying he's off the clock); Ex. 51, Yowonske Dep., 46:18-47:12, 108:18-109:5 (doesn't record off-shift time if task took less than 20 minutes because "it's just eh way we did things years ago" and wasn't sure if he could record wait times with IT to repair laptop)

[48] *See, e.g.*, Ex. 29, Li Dep., 47:14-52:15 (attests that his time records are "accurate, for the most part" because he enters his time in advance each week because his schedule does not change, but he could forget about 1-2 minute call or text, but will record "an hour or so when I felt that … it merits overtime, or it disturbed me enough, or it disturbs my wife"); Ex. 43, Scales Dep., 124:12- (whether he records his pre-shift work varies depending on which schedule is on based on his understanding when his manager told him to record a pre-shift call)

22, Isho Dep., 78:2-79:13; Ex. 26, Karruli Dep., 56:21-59:15, 61:3-16)  Thus, there is no programmatic

incentive or benefit for a CE to under-report his work hours.[49]  Put another way, the "5 Star" program is

in fact designed in such a way *so as to discourage* off-the-clock work, consistent with NCR's written

policies prohibiting such work.  (*Id.*)

### 3.  Plaintiffs' Disparate Work Experiences Also Support Decertification

In evaluating whether the members of a collective are "similarly situated" so as to justify

certification, courts consider such factors as job locations, job duties, uniform compensation plans and

common supervision.  *See Camilotes*, 286 F.R.D. at 346; *Blakes*, 2013 WL 6662831, at *10.  These

factors also justify decertification of the collective in this action.

First, Plaintiffs' work experiences are too varied to permit collective adjudication.  The claimed

off-the-clock work, and its frequency and duration, vary widely based on whether individual Plaintiffs

worked particular types of jobs, whether they were team leads or senior CEs, whether they were union

or non-union CEs, whether they were working in California or Washington as opposed to other states,

or whether they were working on multi-day installs or white glove assignments.  As a result,

"determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry."

*Camilotes*, 286 F.R.D. at 346; *see Blakes*, 2013 WL 6662831, at *10 ("Where individualized

circumstances and questions predominate over common issues, decertification is appropriate.").

This certification-disqualifying variation is also evident from the fact that "discovery revealed

no set pattern or established routine" as to the alleged off-the-clock work at issue.  *See Marshall*, 2012

WL 5499431, at *7.  The deponent Plaintiffs testified collectively (but not individually) to a slew of

differing off-the-clock activities, and also to wide disparities in the frequency and duration of such

---

[49] *See* Ex. 37, Redding Dep. 59:25-61:23 (explains difficulty in understanding data considered in "5 Star" metrics
such that he'll close more than the minimum calls but will have four stars in productivity, but someone else will
close fewer and receive five stars)

activities  - (*e.g.,* Wilson reviews jobs and emails pre-shift for between one and five minutes while others identify as 15 minutes for emails and up to thirty minutes for reviewing job assignments). (*Supra*, §§ III.B-C).  Many of the deponent Plaintiffs also testified to engaging in the same activities that they allegedly performed off-the-clock while they were on-the-clock, and to always being paid for the latter time.  (*See, e.g.,* Ex. 13, Duncan Dep., 61:8-62:17 (recorded time on his day off for parts management and was paid for it); Ex. 45, Vona Dep., 65:22-68:2 (recorded time for work he performed before and after his shift and the decision to record his time is based on the amount of time involved, explaining that "if it was fifteen, twenty minutes [he] might not, but if it's an hour and a half, two hours [he] might put in for it."); Ex. 7, Bratt Dep., 42:2-24 (recorded time for checking e-mail prior to the start of his shift, stating "sometimes I hit and miss whether I put it in or not" based on him "just being lazy")).  *See King v. CVS/Caremark Corp.*, No. 07-21824-CIV, 2008 WL 5973490, at *4 (S.D. Fla. Sept. 11, 2008) ("some Plaintiffs testified that they remained on the clock while working past their respective shifts," while others "would clock out and stay working past their shift"); *Briggins*, 882 F. Supp. 2d at 1271 (evidence that certain employees did not work pre-shift "casts doubt on whether all plaintiffs had to do this work incident to their job"); *Proctor*, 250 F.R.D. at 283 (quantity of time and the pattern of incidents plaintiffs allege they have spent working off-the-clock vary).

