UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL MEADOWS, <br><br> Plaintiff, <br><br> v. <br><br> NCR CORPORATION, <br><br> Defendant. | No. 16 CV 6221 <br><br> Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Michael Meadows sued his former employer, NCR Corporation, to collect unpaid overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, and Illinois's minimum wage law, 820 ILCS 105/1, *et seq.* A jury found in Meadows's favor, concluding that Meadows worked 1,560 hours of unpaid compensable overtime during a six-year span. Contending that the jury's verdict is at odds with the manifest weight of the evidence, NCR moves for a new trial under Rule 59(a). The motion is denied.

**I.    Legal Standards**

The court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Bowers v. Dart*, 1 F.4th 513, 521 (7th Cir. 2021) (quoting *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014)). When considering whether the jury's verdict goes against the manifest weight of the evidence, the court must perform "its own

assessment of the evidence presented." *Lewis v. McLean*, 941 F.3d 886, 893 (7th Cir. 2019) (quoting *Mejia v. Cook Cty.*, 650 F.3d 631, 634 (7th Cir. 2011)). When doing so, the court analyzes the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citation omitted).

At the same time, a jury's verdict will be set aside "only if 'no rational jury' could have rendered the verdict." *Bowers*, 1 F.4th at 521 (quoting *Willis*, 687 F.3d at 836). Courts should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Est. of Burford v. Acct. Prac. Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (citation omitted). Jury verdicts "deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Moore ex rel. Est. of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995)). The court's "narrow" role is to determine whether a "reasonable basis exists in the record to support the verdict." *Lewis*, 941 F.3d at 893 (citation omitted); *see also Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) ("We uphold a jury verdict on appeal as long as a reasonable basis exists in the record to support this verdict.").

## II.    Background

From 2008 to 2019, Meadows was employed by NCR as a customer engineer. Trial Tr. at 36:8–10, 38:6–39:1.[1] Meadows's job involved servicing NCR's products, including cash registers and other electronic devices at the locations of NCR's customers. *Id*. at 36:18–23. He used a company-owned vehicle to commute to and from daily assignments, and generally performed his work in the field, on his own, and without any direct on-site supervision. *Id*. at 36:21–37:3. Meadows received an hourly wage and was eligible for overtime pay. *Id*. at 36:10–11. In 2016, Meadows filed this suit against NCR under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, and Illinois's minimum wage law, 820 ILCS 105/1, *et seq.*, alleging that NCR failed to pay him for overtime he had worked. *See* [1].

The case proceeded to trial, where Meadows sought to recover unpaid overtime wages from June 2013 to May 2019 (when he retired). Trial Tr. at 39:19. Meadows testified that his shifts started at 8:00 a.m. and ended at 5:00 p.m. (except between 2014 and 2017, when his supervisor allowed him to work through his lunch hour and end his shift at 4:00 p.m.). *Id*. at 40:23–25, 43:2–12, 76:2–4. Meadows said that he typically started performing work at 7:20 a.m. and would work until he left for his first call at 7:30 a.m. *Id*. 49:1–14. During those ten minutes, Meadows would review emails from his supervisors to prioritize calls and find out where he was going for the day. *Id*. at 47:10–14. He would also review the calls in his queue, develop a route,

---

[1] The trial transcript can be found at [331], [332], and [333]. Bracketed numbers refer to entries on the district court docket. Other than in citations to the trial transcript, referenced page numbers are taken from the CM/ECF header placed at the top of filings.

3

check to see if he had parts, inherit calls from other customer engineers, and track down missing parts. *Id*. at 47:21–48:7, 50:11–14. Meadows also testified that he performed work over the phone during his commute almost daily from about 7:30 a.m. until 7:50 a.m. *Id*. 49:15–50:9. According to Meadows, each of his supervisors told him that he would not be paid for any pre-shift work. *Id*. at 79:18–80:2.

Meadows also testified that NCR had a policy that customer engineers were supposed to take an hour-long unpaid meal break each day, but the policy was not consistently enforced. *Id*. 74:15–21. For example, one of Meadows's supervisors, Frank Ivic, did not have a problem with Meadows working through lunch. Under Ivic's supervision from 2014 to 2017, Meadows typically worked from 8:00 a.m. to 4:00 p.m. with no meal break. *Id*. at 76:2–4, 112:25–113:6. Meadows testified that his next supervisor, on the other hand, required him to take unpaid lunches during which Meadows would receive calls and typically work 10 to 15 minutes. *Id*. at 76:6–77:20. Meadows also said that it ordinarily took him five minutes to enter his time after his shift ended. *Id*. at 78:12–14.