A glaring example of the disparities in experiences amongst the deponent Plaintiffs arises from their testimony regarding their TMs.  Some deponents, such as Meadows himself, attribute their working off-the-clock *entirely* to instructions they purportedly received from their TMs.  In contrast, many other deponents admit that their TMs *never* told them to work off-the-clock, and/or expressly instructed them to record all of their work time.  And *every* deposed TM denies having ever told or encouraged a CE to work off-the-clock, including Plaintiff Clark who is a former TM.  (*See, e.g.,* Ex. 11, Clark Dep., 10:10-12:3 (As a TM, Clark instructed CEs  that "once you're off shift you're not

required to answer any e-mails, answer any phone calls, do any work" and "you should be putting [all time] in through overtime" if you do); Ex. 14, Fisher Dep., 63:10-63:23 ("I personally told them if it takes more than two minutes, … you need to put the time in and get paid for it. You don't work for free."); Ex. 20, Hatcher Dep., 33:3-6 ("I've instructed my CEs to report any overtime they work."); Ex. 33 Oestreicher Dep., 105:22-106:16 ("My attitude towards them is if you work, report the time. Even if you only work a minute, I'd rather you report a minute of time."); Ex. 26, Karruli Dep., 76:20-77:10 ("We specifically tell our CEs to record every minute of their time, it doesn't matter what and how and where…"))  These testimonial dissimilarities support decertification. *See Smith*, 2005 WL 5336571, at *2 (certification held inappropriate when some plaintiffs testified they worked off-the-clock only under some of their supervisors); *Proctor*, 250 F.R.D. at 283 (court decertifies collective, citing plaintiffs' testimony that they worked off-the-clock under some managers but not others); *Reed*, 266 F.R.D. 459 (partial decertification ordered based on evidence that whether off-the-clock work was performed depended on identity of individual supervisors, and the absence of a single, uniform policy requiring such work); *Martin*, 2013 WL 1234081, at *4 (decertification granted where plaintiffs testified to being denied overtime under one manager but not another); *MacGregor v. Farmers Ins. Exch.*, No. 2:10-CV-03088, 2011 WL 2981466, at *3 (D.S.C. July 22, 2011) (certification denied where plaintiffs admitted that company policy was to compensate employees for all time worked, and where "each supervisor's actions are essential to establishing any violation of the law").[50]

As noted, some deponent Plaintiffs admitted that their TMs told them *not* to work off-the-clock, while others *inferred* a contrary instruction or *assumed* their TM would not approve or authorize

---

[50] *See also Ray v. Motel 6 Operating Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996) ("[T]he illegal overtime plan alleged by Plaintiffs … is not necessarily carried out through central management. First, official written policy dictates that overtime will be paid in compliance with the FLSA. Second, if an illegal scheme exists at all, it is implemented on a decentralized level. Specifically, the approval of overtime is controlled by area supervisors."); *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 966 (W.D. Mich. 2009) (conditional certification denied "because there is a formal policy to pay employees for donning and doffing activities, [and] any failure to follow that policy will be unique to specific departments and supervisors").

payment for any overtime. (*See, e.g.*, Ex. 18, Gathers Dep., 33:15-33:23 (reached her own conclusion that there's "unwritten policies" to do pre-shift work, though "no one has verbally expressed that to me"); Ex. 7, Bratt Dep., 76:16-77:21 (one of his TMs discouraged him for recording his pre-shift work, but because he was recording it as "training time"; he never tried to record time spent checking email as "admin" because he "was under the impression or told that the only time that actually counted for CE's was either actual work on a work order or putting it in as training time.")) Thus, "each employee's own subjective interpretation of his supervisor's directive would require an individualized, rather than common, approach." *Hadley v. Journal Broadcast Group, Inc.*, No. 11-C-147, 2012 WL 523752, at *4 (E.D. Wis. Feb. 16, 2012). Indeed, <u>conditional</u> certification (which is subject to a "lenient" as opposed to "stringent" evidentiary standard) has been held improper where "most Plaintiffs provide no evidence that their supervisors actually told them they must perform work off-the-clock, nor do most Plaintiffs provide proof of any rejected request for overtime pay . . . Plaintiffs' declarations and depositions establish that most Plaintiffs *believed* that they had to work off-the-clock in certain respects." *See Richardson*, 2012 WL 334038, at *4 (emphasis in original).