Meadows later estimated that he worked off the clock for "around 40 minutes" a day. *Id*. at 81:13. When asked how many hours a week he typically spent performing pre-shift, meal-break, or post-shift work for NCR, Meadows said: "I would say probably five hours a week. … Five, six, at the most. Six, probably. Five or six." *Id*. at 82:1–3.

On cross examination, Meadows admitted that none of his supervisors ever told him to work off the clock. *Id*. at 90:10–91:3. NCR's customer engineer handbook

4

stated: "All work time is compensable time. Employees are required to document and report all time worked." Exhibit 4 at 447. The handbook also noted that "NCR strictly prohibits all non-exempt employees, including [customer engineers], from performing any work 'off the clock.' All time worked must be accurately recorded and paid." *Id.* at 455. The handbook listed examples of proscribed off-the-clock work, including reading or responding to work e-mails, answering calls, processing or ordering parts, and inputting details about calls. *Id.* It also stated that "[n]o work should be performed during the first and last thirty (30) minutes of your commute" including "taking calls or answering emails when they take more than one or two minutes to complete." *Id.* at 449. Any such work performed during commute time "must be recorded and you will be compensated for it." *Id.*

Meadows acknowledged that the handbook said these things, but also said "that's not reality" and while "[i]t may be in the policy, … it's not how we could complete our job." Trial Tr. at 100:15, 100:23–24. Meadows said that while nothing in NCR's policy permitted or directed customer engineers to work off the clock, it was "the managers you were working for." *Id.* at 106:13–17. And while NCR's policy barred work during unpaid meal periods, Meadows testified that his supervisors interrupted his lunch many times. *Id.* at 114:17–18.

Meadows also testified that "I'm sure I took all of my vacation time I had earned." *Id.* at 119:8. Defense counsel showed Meadows three wage statements from the end of the years 2013, 2014, and 2015, respectively, to refresh Meadows's recollection about the vacation, holiday, and sick time he received for those years.

5

Meadows confirmed that in 2013 he received 136 hours of vacation, 48 hours of floating holiday pay, 48 hours of holiday pay, and 8 hours of sick time. *Id*. at 122:17–23. He also testified that in 2014 he received 120 hours of vacation, 40 hours of floating holiday time, 48 hours of holiday time, and 11 hours of sick time. *Id*. at 124:13–20. Finally, Meadows testified that in 2015 he received 104 hours of vacation, 56 hours for floating holidays, 48 hours for holidays, and 17.5 hours for sick time. *Id*. at 125:24–126:7. When asked if he continued to take vacation, holiday, floating holiday, and sick time in the following years until his retirement, Meadows responded: "I'm sure I took … vacation every year, yes." *Id*. at 127:8–10. He also acknowledged that he did not work overtime when he was on vacation. *Id*. at 127:16.

The jury heard testimony from other witnesses too. Mariana Hall, a former NCR human relations employee, testified about compensable work at NCR. She said that "anything that would take more than three minutes to complete would be considered work time" and "[i]f any action takes longer than three minutes to complete, you should receive payment for that." *Id*. at 153:17–21. Hall further testified that mapping routes for the day, loading vehicles with parts and equipment, providing estimated arrival times to NCR customers, and receiving calls would all constitute compensable work time if the actions, either individually or collectively, took longer than two minutes to complete. *Id*. at 162:14–164:15. Finally, Hall testified that while the first 30 minutes of a customer engineer's commute time were not compensable, if a customer engineer performs any work during the commute time (such as taking a phone call from a supervisor), that time would be compensable work

6

time. *Id.* at 164:20–165:7. And Frank Ivic and Gary Chardavoyne, two of Meadows's former supervisors at NCR, testified that reading and responding to e-mails, answering or making work calls, picking up parts, attending meetings, and reviewing orders were all examples of compensable work. *Id.* at 213:9–214:9, 322:5–17.

The jury returned a verdict in Meadows's favor, finding that NCR had willfully violated the FLSA. *Id.* at 404:7–404:12. The jury determined that Meadows proved that he worked 1,560 hours of compensable unpaid overtime: 260 hours of unpaid overtime from June 16, 2013 through June 16, 2014 (5 hours per week); 1,240 hours from June 17, 2014 through February 18, 2019 (5.10 hours per week); and 60 hours from February 19, 2019 through May 31, 2019 (4.14 hours per week). *Id.* at 404:13–20. NCR contends that the manifest weight of the evidence does not support the jury's findings on liability, willfulness, or total compensable unpaid overtime hours. Accordingly, NCR moves for a new trial under Rule 59(a).