Decertification is also justified here because some Plaintiffs were/are union employees and some were/are not. The terms and conditions of employment for unionized CEs are governed by CBAs. TMs and deponent Plaintiffs working in New Jersey and New York confirm that pursuant to NCR's CBA with Local 202 of the International Brotherhood of Teamsters, the Plaintiffs who work in those states are subject to special timekeeping and pay practices that are not applicable to CEs anywhere else within NCR. (Ex. 2, Abbruscato ¶¶ 7-11, Mousaad ¶¶ 5-7, Wolven ¶¶ 6, 10; Ex. 8, Brown Dep., 44:16-45:15) Specifically, the union CEs begin their work days at home and are paid for their commute time to and from all field assignments. (*Id.*) Accordingly, these CEs cannot possibly be subject to the policy/practice specifically alleged and testified to by Meadow; *i.e.*, that CEs are

instructed to record the start of their work day as coinciding with their arrival at their first job location of the day, and to record the end of their work day as coinciding with their departure from their last job location of the day.  (*Id*.; *see also* Ex. 8, Brown Dep., 44:16-45:15 (a New York-based CE confirming that he is paid for all the commute time from his home to the first job)  The start of a union CE's work day is established under the governing CBA, and the compensation policies applicable to union CEs are dissimilar to the compensation practices applicable to other CEs.  It follows that Plaintiffs cannot possibly establish that union and non-union members of the collective are "similarly situated" so as to justify continued certification.  *Anderson v. Cagle's, Inc.*, 488 F.3d 945 (11th Cir. 2007) (affirming decertification, while noting that "[a]mong the numerous distinctions [supporting decertification], we find particularly important evidence that, unlike all of the named plaintiffs, many of the opt-in plaintiffs are not unionized"); *Desilva v. North Shore-Long Island Jewish Health System, Inc.*, 27 F. Supp. 3d 313 (E.D.N.Y. 2014) (plaintiffs failed to demonstrate that they were similarly situated where "[t]hey held 235 different positions during the claim period, were comprised of both union and non-union members, worked on and off-site and had varying degrees of patient responsibility.")

Similarly, in California and Washington, CEs clock in for the start of their work day while at home, and clock out for the end of their work day upon their return to their homes.  (*See, e.g,* Ex. 22, Isho Dep., 61:6-15; Ex. 42, Sauco Dep., 36:15-25; Ex. 40, Santos D., Dep. 69:11-70:2; Ex. 28, Lane Dep., 88:1-3, 89:1-23; *see also* Ex. 3 and 4 Handbook at pp. 8; Ex. 2, Dosie ¶¶ 7-11 (former California TM and current CE, explaining scheduling, compensation and timekeeping of CEs in California, "they clock in for their shift while at home and prior to commencing their commute to their first assignment, and that they clock out for the day no sooner than when they returned home from their final assignment."))  Thus, as with the unionized CEs, the CEs working in California and Washington are paid for their commute time to and from their field assignments, and hence are not subject to the

"common" practice identified by Meadows of having to make start-of-day and end-of-day time entries based on their arrival/departure times from their first/last job locations. These disparities in the commuting, timekeeping and payroll practices applicable to the 404 Plaintiffs who worked in California, Washington, New Jersey and New York make them fundamentally dissimilar to the Plaintiffs who worked in other states. (Ex. 52, Tellado ¶ 4) These undisputed facts alone highlight that not all members of the proposed collective are "similarly situated."[51]

### C. NCR Has Individualized Defenses To Plaintiffs' Claims

Decertification of this action is also justified because NCR has individualized defenses as to virtually every Plaintiff. Those defenses include (but are not limited to) the fact that (1) NCR did not have knowledge of the off-the-clock work allegedly performed by an individual Plaintiff, (2) the specific nature of the off-the-clock work allegedly performed by an individual Plaintiff was insufficient to trigger the continuous workday doctrine, (3) the alleged off-the-clock work was *de minimis*, (4) NCR is entitled to a setoff based on an individual Plaintiff's having previously released his or her claims, and (5) an individual Plaintiff is simply not credible, as confirmed by his deposition testimony and the testimony of his TMs. This Court must "consider whether the defenses that apply to the opt-in plaintiffs' claims are similar to one another or whether they vary significantly." *Marshall*, 2012 WL 5499431, at *9; *see also Smith*, 2005 WL 5336571, at *3. Given Plaintiffs' varying allegations and experiences, "[t]he defense as to each Plaintiff would require consideration of different facts and individualized testimony that is unique to each Plaintiff and could not be generalized" across the collective. *See Kuznyetsov v. W. Penn. Allegheny Health Sys., Inc.*, No. 10-948, 2011 WL 6372852, at *6 (W.D. Pa. Dec. 20, 2011); *Proctor*, 250 F.R.D. at 283 (when "evidence shows a large factual variety