### III. Analysis

Under the FLSA, employers must pay overtime to non-exempt employees who work more than forty hours in a work week. 29 U.S.C. § 207(a). The law defines "employ" as "to suffer or permit to work." *Id.* § 203(g). This "broad definition is central to the purpose" of the FLSA because it "helps prevent evasion by employers who might seek to issue formal written policies limiting overtime that are widely violated, or who might deliberately close their eyes to overtime work their employees are doing." *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017). The employee bears the burden of proving that he performed overtime work, that his employer had actual

7

or constructive knowledge of the overtime work, and that he was not compensated for that work. *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173, 177 (7th Cir. 2011). An employer must compensate an employee for work that it knows about or should have known about through the exercise of reasonable diligence, but it need not pay for work it did not know about and had no reason to know about. *See Allen*, 865 F.3d at 938–39; *Kellar*, 664 F.3d at 177.

Not all work-related activities are compensable under the FLSA. *See* 29 U.S.C. § 254. The FLSA applies to an employee's "principal activity." *Chagoya v. City of Chicago*, 992 F.3d 607, 618 (7th Cir. 2021). "Principal activity" is activity that the employee is employed to perform, and it includes all activities that are "integral and indispensable" to those activities. *Id.*; 29 C.F.R. § 790.8(b); *see also IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005). An activity is "integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014). On the other hand, incidental activities such as "ordinary commute times and preliminary and postliminary activities that occurred before or after the workday" are generally not compensable under the FLSA. *See Chagoya*, 992 F.3d at 617. But an employer is not relieved from FLSA liability when it agrees to compensate otherwise non-compensable activity through contract, custom, or practice. *See* 29 U.S.C. § 254(b). Here, the parties stipulated that Meadows's claims were not

8

predicated on NCR's "alleged failure to pay [Meadows] all wages due for commute time." Trial Tr. at 37:9–14.

As for damages, the plaintiff "bears the burden of proving that [he] performed overtime work for which [he] was not properly compensated." *Brown v. Fam. Dollar Stores of IN, LP*, 534 F.3d 593, 594 (7th Cir. 2008). But when an employer's "records are inaccurate or inadequate … an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). After doing so, the burden "shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id*. at 687–88. Here, Meadows did not record his claimed overtime in NCR's system, and neither side had documents precisely calculating Meadows's claimed hours during the entirety of his employment. The jury had to make its calculation based on the credibility of Meadows's testimony.

### A. Liability

NCR argues that there's no reasonable basis for the jury's liability finding. It says Meadows's off-the-clock work before and after his shifts consisted entirely of non-compensable activities incidental to his commute, and that it did not agree by contract, custom, or practice to pay Meadows for any unrecorded time. In fact, NCR argues, its written policies prohibited Meadows from performing such work.

9

The jury's liability finding was reasonable. There was evidence at trial that NCR had a custom or practice of paying for otherwise non-compensable activities. A reasonable jury could have inferred from Hall's, Ivic's, and Chardavoyne's testimony that NCR had a custom or practice of compensating activities such as reading and responding to emails, making and answering work-related phone calls, loading the vehicle and securing parts, and any work-related action that took more than two to three minutes to complete. *See, e.g.*, Trial Tr. at 153: 17–21. NCR's CE handbook also noted that work performed during a customer engineer's commute included taking calls or answering emails that take more than one to two minutes to complete. *See* Exhibit 4 at 449. While NCR might have discouraged such work, a reasonable juror might infer that it had a custom or practice of compensating employees for such work when done during their commutes.

NCR argues, however, that it had no custom or practice of compensating "unrecorded" time, regardless of the activities involved. NCR asserts that "it matters not that [NCR] may have had knowledge of any unrecorded work if that work was in fact non-compensable." [342] at 15. But NCR conflates two distinct issues. First, the Section 254 inquiry looks at the type of activity involved and asks whether (1) it is principal activity or (2) it is non-compensable activity that an employer has nevertheless agreed to pay for by contract, custom, or practice. *See* 29 U.S.C. § 254(a)–(b). The focus is on the *activity* at issue, not whether the employee records his time spent on the activity. Just as NCR could not evade liability under the FLSA for failure to compensate an employee for principal activity simply because an employee failed

10

to record such time, neither can it escape liability if it has agreed through custom or practice to compensate certain incidental activities solely because an employee fails to record the time.