---

[51] Of the 1,600+ Plaintiffs in this action, 404 Plaintiffs (approx.. 25% of the collective) work or worked in California, Washington, New Jersey and New York. (Ex. 52, Tellado ¶ 4)

among the individual Plaintiffs' claims and the times they allege they worked off the clock," then

"Defendant's defenses would also vary").

### 1. Whether NCR Had Actual Or Constructive Knowledge Of The Alleged Off-The-Clock Work Will Require Individualized Inquiries

An employee asserting an overtime claim "must show" the employer "had actual or

constructive knowledge of [the] overtime work." *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177

(7th Cir. 2011); *see also Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 270-71 (7th Cir. 2014)

(employer has no obligation to pay for work it did not know about and had no reason to know about);

29 C.F.R. § 785.11.  NCR's right to contest liability to individual Plaintiffs based on a lack of

knowledge of their alleged off-the-clock work supports decertification.  *See, e.g., Blakes*, 2013 WL

6662831, at *14; *Camilotes*, 286 F.R.D. at 352-53; *Kuznyetsov*, 2011 WL 6372852, at *6; *Prise v.

Alderwoods Group, Inc.*, 817 F. Supp. 2d 651, 676 (W.D. Pa. 2011); *Smith*, 2005 WL 5336571, at *3;

*Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 468 (S.D.N.Y. 2011) ("In the absence of a

company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had

actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper

compensation.").

There is abundant testimony from the deponent Plaintiffs that they did not inform their TMs of

their alleged off-the-clock work, and, quite obviously, they did not report such work on their time

sheets.  (*See, e.g.*, Ex. 16, Flood Dep., 172:23-173:16; Ex. 42, Sauco Dep., 46:2-9; Ex. 18, Gathers

Dep., 43:1-3; Ex. 25, Johnson Dep., 41:13-15, 43:23-44:6; Ex. 27, Korinek Dep., 73:22-74:8; Ex. 24,

Jackson Dep., 104:2-14).  "If an employer establishes a reasonable process for an employee to report

uncompensated work time the employer is not liable for non-payment if the employee fails to follow

the established process … When the employee fails to follow reasonable time reporting procedures she

prevents the employer from knowing its obligation to compensate the employee and thwarts the

employer's ability to comply with the FLSA." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (affirming decertification and summary judgment for employer), *pet. for reh'g denied*, 134 S. Ct. 296 (Oct. 7, 2013). *See also Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 3777251, at *11 (W.D. Wis. July 19, 2013) ("It would be improper to hold defendants liable for plaintiffs' voluntary failure to comply with reasonable timekeeping procedures, particularly when there is no evidence that defendants discouraged plaintiffs from complying with the system or had any reason to believe plaintiffs would not comply with it."); *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230-31 (10th Cir. 2012) (affirming summary judgment for employer when plaintiff chose not to report hours worked from home on the defendant's timekeeping system in violation of company policy).

It is uncontested that Plaintiffs did not and do not perform their field work under the direct oversight of a TM. Rather, CEs are home-dispatched and work in the field without any "eye ball" supervision, and many of the off-the-clock work activities alleged in this case were purportedly performed at the CEs' *homes*. It follows that whether a particular TM knew or should have known that a particular Plaintiff was working off-the-clock is a highly-individualized and case-specific inquiry.