Instead, once the jury determined that NCR had a custom or practice of compensating Meadows's off-the-clock activities that lasted more than two to three minutes, the next question was whether NCR suffered or permitted Meadows to perform such work. *See* 29 U.S.C. § 203(g). NCR was required to compensate Meadows for work that it knew about or should have known about through the exercise of reasonable diligence. *See Allen*, 865 F.3d at 938–39; *Kellar*, 664 F.3d at 177. That includes work performed away from the job site or at home, so long as an employer knows or has reason to believe that the work is being performed. *See* 29 C.F.R. § 785.11–12.

Based on the evidence offered at trial, it was reasonable for the jury to find that NCR had actual or constructive knowledge of Meadows's off-the-clock work. Meadows testified that he received off-the-clock phone calls and emails—from supervisors and the control tower in Serbia—that he had to check before his shift to prioritize his calls for the day. Trial Tr. at 49:19–23; 52:23–53:5. Meadows told the jury that each of his supervisors told him that he would not be paid for any pre-shift work. *Id*. at 79:18–80:2. While Meadows acknowledged that NCR's handbook did not indicate that customer engineers should work off the clock, he asserted that "the managers [he was] working for" did. *Id*. at 106:13–17. And while NCR's policy barred

11

work during unpaid meal periods, Meadows testified that "many times" his supervisors interrupted his unpaid meal breaks. *Id*. at 114:17–18.

There's evidence in the record to support the jury's custom or practice finding as well as its finding that NCR knew or should have known that Meadows performed compensable off-the-clock work. The policy to require recording time and Meadows's failure to record time undermined the credibility of his testimony that he did the work and NCR knew about it, but not so much that it was a miscarriage of justice for a jury to credit Meadows. A jury could have reasonably concluded that Meadows's supervisors encouraged and endorsed off-the-books overtime without compensation.[2]

## B.  Damages (Total Hours)

The jury found that Meadows worked an average of just over 5 hours of overtime per week during the relevant period (1,560 total compensable unpaid overtime hours, divided by 309.5 weeks from June 16, 2013 to May 31, 2019). Trial Tr. at 404:13–20. In his testimony, Meadows offered three estimates of his off-the-clock work. Most specifically, Meadows testified that on a typical day, he performed about 30 minutes of pre-shift work, 10 to 15 minutes of meal-break work (except for when Ivic was his supervisor from 2014 to 2017), and about five minutes of post-shift work to enter his time (a total of 45 to 50 minutes per day). *Id*. at 50:7–9, 77:11–20, 78:9–14. Meadows later estimated that he worked off the clock for "around 40

---

[2] NCR also moves for a new trial on the jury's finding that NCR willfully violated the FLSA. *See* [334] at 1. NCR advances one argument on this front: there can be no willfulness finding if there's no overall liability. [335] at 18 n.12. The jury's liability finding is supported by evidence and NCR has provided no other basis to overturn the jury's willfulness finding, so that part of NCR's motion is denied.

minutes" per day. *Id.* at 81:9–16. Finally, Meadows estimated that he would work off the clock "probably five hours a week. … Five, six, at the most. Six, probably. Five or six." *Id.* at 82:1–3.

NCR seizes on Meadows's daily estimates and contends that the evidence does not remotely justify the jury's total-hours finding. Further, because the parties stipulated that commute time was not compensable, NCR argues, Meadows's time spent on phone calls during his pre-shift commute was not compensable. *See* [335] at 10. According to NCR, Meadows's testimony at most supports a finding that he worked 10 minutes per day before his shifts. NCR also contends that the jury's findings must have included meal-break time from the three-year period when Meadows admitted he did not take meal breaks. Accordingly, NCR calculates that the evidence at trial supported a finding that, at most, Meadows worked off the clock for 30 minutes a day (10 pre-shift minutes; 15 meal-break minutes; 5 post-shift minutes) in 2013, 2018, and 2019, and just 15 minutes per day (10 pre-shift minutes and 5 post-shift minutes) for the three years when Meadows did not take meal breaks. *See* [335] at 11–12. If the jury had employed such calculations, the number of total overtime hours would have been 580 hours, only about a third of what the jury found. NCR also points to Meadows's attorney's ask in her closing that the jury find that Meadows worked a "bare minimum" of "1.67 hours" of unpaid overtime per week. Trial Tr. at 373:9–10, 396:22–24, 397:11–13.