The deponent TMs uniformly testified that they do not have direct oversight over the CEs who report to them, and that they are unaware of any CEs working off-the-clock. (*See, e.g.,* Ex. 33, Oestricher Dep., 74:3-74:21 (explains that only the CE would know if they are receiving or reading assignments after hours because, even if it is put in their queue after hours, "they would only receive if they turn on their device and look."); Ex. 23, Ivic Dep., 73:11-22, 92:3-12 ("there's no way for me to know if they have been working at home or not"); Ex. 22, Isho Dep., 71:23-72:16 (explaining that his ability to see what a CE is doing on ES Mobility depends on the CE inputting accurate information); *see also,* Ex. 42, Sauco Dep., 46:12-19 (confirms he is alone when he is out in the field and that his TM "will never know" he is working off the clock); Ex. 51, Yowonske Dep., 43:24-44:5, 112:17-23 ("[TM]

doesn't know I do it" and TMs couldn't have known time entered was inaccurate))  Thus, the very nature and locations of the alleged off-the-clock work will require individualized inquires to determine if TMs *actually knew* of such work despite their sworn denials of any such knowledge.  *See generally MacGregor*, 2011 WL 2981466, at *5 (describing "necessity for independent inquiries into each alleged violation" when plaintiffs "worked independently in the field" and were instructed to take lunch breaks).

Individualized inquiries will also be necessary to determine whether TMs *should have known* that particular Plaintiffs were working off-the-clock at home or elsewhere.  *Cf. Gaines*, 742 F.3d at 270-71 (court could not make a reasonable inference that *anybody* knew plaintiff was performing pre-shift work simply because supervisors may have seen the plaintiff come to work early); *Schremp v. Langlade County*, No. 11-C-590, 2012 WL 3113177, at *4 (E.D. Wis. July 31, 2012) (the fact that plaintiff sometimes performed work outside his regularly scheduled work hours did not equate to employer knowledge that "he was not being *compensated* for such time") (emphasis in original)); *White*, 699 F.3d at 875 ("The relevant knowledge is not 'I know that the employee was working,' but "I know the employee was working and not reporting his time.'") (citations, quotations alterations, omitted)).

A few of the deponent Plaintiffs contend that they complained about or otherwise discussed off-the-clock work with their TMs.  (*See, e.g,* Ex. 35, Potter Dep., 61:11-65:13; Ex. 7, Bratt Dep., 50:22-51:25)  But even if such testimony is believed in the face of the sworn denials of the TMs, the fact that *some* Plaintiffs identified *some* TMs as culprits, when other deponent Plaintiffs disclaim any TM knowledge of their off-the-clock work, only underscores the need for individualized inquiries to adjudicate liability.  *See Richardson*, 2012 WL 334038, at *5 ("Plaintiffs' own depositions reveal that

some managers had no knowledge and others had little knowledge about subordinates' alleged off-theclock [sic] work activities.").[52]

### 2. NCR Has Additional Individualized Defenses

It is impractical in this memorandum to identify _all_ of the individual defenses applicable to each of the 1,600+ Plaintiffs in this action. Suffice it to say that discovery in this case has provided NCR with ample evidence of decidedly unique defenses as to particular Plaintiffs.

For example, some Plaintiffs may argue that their first and last work activities (however minimal) marked the start and end of their compensable work day under the "continuous workday doctrine." _See IBP, Inc. v. Alvarez_, 126 S. Ct. 514, 520-21 (2005). But determining whether any alleged pre- and post-shift activity triggers the continuous workday rule is a task completely at odds with collective treatment. _See Marshall_, 2012 WL 5499431, at *10 ("[T]here is no required series of events that begins or ends all Plaintiffs' work days, and there is no common routine among the Plaintiffs in terms of their pre-and post-shift actions. To the contrary, the Plaintiffs differ both in what they do before and after their shifts and in what their principal activities are."); _Ginsburg v. Comcast Cable Commnc'ns MGMT LLC_, No. C11-1959RAJ, 2013 WL 1661483, at *7 (W.D. Wash. Apr. 17, 2013) (explaining that an employee may log-in early not to work but for personal reasons or as a matter of convenience, and that such activity does not trigger the continuous workday rule).

---

[52] In fact, courts have denied certification when faced with far stronger evidence of management knowledge of the alleged off-the-clock work. _See, e.g._, _Prise_, 817 F. Supp. 2d at 662-63 (decertification proper notwithstanding testimony of managers changing employees' timesheets); _Slayton v. Iowa College Acquisition Corp._, No. 09 C 6977, 2010 WL 3937455, at *3 (N.D. Ill. Oct. 5, 2010) (Lindberg, J.) (denying Rule 23 certification despite evidence of management requesting time card be changed because it contained unauthorized overtime and managers being observed on several occasions reducing employees' time before approving it); _Diaz v. Elecs. Boutiques of Amer., Inc._, No. 04-CV-0840E(SR), 2005 WL 2654270, at *5 (W.D.N.Y. Oct. 17, 2005) (allegations that plaintiff's "timesheets were altered to delete overtime hours worked [ ] are too individualized to warrant collective action treatment," as "[plaintiff]'s off-the-clock claims require an examination by the Court of when he was scheduled to work, when he actually worked, whether he was paid for such and whether [the manager] altered his timesheets and, then, the Court would to have [sic] conduct the same inquiry as to each other class member.").