The jury reasonably could have landed on NCR's calculations, but it was not required to and there's a "reasonable basis" in the record to support the verdict. *See*

13

*Lewis*, 941 F.3d at 893 (citation omitted). Meadows testified that he worked off the clock for about 40 minutes per day, and he provided specific daily estimates that added up to 45 or 50 minutes of off the clock work. NCR disputes that the evidence supported a finding of 30 minutes of pre-shift work because 20 minutes of that time was commute time. Not so. Hall testified that NCR would compensate a CE for any work performed during commute that took longer than two to three minutes. That is distinct from the commute time itself. When coupled with Meadows's testimony that he almost daily fielded work phone calls during his commute to work, the jury could have reasonably found that Meadows performed 30 minutes of compensable pre-shift work.

A reasonable jury, moreover, could have accepted Meadow's more general estimates of his weekly off-the-clock work, even if those estimates exceeded his more specific daily approximations. NCR did not (and does not) dispute that it was the jury's province to decide whether to accept Meadows's testimony, in part, in whole, or not at all and to determine what weight, if any, to give to the testimony of each witness. *See* Trial Tr. 358:6–9; Federal Civil Jury Instructions of the Seventh Circuit, 1.13. It was reasonable for the jury to ground its calculations in Meadows's estimate of five to six hours per week, even if that figure exceeded his more specific daily estimates. Meadows's "testimony is sufficient to support the verdict." *Venson*, 749 F.3d at 658.

NCR says the jury's verdict must be overturned because the jury failed to account for holidays, sick time, or vacations, when Meadows admitted he worked no

14

overtime. *See* [335] at 5. But for starters, NCR did not conclusively establish the amount of vacation, holiday, or sick time Meadows actually used in any year. NCR instead presented Meadows with three paychecks to refresh his recollection regarding how much overtime, holiday, and sick time he had received in 2013, 2014, and 2015. While Meadows testified that he was "sure I took all of my vacation time I had earned," Trial Tr. at 119:8, NCR did not enter the paychecks into evidence nor present other evidence confirming that Meadows had in fact taken all of his accrued vacation time (as opposed to receiving that time). The jury was not required to accept Meadows's testimony about vacation time.

It is also possible, moreover, that the jury took Meadows's vacation time into account in calculating total hours. Recall that Meadows testified that he received 136 hours of vacation in 2013, 120 hours of vacation in 2014, and 104 hours in 2015. Trial Tr. at 122:17–126:7. The jury determined that Meadows had worked 260 hours of unpaid overtime from June 2013 to June 2014, or about five hours per week. Perhaps the jury determined that Meadows's estimate of six hours of unpaid overtime per week was the proper baseline. If it had done so, the jury would have initially determined that Meadows had worked 312 hours of unpaid overtime during that year. There was no evidence at trial showing when Meadows used his vacation time during 2013 or 2014, so the jury may have chosen to deduct 62 hours of vacation time from its total. And perhaps the jury's deductions for vacation time provide one possible explanation of why the jury's weekly averages slightly increased during the second period on the verdict form—Meadows received less vacation time in 2014 than in

15

2013, and less vacation in 2015 than in 2014. Whatever the jury's actual methods, finding that plaintiff worked approximately five hours of unpaid overtime per week—the lower bound of his weekly estimate—was not against the manifest weight of the evidence.

Finally, NCR argues that the jury improperly included overtime for meal-break work during the three-year period when Meadows admitted he did not take meal breaks, and for post-shift work that NCR could not have known about. But as with the vacation time, NCR has no way of knowing that the jury awarded any meal break time, or any post-shift time. The verdict form asked the jury to find the number of compensable off-the-clock hours Meadows's worked during time periods: June 16, 2013 to June 16, 2014; June 17, 2014 to February 18, 2019; and February 19, 2019 to May 31, 2019. There's no indication of how much (if any) time the jury credited for meal breaks and post-shift work.

This was not an open-and-shut case for Meadows. Far from it. There was evidence from which a jury could have dismissed his account of working on tasks in violation of company policy, and instead concluded that NCR put in place good-faith practices and procedures to prevent uncompensated overtime from ever occurring. And although I can evaluate witness credibility at this stage of the case—and might have reached a different conclusion than the jury—its decision did not shock the conscience. *See Prime Choice Servs., Inc. v. Schneider Logistics Transloading & Distribution, Inc.*, 861 F.3d 633, 635 (7th Cir. 2017) ("[A] judge can't set aside a jury verdict just because had he been a member of the jury he would have voted for a

16

different verdict."). This was a routine factual dispute entrusted to jurors and the verdict had a basis in the evidence.

## IV. Conclusion

NCR's motion for a new trial [334] is denied.

ENTER:

                                                                                              _____
                                                                                              Manish S. Shah
                                                                                              United States District Judge

Date: November 15, 2021