Moreover, NCR is entitled to present evidence that an individual Plaintiff engaged in so much personal activity while also purportedly "working" that the "work" in question could not possibly trigger the continuous workday rule.[53]

NCR also is entitled to argue on an individualized basis that any alleged off-the-clock work by a particular Plaintiff is non-compensable under the *de minimis* doctrine. *See Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 593 (7th Cir. 2012), *aff'd*, 134 S. Ct 870 (2014); 29 C.F.R. § 785.47 ("In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are *de minimis*."). The deponent Plaintiffs' testimony regarding how much time they spent on off-the-clock work varies dramatically, with no fixed pattern as to what the individual deponents did and or how long they spent doing it. Moreover, the fact that some deponent Plaintiffs testified that they engaged in the same pre-shift activities, but gave wildly divergent estimates of the amount of time required for such activities, raises individual credibility issues that NCR is also entitled to assert in its defense. *See, e.g.*, *Hawkins v. Securitas Sec. Servs.*, 280 F.R.D. 388, 400-402 (N.D. Ill. 2011) (Feinerman, J.) ("The applicability of [the de minimis] defense, and thus liability . . . cannot be resolved on a classwide basis"); *Marshall*, 2012 WL 5499431, at *8; *Briggins*, 882 F. Supp. 2d at 1277; *Zivali*, 784 F. Supp. 2d at 468.

NCR also has individualized defenses that arise out of individual and class action settlement agreements between NCR and some of the Plaintiffs. Several California Plaintiffs admit that they received settlement proceeds from the resolution of a prior wage and hour class action. (*See, e.g,* Ex.

---

[53] Ex. 24, Jackson Dep., 86:15-87:4, ("At 5:00 o'clock, I look at the phone to see if there's anything that I need to be aware of now that I don't have to address until I start at 8:00 o'clock. But I might spend five, 10 minutes looking at that now and then go take a shower…. Maybe I'm looking at some stuff while I'm eating breakfast between 6:30 and 7:00 o'clock."); 29 C.F.R. § 785.16(a) ("Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked.")

42, Sauco Dep., 113:9-115:18; Ex. 40, Santos D. Dep., 95:10-100:13; Ex. 24, Jackson Dep., 98:12-100:22; Ex. 28, Lane Dep., 102:24-103:25; Ex. 52, Tellado ¶ 5)  Additional Plaintiffs admit that they received severance payments as part of a reduction in force and in exchange for releases.  (*See* Ex. 24, Jackson Dep., 98:12-100:22)

Finally, the use of collective procedures in this case will inevitably prevent NCR from presenting full and complete cross-examination evidence in its defense.  *See, e.g.*, *Briggins*, 882 F. Supp. 2d at 1276 (recognizing that credibility is an issue for the jury, and "defendants would have to question and impeach individual plaintiffs, because no representative testimony exists as to the extent of a plaintiff's unpaid overtime").  NCR is entitled to challenge the veracity of each Plaintiff's allegations of off-the-clock work, including the nature, reasons and extent of such work, and whether the Plaintiff's TM was aware of that work.  (*See, e.g,* Ex. 22, Isho Dep., 64:3-17 (when he was a TM, he scheduled "administrative time" for his CEs "all the time"); Ex. 26, Karruli Dep., 93:13-94:24 (he has never had a CE complete training off the clock and that he receives an email notification when someone completes a training so if he say they completed it off the clock he would address it, but it hasn't happened)) Certain Plaintiffs have already provided deposition and/or declaration testimony that is demonstrably false, making cross-examination that is unfettered by the time constraints of collective procedures so important.  (*See, e.g.*, Ex. 16, Flood Dep., 248:6-274:15 (detailed cross-examination of Plaintiff Flood's submitted declaration identifying mischaracterizations and misrepresentations).  Only individual trials will fully allow NCR to cross-examine each Plaintiff.  *See, e.g.*, *Briggins*, 882 F. Supp. 2d at 1275 (individualized defenses implicated when the time entries of at least two plaintiffs contradicted their deposition testimony).

In sum, given all the inconsistencies and contradictions in the testimony of the deponent Plaintiffs, "there is no reason to think that any [Plaintiff] can give truly representational testimony

regarding the collective habits of [other CEs][.]" *See Blakes*, 2013 WL 6662831, at *15; *see also Martin*, 2013 WL 1234081, at *6 ("[E]ven if a successful cross examination left a trier of fact questioning one Plaintiff's veracity, the same juror would have little sense as to whether the hundreds of other Plaintiffs were truthful in claiming that they were denied overtime.").

### D. Fairness and Procedural Concerns Require Decertification

#### 1. A Collective Action Would Prove Unmanageable and Inefficient

Collective actions are meant to benefit the judicial system "by [the] efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [illegal] activity." *Hoffman-La Roche Inc. v. Sperling*, 110 S. Ct. 482, 486 (1989). But the qualifiers here – "common issues . . . arising from the same alleged [illegal] activity" – are important. It is axiomatic that the benefits of efficiency do not reduce (much less eliminate) the right to due process. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008); *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1241 (N.D. Ala. 2012) ("The efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of Dollar Tree's due process rights."). Moreover, there is no efficiency to be gained through a collective trial where individualized evidence is necessary to resolve the claims at issue. *Kuznyetsov*, 2011 WL 6372852, at *7; *see also Camilotes*, 286 F.R.D. at 353 (plaintiffs' desire to litigate collectively for economic reasons "does not override the negative effects that certification is very likely to have on the fairness and manageability of the proceedings").

Here, adjudicating all of Plaintiffs' claims collectively will necessarily violate NCR's due process rights by depriving NCR of the opportunity to present all of its defenses – defenses that are individualized and Plaintiff-specific. The many dissimilarities exposed amongst the 40 Plaintiffs who have been deposed in this case confirm that collective adjudication of the claims of 1,600+ Plaintiffs based on representative evidence is impossible. *See Proctor*, 250 F.R.D. at 284 ("In this case, there is no consistency among the testimony, there is no consistently applied policy resulting in working off the

clock, and the time spent working off the clock is not alleged to be uniform or of a predetermined duration."); *Briggins*, 882 F. Supp. 2d at 1276 (calling use of representative testimony "dubious given the inconsistencies that defendants have already highlighted among the small sample of plaintiff depositions").

Moreover, there are no common records or documents to facilitate the collective adjudication of Plaintiffs' claims. For instance, no records reflect when a particular Plaintiff helped his buddy after his shift, or the amount of time another Plaintiff spent organizing his truck, or the time another Plaintiff spent processing parts on a Saturday. (*See, e.g,* Ex. 9, Bucher Dep., 39:23-41:2, 54:25-55:4, 72:7-20 (confirms there is "no mechanism in place that would consistently measure" his alleged pre-shift off-the-clock work); Ex. 37, Redding Dep., 16:12-20; 71:16-24 (has not "kept track" of alleged off-the-clock emails and calls from coworkers and managers)) And none of the deponent Plaintiffs kept any record of his or her alleged off-the-clock work time.[54]

In short, the resolution of this case will require an amalgamation of mini-trials, where individual Plaintiffs present evidence that they worked off-the-clock with the knowledge of their TM, and NCR then defends itself through Plaintiff-specific cross-examination, the denial testimony of the relevant TMs, and such other exculpatory evidence as may exist. "Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *Zivali*, 784 F. Supp. 2d at 469 (citations and quotations omitted); *see also Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 108 (N.D. Ill. 2013) (Gottschall, J.) (describing how the "need to address individualized factual issues weighs in favor of decertification"); *Martin*, 2013 WL 1234081, at *8 ("Any efficiency gained through bringing this action collectively

---

[54] *See, e.g.,* Ex. 16, Flood Dep., 100:21-101:12, 224:2-10, 225:8-23, 235:18-236:2 (no records of alleged off-the-clock work performed); Ex. 30, Meadows Dep., 52:3-52:21 (same); Ex. 10, Charles Dep., 48:19-49:22 (same); Ex. 42, Sauco Dep., 111:12-15; Ex. 11, Clark Dep., 87:10-88:1, 89:10-13; Ex. 34, Pfiester Dep., 35:12-36:11, 45:22-46:9

would be outweighed by the substantial likelihood of 'mini-trials' and the risk of prejudice to both parties."); *Smith v. Family Video Movie Club, Inc.*, No. 11 CV 1773, 2013 WL 1628176, at *11 (N.D. Ill. Apr. 15, 2013) (Lee, J.) (class certification denied on off-the-clock claims in light of individualized inquiries); *Rosenberg v. Renal Advantage, Inc.*, No. 11-cv-2152-GPC-KSC, 2013 WL 3205426, at *12 (S.D. Cal. June 24, 2013) ("The Court would have to resort to a series of mini-trials to determine hours worked for each class member."); *Hernandez v. Ashley Furniture Indus., Inc.*, No. 10-5459, 2013 WL 2245894, at *8 (E.D. Pa. Mar. 22, 2013) (ascertaining allegedly uncompensated meal break work would require individualized inquiries); *Doyel v. McDonald's Corp.*, No. 4:08-CV-1198 CAS, 2010 WL 3199685, at *7 (E.D. Mo. Aug. 12, 2010) (evidence supporting off-the-clock claim "would have to be testimonial"); *Lawrence*, 2004 WL 945139, at *2 (evidence to support claims of off-the-clock work involve questions of fact that "will likely differ for each Plaintiff and will be unduly burdensome to both Defendant and to the Court in managing as a collective claim.").

### 2. Plaintiffs Have No Viable Method For Calculating Damages For All Plaintiffs

Finally, even if the Court were to find Plaintiffs "similarly situated" as to liability issues – which they are not – Plaintiffs' damages claims also reveal vast dissimilarity. The Supreme Court has made clear that whether presented in a class or an individual action, representative evidence that is based on implausible assumptions cannot "lead to a fair or accurate estimate of the uncompensated hours an employee has worked." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048-49 (2016); *see also Espenscheid*, 705 F.3d at 775-76 (finding that because the plaintiffs offered no feasible method to determine damages for the entire class, thousands of individual separate hearings on damages would need to be conducted, making a collective action improper).

Here, the deponent Plaintiffs generally testified that they have no way to calculate the amount of time they spent on off-the-clock work.[55]  When asked to describe and quantify their damages, the deponent Plaintiffs could do no more than regurgitate the boilerplate remedies available under the FLSA.  With only anecdotal, self-serving and largely contradictory testimony regarding damages available, it will be impossible for a factfinder to determine damages across the entire collective based on "plausible" representative evidence.

## V.     CONCLUSION

For all the foregoing reasons, NCR requests that the Court grant its motion to decertify the collective, and dismiss without prejudice the claims of all Plaintiffs who have filed consents to join this litigation.

---

[55]  *See, e.g,* Ex. 16, Flood Dep., 225:24-229:4 (admits that time spent on alleged off-the-clock varied and would be unable to calculate); Ex. 24, Jackson Dep., 87:19-88:18 (same); Ex. 34, Pfiester Dep., 35:12-36:11, 45:22-46:9 (confirms he has not kept any record of alleged off-the-clock work and there is no way to really determine the entire amount without guessing); Ex. 50, Wilson Dep., 128:18-129:15 (explains it would be "hard to calculate" how much he allegedly worked off-the-clock); Ex. 17, Galle Dep., 57:9-20 ("I wouldn't know how to place a number" on how often he responds to e-mails pre-shift, but it is "not every day"); Ex. 25, Johnson Dep., 36:21-37:20 ("It could be as little as five minutes, it could take me as much as 45 minutes… it was never consistent because the work was never consistent.")

Date:   July 12, 2019

Respectfully submitted,

NCR CORPORATION

By:____/s/ *Thomas E. Hill*_____
One of Its Attorneys

Thomas E. Hill (*admitted pro hac vice*)
Christina T. Tellado (*admitted pro hac vice*)
Deisy Castro (*admitted pro hac vice*)
HOLLAND & KNIGHT LLP
400 S. Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: (213) 896-2400
Fax: (213) 896-2450
thomas.hill@hklaw.com
christina.tellado@hklaw.com
deisy.castro@hklaw.com

Jennifer J. Froehlich (Bar No. 6295017)
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Tel: (312) 263-3600
Fax: (312) 578-6666
jennifer.froehlich@hklaw.com

Attorneys *for NCR Corporation*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 12, 2019, I filed the foregoing document with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system which automatically served all counsel of record.


*/s/ Thomas E. Hill*
Counsel for Defendant